## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CARMEN M. SEGARRA, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. 13 CIV 7173 |
| v. | : | |
| | : | |
| THE FEDERAL RESERVE BANK of | : | JURY TRIAL DEMANDED |
| NEW YORK;  MICHAEL SILVA; | : | |
| MICHAEL KOH; and JOHNATHON | : | |
| KIM, | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff Carmen M. Segarra (hereinafter "Carmen" or "Carmen Segarra"), by and

through her attorney, Linda J. Stengle, Esq., brings this action against Defendants Federal

Reserve Bank of New York, Michael Silva, Michael Koh, and Johnathon Kim

(hereinafter "Defendants").  Plaintiff Carmen Segarra alleges as follows:

### I.  INTRODUCTION

1.  This action arises out of Defendants' violations of 12 U.S.C. § 1831 and other

   laws prohibiting obstruction and interference with a bank examiner's examination

   and retaliation for her preliminary examination findings.

2.  On October 31, 2011, Carmen Segarra accepted full time employment offered to

   her by Defendant Federal Reserve Bank of New York.  Carmen's title was Senior

   Bank Examiner, and she was assigned to examine the Legal and Compliance

   divisions of the Goldman Sachs Group (hereinafter "Goldman" or "Goldman

1

Sachs").

3.  Through their misconduct, Defendants repeatedly obstructed and interfered with Carmen's examination of Goldman over several months.  Finally, in May 2012, Defendants directed Carmen to change the findings of her examination.  Carmen refused.  Because Carmen refused to change her findings, Defendants terminated her three business days later, on May 23, 2012.

4.  In addition, Defendants improperly caused Carmen Segarra reputational and professional harm by firing her for cause.  Specifically, they fired her because they suddenly, after months receiving evidence, changed their position and said Carmen's finding that Goldman Sachs had no conflict of interest policy in compliance with SR 08-08 was not credible.

5.  Defendants caused Carmen Segarra's career in banking to be irreparably damaged.

6.  Plaintiff Carmen Segarra seeks reinstatement to her position as Senior Bank Examiner, back pay, compensation for lost benefits, compensatory damages, punitive damages, and attorney's fees, costs, and expenses, in an amount determined by the Court, to redress Defendants' illegal and improper conduct.

## II. JURISDICTION AND VENUE

7.  This Court has jurisdiction over the subject matter of this action: (i) pursuant to 12 U.S.C. § 1831, which specifically confers jurisdiction of this Court for violations of 12 U.S.C. § 1831; and (ii) pursuant to 28 USC § 1331, which confers federal subject matter jurisdiction.

8.  This Court has supplemental jurisdiction over the state law claims under

28 U.S.C. § 1367.

9.   Venue is proper in this District because Defendants conduct business in this District, and acts giving rise to this Complaint originated in this District.

## III. PARTIES

10.   Plaintiff Carmen Segarra attended Harvard, Columbia, and Cornell University Law School and is an attorney who works in banking. She was employed by Defendant Federal Reserve as Senior Bank Examiner from October 31, 2011, through May 23, 2012. Prior to her employment with the Federal Reserve, Carmen served as Legal Counsel for Societe Generale, as Legal Counsel for MBNA, and as Senior Legal Counsel for Citi. Carmen Segarra resides in New York.

11.   Defendant Federal Reserve Bank of New York (hereinafter "Defendant Federal Reserve" or "FRNBY") is located at 33 Liberty Street in New York, NY 10045. The Federal Reserve Bank of New York states on its web page that it "works within the Federal Reserve System and with other public and private sector institutions to foster the safety, soundness, and vitality of our economic and financial systems." There is a history of employees moving from employment at Goldman to employment at the Federal Reserve and vice versa. Top level management for the Federal Reserve worked at Goldman previously. There are also Federal Reserve personnel who are embedded at Goldman. Prior to 2011, approximately three Federal Reserve employees were embedded on site at Goldman, and one of those employees was Michael Koh.

12.   Defendant Michael F. Silva is a relationship manager for the Federal Reserve

Bank of New York at 33 Liberty Street in New York, NY 10045. Prior to serving as the relationship manager for the FRBNY-Goldman relationship, Silva was chief of staff to Timothy Geithner. According to FRBNY's web page, he is currently chief of staff and senior vice president for the Executive Group at the FRBNY. Silva first became employed by the Federal Reserve as a law clerk in 1992.

13. For all times relevant to this Complaint, Defendant S. Michael Koh was Michael Silva's deputy. Koh's title is Assistant Vice President. Before his employment at the Federal Reserve, Koh worked for Shearson Lehman Brothers.

14. Defendant Johnathon J. Kim was Carmen's supervisor and still works for the Federal Reserve Bank of New York at 33 Liberty Street in New York, NY 10045. He is the Supervising Officer of the Legal and Compliance risk team. On July 22, 2012, the Federal Reserve announced it had promoted Defendant Kim.

## IV. STATEMENT OF THE FACTS

15. In 2011, news sources published articles about 3 Goldman transactions that raised questions about Goldman's management of its conflicts of interest. The three transactions were known as Solyndra, Capmark, and El Paso/Kinder Morgan.

16. Defendant Federal Reserve Bank hired Carmen Segarra on October 31, 2011. Carmen's title was Senior Bank Examiner. Defendant Federal Reserve assigned Carmen to specifically examine Goldman Sachs's conflict of interest program and the three transactions discussed in the media - Solyndra, Capmark, and El Paso/Kinder Morgan.

17. Carmen's supervisor, Defendant Johnathon Kim, met with Carmen on November

1, 2011, to discuss Carmen's impending examination of Goldman's conflict of interest program. During that meeting, Defendant Kim provided Carmen with a copy of SR 08-08 to use as the basis of her examination of Goldman.  Defendant Kim also showed Carmen printed copies of emails written by Defendant Federal Reserve employees that discussed the Solyndra, Capmark, and El Paso/Kinder Morgan transactions.  In addition to examining Goldman's conflict of interest program, Defendant Kim assigned Carmen the responsibility of examining specific Goldman transactions, including Solyndra, Capmark, and El Paso/Kinder Morgan.

18. "SR 08-08" is the term bank examiners use to refer to Federal Reserve Supervision and Regulation 08-08 entitled "Complex Risk Management Programs and Oversight at Large Banking Organizations with Complex Compliance Profiles."  The Federal Reserve promulgated SR 08-08 on October 16, 2008, under the Federal Reserve's authority to issue banking supervision regulations under the Bank Holding Company Act of 1956 and the Federal Reserve Act.

19. SR 08-08 requires large complex banking organizations to implement a firmwide conflict of interest program that is documented with a set of policies and procedures and compliance risk management standards defined in SR 08-08.  SR 08-08 states, "*Firmwide compliance risk management refers to the processes established to manage compliance risk across an entire organization, both within and across business lines, support units, legal entities, and jurisdictions of operation. This approach ensures that compliance risk management is conducted in a context broader than would take place solely within individual business lines*

or legal entities. The <u>need for a firmwide approach to compliance risk management at larger, more complex banking</u> organizations is well demonstrated in areas such as anti-money laundering, privacy, affiliate transactions, <u>conflicts of interest</u>, and fair lending, where legal and regulatory requirements may apply to multiple business lines or legal entities within the banking organization. ... The processes established for managing compliance risk on a firmwide basis should be formalized in a compliance *program* that establishes the framework for identifying, assessing, controlling, measuring, monitoring, and reporting compliance risks across the organization, and for providing compliance training throughout the organization. A banking organization's compliance risk management program should be documented in the form of compliance policies and procedures and compliance risk management standards." (Emphasis added.)

20. Part of FRBNY's examination involved obtaining documents from Goldman. FRBNY would ask Goldman to produce documents to demonstrate Goldman's compliance with SR08-08 and to allow bank examiners to review Goldman's conduct in transactions. As Senior Bank Examiner, Carmen prepared the Document Requests for review and approval by Defendants. After the Defendants approved the Document Requests, they were sent to Goldman.

21. There were three Document Requests issued to Goldman about conflicts of interest practices during Carmen's employment with FRBNY. Goldman ignored the First Document Request.

22. Carmen asked Goldman for its firmwide conflict of interest policy. Goldman reported it had no firmwide conflict of interest policy on several occasions from

November 8, 2011, through May 23, 2012.

23. Defendant Federal Reserve's employees frequently discussed Goldman's lack of a firmwide conflict of interest policy.  Defendant Federal Reserve knew some of Goldman's divisions had allegedly adopted conflict of interest policies, and Defendant Federal Reserve also knew that none of the divisions' conflict of interest policies satisfied the requirements of SR 08-8.

24. At the direction of her supervisors, Carmen organized a meeting with Goldman scheduled for December 8, 2011, to discuss Goldman's conflict of interest program. At the meeting, Goldman stated it had no firmwide conflict of interest policy.

25. Goldman was also asked to discuss its role and potential conflicts of interest in the El Paso/Kinder Morgan transaction.

26. Gwen Libstag, on behalf of Goldman, said no one could have predicted El Paso would approach Kinder Morgan, and she said once Goldman discovered the situation, it had laid out the situation for the board in "excruciating detail." (See attached meeting minutes.)

27. Randy Stuzin, then current co-general counsel in London and Goldman's counsel for conflicts of interest, agreed with Libstag and told bank examiners that Goldman had board meeting minutes and email confirmation of the discussions.

28. When the bank examiners asked for documentation of the discussions, they found the written evidence produced by Goldman to be inconsistent with Stuzin's and Libstag's statements to bank examiners.

29. After the Goldman meeting, Defendant Michael Silva convened an impromptu

meeting with FRBNY employees, including Carmen.

30. During the impromptu meeting, Defendant Silva expressed alarm about the implications of Goldman's failure to properly manage conflicts of interest, should those failures become known to consumers and clients. To the meeting's participants, Defendant Silva said he believed Defendant Federal Reserve Bank of New York possessed information about Goldman that could cause Goldman to "explode." Silva noted Goldman personnel had "choked on the backchecking issues." (See 12.8.11 Meeting Minutes attached.) Defendant Silva expressed concern that Goldman would suffer significant financial harm if consumers and clients learned the extent of Goldman's noncompliance with rules on conflict of interest.

31. Defendants Silva and Koh realized an examination of Goldman's conflict of interest program might result in findings that could cause a consumer "run off." Defendant Silva became concerned large numbers of consumers and clients would discontinue use of Goldman's services if they knew Goldman had no effective way of managing conflicts of interest in financial transactions.

32. As Senior Bank Examiner assigned to examine Goldman's conflict of interest program, Carmen wrote the Federal Reserve's official meeting minutes for the December 8, 2011, meeting with Goldman. (See meeting minutes and notes attached.)

33. Susan Goldberg, an employee working on behalf of Defendants, reviewed Carmen's minutes for the December 8, 2011, Goldman meeting. Susan Goldberg discussed the content of the minutes with Defendant Silva.

8

34. On December 28, 2011, Goldberg asked Carmen to change her meeting minutes to delete references to Goldman's violations of SR 08-08. Carmen refused to change the minutes. (See meeting notes attached.)

35. Carmen complained about Goldberg's request to Defendant Kim. Defendant Silva and Defendant Koh became aware of Carmen's complaint.

36. On January 6, 2012, at 3:54 PM, Goldman emailed Defendant Federal Reserve information about a transaction known as the Santander transaction.

37. Defendant Federal Reserve assigned Carmen to review the Santander transaction as part of her work in examining Goldman.

38. Goldman personnel told Carmen Goldman had performed "AML due diligence" on the Santander transaction. Carmen asked for documentation of the AML due diligence, and Goldman admitted it had no documentation of any AML due diligence work for the Santander transaction.

39. In addition to finding that Goldman fabricated information about performing due diligence on the Santander transaction, Carmen's examination of the Santander transaction revealed Goldman misrepresented Defendant's approval of the transaction.

40. As of January 6, 2012, Defendant Federal Reserve had not approved the Santander transaction. Goldman stated to third parties that it had approval for the Santander transaction when Goldman did not have approval.

41. Carmen informed Defendants of Goldman's misrepresentation of the Federal Reserve's approval of the Santander transaction.

42. Without Carmen's prior knowledge, Defendant Koh discussed with Goldman

Carmen's finding of misrepresentation of the FRBNY's approval of the Santander transaction. Afterwards, Defendant Koh told Carmen Goldman admitted the misconduct. Defendant Koh told Carmen Goldman said it engaged in such misrepresentations "all the time." Koh said he did not think Goldman's misrepresentation was important, and Koh further opined that because the Santander transaction was closed, Goldman's misrepresentation about FRBNY's approval of the transaction was moot.

43. As Senior Bank Examiner, Carmen disagreed with Defendant Koh and believed Goldman's misrepresentations were improper and warranted attention. Carmen discussed Goldman's misrepresentations with the head of the Legal and Compliance group who agreed the conduct was inappropriate. He suggested to Carmen that FRBNY send a reprimand letter to Goldman and that she formally present the matter to the entire Legal and Compliance Risk team.

44. Defendant Koh was unhappy that Carmen pursued the issue. He complained about Carmen to Defendant Kim. In response to Defendant Koh's complaint, Kim forbade Carmen from discussing the Santander transaction with anyone else at the Federal Reserve Bank of New York.

45. Defendant Kim told Carmen not to discuss Santander with anyone who asked her questions about Santander, even attorneys from the Federal Reserve's Legal Department. Carmen asked Kim for a reason, and Defendant Kim stated, "Because I say so. For your protection."

46. Because Defendants prohibited Carmen from asking any further questions about Santander, Carmen could not finish her examination of the Santander transaction.

47. In January 2012, Carmen began meeting weekly with Goldman to discuss issues arising from her multiple ongoing examinations of Goldman, which included, but were not limited to, conflict of interest practices.

48. Around this time, Carmen began reviewing Goldman's CABS system, the system Goldman said it used to document and track conflicts issues. She continued her examination of the El Paso/Kinder Morgan, Capmark, and Solyndra transactions.

49. By February 2012, Defendant Silva was meeting regularly with Carmen to instruct her on how to go about her examination on Goldman.

50. On February 9, 2012, Carmen, as part of her examination, issued a Second Document Request to Goldman. The Second Document Request included requests for documents about conflict of interest practices and the El Paso/Kinder Morgan transaction. (See excerpts of response attached.) Goldman had ignored the First Document Request issued by FRBNY in November.

51. In February 2012, Una Neary of Goldman called the Federal Reserve and said Goldman was very nervous about producing the documents Carmen had requested. Neary asked for an extension and a face to face meeting to allow Goldman to present the documents to the bank examiners. FRBNY again agreed to a meeting, and after several weeks of comparing schedules, the meeting was set for April 25, 2012.

52. On February 22, 2012, Defendant Silva convened the FRBNY quarterly meeting with the Goldman's Legal Department. Carmen attended and asked questions about how Goldman managed conflicts of interest. Goldman reiterated the explanations and positions it took in the previous meetings with FRBNY held on

November 9, 2011, and December 8, 2011. (See meeting minutes for November 9, 2011, and December 8, 2011, attached.)

53. About a week later, on February 29, 2012, Judge Strine issued his decision in response to a shareholder petition asking to stop the El Paso/Kinder Morgan merger for which Goldman had been giving financial advice to El Paso.

54. In his decision, Judge Strine criticized Goldman's management of financial conflicts of interest at play in the proposed merger and noted "Goldman's huge financial interest in Kinder Morgan."

55. At one point in the decision, Judge Strine commented that "Goldman had its hands in the dough."

56. Judge Strine noted Goldman owned approximately $4 billion worth of Kinder Morgan stock.

57. Judge Strine also said, "Goldman's lead banker failed to disclose his own personal ownership of approximately $340,000 in Kinder Morgan stock, a very troubling failure that tends to undercut the credibility of his testimony and of the strategic advice he gave." The lead Goldman banker advising El Paso was Stephen Daniels. Stephen Daniels failed to tell El Paso that he personally owned $340,000 in Kinder Morgan stock.

58. Defendants became aware of Judge Strine's decision on March 1, 2012, when Bloomberg reported details of the decision in an article entitled, "Goldman Criticized by Judge on Kinder Morgan Deals."

59. Defendants gave Goldman permission to delay the production of documents and agreed to allow Goldman make its presentation.

60. Goldman's response to the Second Document Request showed it did not have a firmwide conflict of interest policy that complied with SR 08-08.  Goldman provided some procedures for individual divisions but had no policy in place firmwide. (See portions of Goldman's response to the Second Document Request attached.)

61. Contrary to Goldman's statements made to Carmen on December 8, 2011, Goldman now stated that no such documentation of a board review of conflicts in the El Paso/Kinder Morgan transaction existed.  Goldman now said no board minutes were involved in the Conflicts clearance process and now said the Conflicts Group for Goldman did "not confer with the Board of Directors of The Goldman Sachs Group, Inc. on specific transactions." (See Goldman response to questions about the El Paso/Kinder Morgan transaction attached.)

62. In response to requests by FRBNY for conflicts policies in effect as of November 1, 2011, Goldman produced procedures dated December 1 and 5, 2011, that appeared, on their face, to be the first ever conflicts of interest procedures for individual Goldman divisions.

63. On March 21, 2012, the Legal and Compliance risk team met all day.  Defendant Kim attended the meeting. The Legal and Compliance risk team is a group of FRBNY bank examiners charged with examining the Legal and Compliance divisions of major banks, specifically the largest banks supervised by FRBNY.

64. As part of the day's activities, Carmen reported in detail about her examination of Goldman's conflict of interest policies and Goldman's non-compliance with SR 08-08.  The group agreed Goldman's failure to comply with SR 08-08 warranted

mention in the annual report and/or examination letter to be issued by FRBNY to Goldman to cover the findings pertaining to the conflicts of interest program examination.

65. As of the end of the day on March 21, 2012, the Legal and Compliance risk team agreed Goldman's failure to comply with SR 08-08 should be labeled as a "Matter Requiring Immediate Attention" or a "Matter Requiring Attention." The Legal and Compliance risk team also approved downgrading Goldman's annual rating pertaining to policies and procedures to show Goldman had systemic policy and procedure issues due to its noncompliance with SR 08-08. (See Rating Sheet attached.)

66. Defendants Silva and Koh did not attend the daylong session on March 21, 2012.

67. On March 28, 2012, Carmen informed Defendants Silva and Koh about the decision of the Legal and Compliance risk team. Defendant Kim was in attendance. Defendants Silva and Koh also learned that the Legal and Compliance risk team planned to downgrade Goldman's annual rating pertaining to policies and procedures.

68. In early April, Carmen identified additional documents needed to complete her examination of Goldman's conflict of interest program and the El Paso/Kinder Morgan transaction. She prepared a Third Document Request. This Request was issued to Goldman on April 17, 2012.

69. On April 22, 2012, Goldman's responded to Third Request for Documents.

70. On April 23rd and 24th, Carmen analyzed the documents produced by Goldman with a New York state bank examiner. The two examiners finalized a list of 65

questions they had about Goldman's conflict of interest program.

71. On April 25, 2012, in the morning before the scheduled meeting with Goldman, Defendant Silva instructed Carmen not to ask Goldman any questions at all. For the first time, Silva said Carmen had to have her questions for Goldman pre-approved and asked if, in fact, Carmen had obtained prior approval for the questions she intended to ask Goldman at the meeting. Carmen responded that she had discussed the conflict of interest program questions with Defendant Johnathon Kim.

72. Defendant Silva relented, in part, and told Carmen she could ask Goldman the questions she had discussed with Defendant Johnathon Kim.

73. Defendant Silva told Carmen she was prohibited from asking about the El Paso transaction. Silva said Defendants had decided such questions would cause Goldman to "waive privilege."

74. FRBNY had never prevented Carmen from asking questions at meetings with Goldman before April 25, 2012, nor had Defendants ever before required Carmen to obtain prior approval for questions she wanted to ask at the meeting. Because she could not ask questions, Carmen could not complete her examination of the El Paso/Kinder Morgan transaction.

75. At the meeting, Goldman talked about Stephen Daniels, the Goldman employee Judge Strine said owned $340,000 of Kinder Morgan stock in the February 29, 2012, ruling about the El Paso/Kinder Morgan transaction. The SEC was in attendance and asked questions about Daniels. Goldman's responses to questions about Daniels were muddled.

76. From the muddled responses Goldman was making in response to questions, Carmen believed Goldman was reasoning it had no firmwide conflicts of interest policy in place, so Stephen Daniels had not violated a conflicts of interest policy, so Goldman did not have to discipline Stephen Daniels for failing to disclose his personal ownership of $340,000 in stock.  In other words, Goldman reasoned Stephen Daniels had done nothing wrong because Goldman had no conflicts of interest policy.

77. On April 25, 2012, after the Goldman meeting, Defendant Silva told Carmen to send the 65 questions she had prepared with the New York state bank examiner to Silva and other employees of the Federal Reserve.  Defendant Silva told Carmen the questions had to be reviewed and approved by the Defendant before they were issued to Goldman.

78. The questions were never approved by Defendants, and they were never asked of Goldman.

79. On May 3, 2012, Carmen met with Una Neary of Goldman for their regularly scheduled weekly meeting.  Carmen asked again about a firmwide conflict of interest policy, and Neary stated again that Goldman had no firmwide conflict of interest policy in compliance with SR 08-08.

80. Despite the restrictions placed on Carmen by Defendants, Carmen had nearly concluded her examination of Goldman's conflict of interest policies by the first week of May. Consistent with the decision of the Legal and Compliance risk team on March 21, 2012, Carmen was finalizing her report and preparing language that would be used to describe Goldman's noncompliance with SR 08-08 in the annual

letter to Goldman and the annual report of the bank examiners' activities. The annual letter and the annual report were issued each year in late May or early June. She was also compiling documentation needed for issuing MRIAs and MRAs.

81. Defendants knew Goldman had no firmwide conflict of interest policy in compliance with SR 08-08. Defendants also knew Carmen planned to identify Goldman's failure to comply with SR 08-08 in the annual report and the annual letter scheduled to be issued at the end of May and planned to identify the conflict of interest examination findings as "MRIA" or "MRA" either in the annual letter or a specific examination letter issued concurrently or shortly after the annual letter and report.

82. On May 11, 2012, Defendant Michael Silva stated he was considering adopting the position that Goldman had a conflict of interest policy.

83. A member of the Legal and Compliance risk team heard Defendant Silva's statement and became confused because he knew Silva's statement was contrary to Carmen's examination findings. The Legal and Compliance risk team member suggested Carmen send an email confirming her preliminary examination results about Goldman's noncompliance with SR 08-08.

84. Carmen sent the email to Defendants. (See Email sent from Carmen Segarra to Defendants Silva, Koh, and Kim and Tamara Marcopulos on May 11, 2012 at 12:49 PM attached.)

85. On May 11, 2012, in response to the email, Defendant Kim said Carmen's email was "premature" though he knew Carmen was simply repeating information that

had been shared with and approved by the Legal and Compliance risk team on March 21, 2012. (See Email sent from Defendant Kim to Carmen Segarra and Defendant Silva on May 11, 2012 at 5:41 PM attached.)

86. Two days later, on May 13, 2012, Defendant Silva stated he had found Goldman had a firmwide conflict of interest policy. Defendant Silva referenced a noncompliant mention of personal conflicts of interest in Goldman's 2011 Code of Business Conduct and Ethics. (See Email sent from Defendant Silva to Carmen Segarra on 5.13.12 at 11:32 PM attached.)

87. Defendant Silva was not a bank examiner. He was a "relationship manager" for Goldman. Defendant Silva had not conducted a formal examination of Goldman's conflict of interest program. Carmen did not work directly for Defendants Silva and Koh. Her supervisor was Defendant Kim.

88. On May 15, 2012, Defendants Silva and Koh met with Carmen and attempted to force her to change the findings of her examination of Goldman. They said they did not believe her finding that Goldman had no conflict of interest policy was "credible." Defendants Silva and Koh told Carmen that she had to "come off of that position."

89. To change her findings and to provide support for those false findings, Carmen would also have to alter, destroy, and or suppress meeting records and documents produced by Goldman in response to the examination questions and document requests. Such conduct was illegal and could subject Carmen to criminal charges. Carmen told Defendants Silva and Koh she did not believe it was responsible or proper to change her findings to say Goldman had a firmwide conflict of interest

policy when so much evidence existed showing Goldman's non-compliance. She emailed Defendant Silva to confirm her refusal to change her findings, and she emailed Defendant Kim to notify him of Defendant Silva's improper request.

90. Three business days later, on May 23, 2012, Defendants terminated Carmen and had security escort her from the building.   Defendants terminated Carmen because her bank examination found that Goldman had no conflict of interest program in compliance with SR08-08 and because Carmen refused to change her examination findings.

91. As a result of Defendants' improper termination, Carmen has suffered reputational harm and decreased employment prospects.

## V.  CAUSES OF ACTION

### COUNT ONE
### Violation of 12 U.S.C. § 1831
### Prohibitions for Terminating Bank Examiners
### for Engaging in Protected Conduct

92. All of the preceding paragraphs are reincorporated and realigned by reference, herein.

93. Defendant Federal Reserve is a "Federal reserve bank" as identified in 12 U.S.C. § 1831(a)(2).

94. Defendants Silva, Koh, and Kim are "employees of banking agencies" as identified in 12 U.S.C. § 1831(a)(2).

95. At all times relevant to this Complaint, Defendant Federal Reserve employed Carmen as a Senior Bank Examiner, and she provided information to the Federal Reserve regarding Goldman's violations of conflict of interest regulations and its misrepresentations to bank examiners.

96. Carmen's examination findings and related work activities were protected conduct as described within 12 U.S.C. § 1831's description of protected conduct.

97. Defendants terminated Carmen for finding Goldman did not have a firmwide conflicts of interest policy in compliance with SR 08-08 and for refusing to change her examination findings.

98. Defendants' termination of Carmen violated federal law 12 U.S.C. § 1831.

99. Because Defendants violated federal law 12 U.S.C. § 1831, Carmen is entitled to reinstatement to her position as Senior Bank Examiner, compensatory damages, and any other relief the Court deems appropriate.

100. Pursuant to 12 U.S.C. § 1831, the Court may also take any other appropriate actions to remedy any past discrimination.

101. These practices of Defendants were in violation of the Defendants' obligations to conduct bank examinations properly, a violation of which represents substantial damage to the public, which depends on the honesty and integrity of bank examiners and Federal Reserve employees.

102. Defendants' reckless conduct caused serious damage to Carmen's reputation and employment prospects. If allowed to go on unchecked, Defendants' conduct would have a chilling effect on bank examiners working for FRBNY. Defendants' conduct thwarts the very purpose of the Federal Reserve system.

103. Because the United States relies so heavily on the honesty and integrity of bank examiners and Federal Reserve employees, and because these Defendants failed to adhere to lawful conduct and instead obstructed Carmen's examination of Goldman, the Court can and should order Defendants to pay punitive damages.

20

## COUNT TWO
### New York General Business Law § 349

104. All of the preceding paragraphs are reincorporated and realigned by reference, herein.

105. Defendants improperly interfered with Carmen's examination because Defendants did not want consumers and clients of Goldman's services to become concerned about Goldman's failure to adhere to rules requiring Goldman to have a firmwide conflict of interest program in compliance with SR 08-08.

106. In other words, Defendants' acts were directed to consumers as described in New York Business Law § 349.

107. Defendants engaged in acts and practices that were deceptive and misleading in a material way. For example, Defendants stated that Goldman had a proper firmwide conflict of interest program when Goldman did not. Carmen uncovered specific examples of material violations during the time she worked as a Senior Bank Examiner.

108. Carmen has been injured by Defendants' deceptive and misleading acts and practices. She suffered economic loss and reputational damage.

109. Among other forms of redress, Carmen is entitled to reimbursement of reasonable attorney's fees under New York General Business Law § 349(h).

## COUNT THREE
### Wrongful Termination in Violation of Public Policy

110. All of the preceding paragraphs are reincorporated and realigned by reference, herein.

111. Defendants terminated Carmen Segarra in violation of Public Policy.

112. The federal government relies heavily on the honesty and integrity of bank examiners to examine financial institutions, like Goldman, and to determine their adherence to federal statutes, regulations, and rules. In part, this reliance informed federal statute 12 U.S.C. § 1831.

113. The public at large is benefited by proper bank examination.

114. The public policies of ensuring proper bank examinations and protecting bank examiner conduct under 12 U.S.C. § 1831 are substantial and fundamental to the economy and general welfare of the United States.

115. Because Defendants terminated Carmen in violation of public policy, the Court can and should order her reinstatement to the position of Senior Bank Examiner and damages for the injuries she incurred.

## COUNT FOUR
### Breach of Implied In Fact Employment Contract

116. All of the preceding paragraphs are reincorporated and realigned by reference, herein.

117. Carmen engaged in statutorily protected conduct when she worked as a bank examiner for Defendants.

118. Defendants cannot be considered At Will employers, because they must comply with federal statutes limiting their ability to hire and fire bank examiners.

119. In addition to having their ability to hire and fire bank examiners limited by statute, Defendants, in writing and verbally, cite numerous instances in which they assure bank examiners would receive training and other forms of supervisory assistance before termination.

120. Despite these prohibitions and statements, Defendants did not provide Carmen with supervisory assistance or remedial training when Defendants improperly "identified a problem" with Carmen's work performance.

121. Instead, Defendants improperly terminated Carmen for protected conduct and in violation of public policy.

122. Defendants did not terminate Carmen for good cause.

123. Defendants did not adhere to their many public statements about the autonomy of bank examiners.

124. Defendants violated their implied covenants of Good Faith and Fair Dealing, when they interfered with and obstructed Carmen's examination of Goldman Sachs.

## VI. PRAYER FOR RELIEF

WHEREFORE, Carmen Segarra prays:

a.   That the Court enter judgment against the Defendants;

b.   That the Court issue a Declaratory Judgment stating the Defendants illegally interfered with Carmen Segarra's bank examination and with her bank examination findings;

c.   That the Court order Defendants to reinstate Carmen Segarra to her position of Senior Bank Examiner;

d.   That the Court award Carmen Segarra damages in an amount equal to all of her accumulated lost wages and benefits, including back pay and benefits; compensatory damages; and punitive damages; for the harm caused by the

23

Defendant, including prejudgment and post judgment interest and any other

damages permitted;

e.   That the Court award Carmen Segarra payment of all fees, costs, expenses, of this

action, including attorney's fees and expert witness fees.

f.   That the Court order any other relief as the Court deems just and proper.

## VII. JURY DEMAND

Plaintiff Carmen Segarra respectfully requests a trial by jury to resolve all claims in this

action.


Respectfully Submitted,


LINDA J. STENGLE, ESQUIRE
Stengle Law
New York Bar No.:   4848958
SDNY Bar No.: LS3756
9 Lenswood Drive
Boyertown, PA 19512
(610)367-1604


Date:  October 10, 2013

24

# Appendix

# A

# INDEX

12.8.12 Handwritten Meeting Notes

12.28.12 Handwritten Meeting Notes

Excerpts From Goldman's Response to FRBNY's Second Document Request

11.9.11 FRBNY Memorandum

12.29.11 FRBNY Memorandum of 12.6.11 Meeting

12.29.11 FRBNY Memorandum of 12.8.11 Meeting

12.29.11 FRBNY Memorandum of 12.8.11 Meeting

Rating Sheet (Redacted)

4.25.12 Handwritten Meeting Notes

5.13.12 and 5.11.12 Emails

SSO Team Meeting  - Synopsis

2:00 pm
DEC 8, 2010

[I walked in at  2:15 pm]

When there is a disagreement as to a meeting, whether it goes forward or not,
risk specialist always wins

Correct 41st Floor - M. Silva has the last say as SSO.

It is helpful for risk specialist to understand that they can go forward
we do expect the risk specialist to always touch base with
the business specialist.

I want the business specialists share with the risk specialists
what is going on.

If its the case that a particular risk series creates a pattern
of interactions with the firm that is not the best, then that
is another story.    We will revisit the situation if it draws
into a problem.

There are consequences regarding our interactions between State + the FDIC
You do get more out the firm if you let them talk.

Be careful about taking an interrogating attitude it may not help
you.

As for the hours, we are seeing more grumpyness, but at the end
of the day, we get what we want.

Goldman over time will get more annoyed with us, and I plan
on annoying them quite a lot.

We is positive, casual, complimentary,   but  0 tolerance for threats or
bullying ,  don't engage directly,  but do let me know so
I can engage them.

M. Koh —

This goes back to the once team concept

Question-Steps.  : clarification on scope of meetings
whether a meeting should occur  or  what questions should be asked?
Are we going to loose credibility by asking questions we already
asked ?

What happened?  Frank / Chris's   meetings with front office

the are where the areas overlap.   This was the inflation desk.
Closs + Brian → disagreed on  w/n to have a meeting.

Bill Survey Meeting                    Dec 8, 2011

Bill leads

What he is interested in monitoring  – Board Perspective

Consumer issues are found + corrected + followed to completion

eg: net alerts , iTRACK alerts, Bono alerts, meeting minutes
    ESCAPE, SHAREPOINT    → he is overseeing 17th institutions.

They have taken on the 780's – 8 different ones

He finds inconsistency in terms of the info posted into the databases

Leslie – 2011 Supervisory database    – we call it team room

Bill prefers I post Consumer issues to the "team room."

     eg: OC monthly reports
         OC quarterly reports
         July is the last post. —

(TA) Leslie will show me where to post

     Bill – also an exam posted in October. He wants us to post
     there.

(TA) Bill – review his list
NEED
TO SEE { (1) Exam scope documents  (2) + draft exam reports before they
         are finalized.  (3) risk assessments  (4) iTrack for MRA, MRIA's
         (Troy would take the lead in that)        he is expected to follow
                                                    to completion
     (5) Any other issues cited by other regulators.  (6) schedules + info
     Troy – responsible for risk assessment              on upcoming exams.

        (TA) → Troy sends risk assessment to CFPB.

     Info sharing agreement being developed + it won't be as much exchange
     of info.

(TA) → Set up biweekly meeting with TROY !


   TA – Ask Grace if she is planning consumer exams.
   Bill questions: 16-17 iTRACK ISSUES, 15 litton related.

Rob had the letter issues taken out of the 1track.

(TA) → get answer to Cotton. Are issues gone or is it still gen-
            workloch . Consent order still remain
        get him the answer

[Governance structure from compliance perspective + consumer issues]

BMI was in a meeting re: Goldman requested the CFPB review.
Leslie was on that call

(TA) Confirm CFPB comes in on January
    Bill back to 1TRAK → there is a Fair Lending MRA
                            with WELO — business closed down. Find out
Goldman specific OC reports — (TA) ask Paula.

August 12 — response letter to Mr. Silva re: Consumer compliance exam.

Set up next call  for January.

(TA) →  Ask the Grace for work on consumer space
                Compliance testing + audit have done in the
                consumer space.

(TA) →  Set up bi-weekly with Troy + monthly
                with Bill. (not the week of Jan 30th he is out)

with Alina [ van ter pool ] + Troy's boss  keep in loop.

4

Michael Silva – (F-U to Conflicts Meeting)

Mike –
 1 employee let go in 4 years
 they checked on the backchecking issue

Susan –
 resonated with her that the deal clearing it different
 what the one that was approved.

Mike – Audit doo shit.

 Skeptical that they are managing the conflicts are being
 managed well at all.

Susan – they think that there are no walls w/in the Merchant
 Banking Conn.
Mike – disingenuous that they are just like other firms.

 Me – no compliance involved
 no real conflict check – more like a business check
 no real reputational risk team.
 no clear documentation.

Mike – he cares about they don't fail in a way that
 its sufficiently disorderly for other people.
 conflict of interest will lead to client runoff.

(F/U) talk to Jim + Johnathan about Reputational
 Risk / Ethics officer across the board
 Conflicts Groups headed by Attorney.

Mike – not get the sense they have something that will explode
 as Fed – impression that they are in some sides on every deal
 ... in decide as a business matter that Goldman

is too big to manage these conflicts.

Dixon/Cashin — Factor is into understanding how this place governs itself

They did whole Business Standards Committee.

Meeting notes comments:

Follow-up

- lack of Chinese firewalls for legal + compliance people.
    Find out what the Fed's policy is + if the Fed no because if the Fed
    don't require it, then we can't force anyone else.


- why is the compliance division not part of the conflict of interest determination
    does the Fed require it? We may need to challenge that
    as well.



Meeting with   M Silva                    28 Dec. 2011
                                          est. 10:30 am

- mentoring feedback
  credibility
        When you say something is wrong you want then to give
        that respect
        Be careful that you are sure we have evidence on hand
  credibility at the Fed is about subtleties, perceptions
        as opposed to realities
  worried they will freeze me out
        respects most people who are deeply analytical
        + gathers facts + appears unbiased in gathering
        them.   You must be perceived as analytical
  new people don't perceive how the organization is perceiving
  them
        Do refer to your experience in the past
        We are careful on acting on tips + you can investigate
        them - don't reveal the source of your tips
  the ones that are taken most seriously are the most quiet
  ones
        Make sure your experience comes out in an unthreatening way,
            unclouded by biases (or in this case, perceived bias)

if it pushes you is very analytical, very team oriented,
make sure they feel you respect them,

If you want to move to other areas, they ask your
colleagues, don't look at the reviews

- print him out copies of all meeting notes

Susan Goldberg

Stopped by sometime before noon
asked where I got the meeting notes, implied
cemented them. it was interesting how different people
hear different things in a meeting. She did not recall
hearing a lot of the things noted in one meeting notes
but "did not seem to imply" that had not taken
proper notes

Said it must be difficult to take good notes when
you are leading a meeting. [I did not lead 4 out of
the 5 meeting note posted, the one I lead was only preparing]
Asked how she could do correction, or them : [told her
first she could hand me a red-line version, which is what
others have done in the past] [I also told her that it wasn't
hard to take meeting note. – I was just transcribing what GS
was saying, and did not think about what they where
saying while after I had taken down notes. My goal was
to gather evidence.]

~

8



FRBNY Response

Conflicts of Interest – Reputational Risk

Goldman, Sachs & Co. | 200 West Street | New York, NY



---

**Federal Reserve Bank of New York Information Request**

## *Conflicts of Interest – Reputational Risk*

1. **Copies of conflicts of interest policies, procedures, and risk assessments applicable to all GS divisions (GS Bank, Securities, IMD, PWM, IBD, MBD) as November 1, 2011.**

   We have attached the following conflicts of interest policies and procedures. Please note that in accordance with the recommendations of the Business Standards Committee issued in January 2011, the firm reviewed and updated its conflicts policies and procedures and created a consolidated and comprehensive compilation of these policies and procedures. Accordingly, the previous conflicts policies for the Investment Banking, Merchant Banking and Securities Divisions were revised and updated, and separate policies for the OTF&S Division and GS Bank were created, all of which were published in December 2011. We have attached these revised and updated policies as follows:

   1. Investment Banking Division
   2. Merchant Banking Division
   3. OTF&S Division (Bank Debt Portfolio Group, Credit Risk Management, and Firmwide Strategy) 
   4. Goldman Sachs Bank USA
   5. Securities Division

   The updated, consolidated policy for the Investment Management Division is in the final stages of completion and, therefore, a final version is not yet available. In lieu thereof, we have attached copies of existing policies for the following IMD businesses:

   6a. GS Private Equity Group
   6b. Petershill Fund
   6c. Private Banking Lending Business within Private Wealth Management

   Refer to Exhibit A for Policies and Procedures and Exhibit B for Risk Assessments.

7. **Copy of Best Practices training for Conflicts employees.**

   Per your request, attached are the Best Practice Memos that have been circulated amongst the BSCRG team. These Best Practice Memos address specific matters and suggests issues to consider and potential steps to be taken when such matters may become relevant. These memos are by no means a comprehensive collection of the training agenda for the BSCRG team. The BSCRG team regularly meets as a group regionally to review practices and provide other forms of training. All members of the BSCRG are familiar with the various divisional policies. In addition, we have completed training on the new conflicts policies for the Investment Banking and Merchant Banking divisions, and are in the process of rolling out to the remaining divisions. Refer to Exhibit C.

---

Note: Kinder Morgan/El Paso cover memo follows; responses provided within Exhibits D through G. Capmark responses are provided in Exhibit H.

Confidential Supervisory Information

Goldman, Sachs & Co. | 200 West Street | New York, NY

*[handwritten annotations:]* Owned by ex GS ecs who were instrumental in the formation of GS global energy partners now operates mainly through the Carlyle Group

**Federal Reserve Bank of New York Information Request**

_**Conflicts of Interest – Reputational Risk**_

## EL PASO / KINDER MORGAN BACKGROUND

**Background.** El Paso Corporation ("El Paso" or the "Company") is a long-standing client of Goldman, Sachs & Co. ("Goldman Sachs"). We have worked closely with the Company on a broad range of strategic and financing matters, including the divestiture of ANR Pipeline in 2006 and the sale of their 50% stake in Great Lakes Gas Transmission in 2006. Since 2006, El Paso has engaged Goldman Sachs as anti-raid advisor to assist them with preparing for potential acquisition proposals and has regularly appeared before their Board on these and other matters. We have also executed various financings for El Paso and its subsidiaries including a $500 million bond offering in 2008 and raising $370 million in equity for its MLP[1] in 2010.

**Spin-off Transaction and Kinder Morgan Approach.** In the spring of 2011, Goldman Sachs was retained as sole advisor by El Paso to advise on strategic alternatives for its Exploration and Production ("E&P") segment including a potential spin-off transaction. Goldman Sachs received $5 million upon signing of the engagement letter, and was due an additional $25 million upon the consummation of the spin-off. On May 24, 2011, El Paso publicly announced (via press release and 8-K filing) its intention to pursue such a spin-off by the end of the year. Goldman Sachs continued to work with the Company as it prepared for the creation of two separate companies resulting from the spin-off. On August 30, 2011, after the announcement of the spin-off but prior to its completion, El Paso received an unsolicited proposal directly from Kinder Morgan, Inc. ("KMI") to acquire the Company.

**Goldman Sachs Fund Investment in Kinder Morgan.** In 2007, KMI was taken private by a consortium consisting of Richard Kinder (founder and CEO), funds managed by the Merchant Banking Division of Goldman Sachs ("MBD"), Highstar Capital LP, Carlyle Group and Riverstone Holdings LLC. In February 2011, KMI sold approximately $2.9 billion of common equity in its initial public offering. Goldman Sachs and Barclays Capital acted as lead underwriters for the offering. Following the IPO, the largest shareholders were:  Richard Kinder (30.6%), Goldman Sachs MBD (19.9%), Highstar Capital (12.6%), Carlyle (8.8%), and Riverstone (8.8%). The Board of Directors of KMI has 13 members, including 2 from Goldman Sachs MBD, 2 from Highstar, and 1 from each of Carlyle and Riverstone. Henry Cornell and Kenneth Pontarelli, both managing directors in MBD, are members of the Board of KMI *(per Question 3)*.

*[handwritten annotations: infrastructure type specialist / asset manager / PE]*

**Conflicts Discussion and Escalation.** On August 25, 2011, Mr. Kinder called Mr. Pontarelli to advise that he was assembling the Board the next day to review his intention to submit a proposal for the acquisition of El Paso. Later that same day, Mr. Pontarelli notified Goldman Sachs's Business Selection and Conflicts Resolution Group ("BSCRG") because he was aware that El Paso was an investment banking client of Goldman Sachs. An initial set of discussions, including Gwen Libstag (head of BSCRG), Dave Park (member of BSCRG), Samantha Migdal (member of BSCRG), David Solomon (co-head of Investment Banking) as well as Rich Friedman (head of MBD), determined that Goldman Sachs's directors would need to recuse themselves from any KMI Board discussions regarding the El Paso transaction, including the Board meeting on August 26, 2011 in which the decision to move forward with El Paso was made (based on the public merger proxy). Neither of the Goldman Sachs representatives on the KMI Board were involved in the preparation of

---

[1] An MLP, or Master Limited Partnership, is a publicly traded limited partnership most commonly found in the energy pipeline industry designed to provide tax attributes of a limited partnership with the liquidity of publicly traded securities.

PRIVILEGED & CONFIDENTIAL
CONFIDENTIAL SUPERVISORY INFORMATION

1

*[handwritten annotation in top right margin:]* Evercore hired Raymond Strong (was from GS senior director for Group, where KMI was his client)

the proposal, nor did KMI request or receive any Investment Banking services from Goldman Sachs in connection with this transaction. According to public filings, KMI was advised by Evercore Group in preparing its proposal to El Paso.

On August 30, 2011, KMI submitted its acquisition proposal to El Paso which sought a response from El Paso by September 14, 2011. Particularly given the limited time to respond, El Paso asked the Goldman Sachs advisory team, which was already actively advising on the E&P spin-off, and had in-depth knowledge of El Paso's businesses and the market more generally, from its long-standing role as general strategic and anti-raid advisor, to assist in evaluating the KMI proposal.

Goldman Sachs felt it important to stand by its client. However, given the MBD investment in KMI and scrutiny that this advisory role would receive if the proposal moved forward, the BSCRG escalated the decision-making process to include the Executive Office including Lloyd Blankfein, Gary Cohn, and David Viniar in addition to continuing to discuss with Mr. Solomon and Mr. Friedman. *(The full list of participants is listed in #5 below.)* The decision was made to accept El Paso's request that the advisory team provide advice with respect to KMI's offer, subject to adopting certain conflict management safeguards in connection with that role, including:

- Immediate hiring of a second financial advisor for El Paso.

- Ongoing recusal by MBD representatives on the KMI board from all further discussions on the matter until further notice. *(Per Question 4, Rich Friedman (as head of MBD) and Ken Pontarelli and Henry Cornell (as KMI Board representatives) orally agreed to such recusal. E-mails on September 14, 2011 document Rich Friedman's and Ken Pontarelli's approval of the specific language to be included in the engagement letter to advise El Paso.)*

- Enhanced team and information separation memorialized by formal KMI / El Paso team separation memos *(per Question 8, see copies of these memos in Exhibit D.)*

- Reminder disclosure to El Paso's Board, senior management, and outside counsel regarding the stake held by MBD and MBD's KMI Board Seats. *(The disclosure was included in our engagement letter dated October 6, 2011; see Question 10 and Exhibit E)*

El Paso hired Morgan Stanley between August 31, 2011 and September 5, 2011 as its second financial advisor on the KMI transaction and negotiated the amount and structure of its fee. Although Goldman was the exclusive advisor on the spin that had previously been announced in May, El Paso and Morgan Stanley were free to structure a fee arrangement to compensate Morgan Stanley in the event that alternative transactions to the KMI proposal were pursued.

On September 7, 2011, the El Paso team was formally cleared by the BSCRG to proceed subject to the protocols described above. *(See clearance notes from the BSCRG database ("CABS") in Question 2 below; copies of the CABS/Company Query entry are attached per Question 9 in Exhibit F. These clearance conditions were ultimately memorialized in the engagement letter with El Paso per Question #10 in Exhibit E.)* At the September 15 board meeting, the El Paso Board limited the role of the Goldman Sachs advisory team and excused the team from all deliberations regarding negotiating tactics with KMI. El Paso Board's decision how to handle further negotiations with KMI and whether or not to approve the KMI transaction was based on the advice provided by Morgan Stanley.

**Transaction.** On October 16, 2011, KMI and El Paso announced their agreement to a purchase by KMI of El Paso for $26.87 per share (based on KMI's closing price as of October 14, 2011)—representing a 47% premium to the 20-day average closing price prior to announcement and a 37% premium to El Paso's closing price on October 14, 2011. KMI publicly announced that it would immediately seek a buyer for the E&P business that was originally set to be spun off by El Paso. On March 9, 2012, 95% of El Paso shareholders who were involved in voting for the transaction (79% of eligible El Paso shareholders chose to vote at all) voted in favor of the KMI acquisition proposal.



*Evercore hired*
*Raymond Strong*
*(away from GS energy*
*sector group where*
*KMI was his*
*client.*

the proposal, nor did KMI request or receive any Investment Banking services from Goldman Sachs in connection with this transaction.  According to public filings, KMI was advised by Evercore Group in preparing its proposal to El Paso.

On August 30, 2011, KMI submitted its acquisition proposal to El Paso which sought a response from El Paso by September 14, 2011.  Particularly given the limited time to respond, El Paso asked the Goldman Sachs advisory team, which was already actively advising on the E&P spin-off, and had in-depth knowledge of El-Paso's businesses and the market more generally, from its long-standing role as general strategic and anti-raid advisor, to assist in evaluating the KMI proposal.

Goldman Sachs felt it important to stand by its client.  However, given the MBD investment in KMI and scrutiny that this advisory role would receive if the proposal moved forward, the BSCRG escalated the decision-making process to include the Executive Office including Lloyd Blankfein, Gary Cohn, and David Viniar in addition to continuing to discuss with Mr. Solomon and Mr. Friedman.  *(The full list of participants is listed in #5 below.)*  The decision was made to accept El Paso's request that the advisory team provide advice with respect to KMI's offer, subject to adopting certain conflict management safeguards in connection with that role, including:

- Immediate hiring of a second financial advisor for El Paso.

- Ongoing recusal by MBD representatives on the KMI board from all further discussions on the matter until further notice. *(Per Question 4, Rich Friedman (as head of MBD) and Ken Pontarelli and Henry Cornell (as KMI Board representatives) orally agreed to such recusal. E-mails on September 14, 2011 document Rich Friedman's and Ken Pontarelli's approval of the specific language to be included in the engagement letter to advise El Paso.)*

- Enhanced team and information separation memorialized by formal KMI / El Paso team separation memos *(per Question 8, see copies of these memos in Exhibit D.)*

- Reminder disclosure to El Paso's Board, senior management, and outside counsel regarding the stake held by MBD and MBD's KMI Board Seats.  *(The disclosure was included in our engagement letter dated October 6, 2011; see Question 10 and Exhibit E)*

El Paso hired Morgan Stanley between August 31, 2011 and September 5, 2011 as its second financial advisor on the KMI transaction and negotiated the amount and structure of its fee. Although Goldman was the exclusive advisor on the spin that had previously been announced in May, El Paso and Morgan Stanley were free to structure a fee arrangement to compensate Morgan Stanley in the event that alternative transactions to the KMI proposal were pursued.

On September 7, 2011, the El Paso team was formally cleared by the BSCRG to proceed subject to the protocols described above.  *(See clearance notes from the BSCRG database ("CABS") in Question 2 below; copies of the CABS/Company Query entry are attached per Question 9 in Exhibit F.  These clearance conditions were ultimately memorialized in the engagement letter with El Paso per Question #10 in Exhibit E.)*  At the September 15 board meeting, the El Paso Board limited the role of the Goldman Sachs advisory team and excused the team from all deliberations regarding negotiating tactics with KMI.  El Paso Board's decision how to handle further negotiations with KMI and whether or not to approve the KMI transaction was based on the advice provided by Morgan Stanley.

**Transaction.**  On October 16, 2011, KMI and El Paso announced their agreement to a purchase by KMI of El Paso for $26.87 per share (based on KMI's closing price as of October 14, 2011)—representing a 47% premium to the 20-day average closing price prior to announcement and a 37% premium to El Paso's closing price on October 14, 2011.  KMI publicly announced that it would immediately seek a buyer for the E&P business that was originally set to be spun off by El Paso.  On March 9, 2012, 95% of El Paso shareholders who were involved in voting for the transaction (79% of eligible El Paso shareholders chose to vote at all) voted in favor of the KMI acquisition proposal.

**Litigation.**  In response to the KMI/El Paso announcement, a series of shareholder lawsuits were filed in the Delaware, Texas and New York courts against El Paso, its Board, KMI and Goldman Sachs alleging, among other things, that El Paso's Board breached its fiduciary duties in approving the transaction and that Goldman Sachs and KMI aided and abetted the alleged breach.  The shareholder plaintiffs in the Delaware Court sought to enjoin the El Paso shareholder vote.  On February 29, 2012 the court expressed concerns about various aspects of the process leading to the transaction agreement, but ruled that the shareholder vote could proceed.  The litigation continues as a claim for monetary damages. Goldman Sachs believes that it has valid defenses to the claims asserted against it.  In this regard, it is noteworthy that in his opinion Chancellor Strine stated that it is difficult to prove an aiding and abetting claim and that whether the plaintiffs can ultimately prove Goldman Sachs liable "is, at best, doubtful."

**Lead Banker's Personal Investment.**  The lead banker on the El Paso team, Steve Daniel, has two investments which are related to Kinder Morgan, but he has no direct interest in KMI—the parent company which is party to the El Paso transaction.  The first is an indirect interest in KMI as a result of an investment made in 2005 in the MBD vehicle which holds the bulk of the 19.9% stake described earlier.  Mr. Daniel's holding is completely passive without control rights, and he has no involvement in investment committee decisions made by MBD.  This investment was worth approximately $42,500 as of October 14, 2011.  The second investment, made in 2003 (worth approximately $215,000 as of October 14, 2011), is in Kinder Morgan Management LLC ("KMR", specifically not in KMI, the party to the merger), the manager and a limited partner in Kinder Morgan Energy Partners, L.P. (or KMP), the master limited partnership that owns the bulk of the Company's operating assets.  The Investment Banking Division has followed a long-standing policy of requiring its personnel to pre-clear equity investments.  The lead banker requested and received the required approval to make the KMR investment in 2003.  Although, as noted above, the Goldman Sachs advisory team was eventually excluded from negotiation of the Kinder Morgan offer, unfortunately, El Paso's Board of Directors was unaware of the lead banker's Kinder Morgan-related holdings.

PRIVILEGED & CONFIDENTIAL
CONFIDENTIAL SUPERVISORY INFORMATION

## FRBNY Question Responses Related to Kinder Morgan/El Paso in Order

**_Question 2:_** _All meeting notes/minutes documenting conflict check discussions and escalation, including Board Presentation and email confirmations of actions taken for Kinder Morgan /El Paso._

i. Meeting Notes / Minutes

No minutes are involved in the Conflicts clearance process.  The notes on this matter are recorded in CABS (See Exhibit F) as follows:

> <09/07/2011>  _Multiple discussions with Solomon, Friedman, Libstag, Park, Kotran of S&C, concluded; Will serve as anti-raid advisor to El Paso if they choose to use GS. Will advise/remind EP, their Board and counsel of GS interest in KMI, incl having ~19% of KMI with 2 of 11 Bd seats.  Will also remind EP that GS swaps counterparty. PIA must recuse from Board and all deliberations relating to EP. Friedman agreed to recuse the two Board seats.  Will formally separate teams.  Should recommend EP get second advisor if they haven't already considered.  Believe Evercore is in some capacity advising Kinder.  Communicated this to Steve Daniel._

ii. Board Presentation

The BSCRG as a general matter does not confer with the Board of Directors of The Goldman Sachs Group, Inc. (the firm's publicly-held parent company and limited partner of Goldman Sachs) on specific transactions as part of the conflicts clearance process and did not do so on the KMI / El Paso situation (although, as in this situation, Messrs. Blankfein and Cohn (who are directors) may be consulted, as appropriate, in their capacities as CEO and COO, respectively).

iii. E-mail Confirmation

Communication for clearance was done orally and logged in CABS.

**_Question 3:_** _Name of the two GS employees that were appointed/members of Kinder Morgan Board of Directors, their position and titles within GS during the course of the Kinder Morgan/El Paso negotiations._

- Henry Cornell, Managing Director, Merchant Banking Division
- Kenneth Pontarelli, Managing Director, Merchant Banking Division

**_Question 4:_** _The order issued by the Conflicts Group to the GS directors to prevent/gag conversations related to the Kinder Morgan/El Paso purchase._ Email exchange from the GS director acknowledging that he "can't talk."

Mr. Friedman, as head of MBD, and Messrs. Pontarelli and Cornell, as KMI Board representatives, orally agreed that the MBD representatives would cease any participation in the KMI Board of Directors process on this matter.  E-mails in Exhibit G reflect the subsequent confirmation by Mr. Friedman and Mr. Pontarelli of the specific language that would ultimately be included in the engagement letter with El Paso.  This arrangement was memorialized in Goldman Sachs's engagement letter with El Paso dated October 6, 2011.  (See response to Question #10 below.)

**_Question 5:_** _List of the names of every individual in the firm involved in the conflicts discussions for Kinder Morgan from the beginning all the way to final escalation/ Board presentation, together with their position in the firm and title at the time of the discussions. List of the names of every GS_

PRIVILEGED & CONFIDENTIAL
CONFIDENTIAL SUPERVISORY INFORMATION



*compliance officer and attorney that has done any work for or related to Kinder Morgan / El Paso transaction, together with their titles and roles.*

As addressed in Question #2, the BSCRG does not confer with the Board of Directors of The Goldman Sachs Group, Inc. on specific transactions. There were a series of discussions amongst the Executive Office, BSCRG, Legal, Investment Banking ("IBD") leadership, MBD leadership, and the KMI and El Paso teams before accepting the mandate to advise El Paso in relation to the Kinder Morgan proposal. The list of names involved in these discussions, to the best of our knowledge, is shown below:

| Name | Title | Position / Group |
|---|---|---|
| Lloyd Blankfein | MD | Chairman, CEO, Goldman Sachs Group |
| Gary Cohn | MD | President, COO, Goldman Sachs Group |
| David Viniar | MD | Exec. Vice President, CFO, Goldman Sachs Group |
| Rich Friedman | MD | Head, Merchant Banking Division |
| David Solomon | MD | Co-Head, Investment Banking Division |
| Gwen Libstag | MD | Head, BSCRG |
| Henry Cornell | MD | Merchant Banking Division / KMI Board Member |
| Ken Pontarelli | MD | Merchant Banking Division / KMI Board Member |
| Steve Daniel | MD | Investment Banking Division, El Paso Team |
| David Greenwald | MD | Deputy General Counsel |
| Dave Park | MD | BSCRG |
| Joe Stern | MD | M&A Legal Counsel |
| Randy Stuzin | MD | General Counsel, Investment Banking Division |
| David Thomas | MD | General Counsel, Merchant Banking Division |
| Samantha Migdal | VP | Business Selection and Conflicts Resolution |
| Andrea Rachmann | VP | Media Relations |
| Steve Kotran | | Outside Counsel, Sullivan & Cromwell |

List of GS compliance officers and attorneys involved in Kinder Morgan/El Paso transaction:

| Name | Title | Position / Group |
|---|---|---|
| Abra Metz-Dworkin | Analyst | IBD/MBD Compliance |
| Ramey Watkins | VP | IBD/MBD Compliance |
| Randy Stuzin | MD | IBD Legal |
| Joseph Stern | MD | Merger Advisory Legal |
| Michael Hickey | VP | IBD Legal |
| Francis Chlapowski | MD | Litigation/Legal |
| Bruce Albert | MD | Control Room/Compliance |
| Amanda Huttenlocher | VP | Control Room/Compliance |
| Michael Wainer | VP | Control Room/Compliance |
| Yozo Tanabe | Analyst | Control Room/Compliance |

PRIVILEGED & CONFIDENTIAL
CONFIDENTIAL SUPERVISORY INFORMATION

**_Question 6:_** _List of individuals (if any) that were excluded from the Kinder Morgan discussions due to conflicts (names titles and roles)._

Discussions were managed consistent with the formal team separation procedures put into place for this situation as detailed in the response to Question #8 below.

**_Question 8:_** _Details on segregation (date Blue Team / Red Team were set up, and list of each team broken down into names, titles, and roles), as well as details on any other information blocks/segregation measures imposed for Kinder Morgan transaction._

The two teams which were subject to enhanced separation are detailed below.  Please note that both the members within MBD who managed the KMI investment as well as the IBD team which covered KMI (although they were not involved in this transaction) were separated from the El Paso IBD team.  The memos separating the teams were sent out originally on 9/6/2011 and amended on 9/28/2011 and are attached in their email form in Exhibit D.

| El Paso Advisory Team | | |
|---|---|---|
| Name | Title | Position / Group |
| Tomer Cohen | Associate | IBD |
| Steve Daniel | MD | IBD |
| Chris Gibbs | Analyst | IBD |
| Robert Kimmel | VP | IBD |
| Murat Konuk | Analyst | IBD |
| Neil McCann | Associate | IBD |
| Bruce Schwartz | VP | Finance |
| Dan Shefter | MD | IBD |
| Cynthia Walker | MD | IBD |



| Kinder Morgan Team | | |
|---|---|---|
| Name | Title | Position / Group |
| Henry Cornell | MD | MBD |
| Scott Lebovitz | MD | MBD |
| Elizabeth Overbay | VP | MBD |
| David Phelan | Analyst | MBD |
| Ken Pontarelli | MD | MBD |
| John Daly | MD | IBD |
| Suhail Sikhtian | MD | IBD |
| Sal Pareja | VP | IBD |
| Javier Velez-Gomez | Analyst | IBD |

**_Question 9:_** _Copies of all Company Query/CABS entries for Kinder Morgan._

See Exhibit F for the CABS entry.  Company Query ("CQ") is a system that BSCRG uses to help identify cash or derivative exposures or relationships that GS may have in a particular entity.  CQ receives a current feed of positions / relationships that is refreshed daily.  The key positions and

relationships in Company Query are noted in the Securities Only section of the CABS entry in Exhibit F.

**_Question 10:_** _Copies of alerts regarding disclosures and scripts delivered to the teams for El Paso / Kinder Morgan._

In its engagement letter with El Paso dated October 6, 2011 (entire letter included in Exhibit E), Goldman Sachs made the following disclosure:



> *As you know, funds managed by an affiliate of Goldman Sachs ("PIA") own approximately 20% of the voting stock of KMI and have appointed two of their designees to its board of directors. The Company is aware that PIA's designees have recused themselves from any board deliberations (and any votes) regarding the Transaction (other than to approve any prospective changes to the governance structure of KMI that may have an adverse effect on Goldman Sachs' rights).*

> *As you are also aware, Goldman Sachs was a joint bookrunner of KMI's IPO, has had various advisory and financing assignments for KMI, and regularly trades with KMI. As you also know, certain Goldman Sachs personnel who are working for the Company on the Transaction have historically been involved in banking transactions for KMI and its affiliates. Per the Company's request, such personnel will continue to work with the Company on the Transaction and will not work on any transaction for KMI during the term of our engagement hereunder. None of the Goldman Sachs personnel working for the Company on the Transaction have communicated or shared or will communicate or share any confidential information with respect to the Transaction with Goldman Sachs personnel having responsibility for managing the PIA investment in KMI or any other member of PIA. Goldman Sachs has implemented procedures reasonably designed to monitor compliance with the preceding sentence.*

PRIVILEGED & CONFIDENTIAL
CONFIDENTIAL SUPERVISORY INFORMATION

To:      Goldman Sachs Private Banking
From:    Central Conflicts
Date:    March 21, 2007

The Private Banking Lending business, within Private Wealth Management, involves making loans to private clients, their families or related entities on either a secured or unsecured basis. We have identified certain situations that require a conflicts check to screen for legal, reputational and client relationship issues. When a Private Banking lending transaction involves or could involve one of the following, PWM Private Banking personnel must clear conflicts before taking any action that would result in any of the following:

## Situations Requiring Conflicts Clearance

- Receiving material non-public information regarding a public or private company (1) whose shares we are accepting as collateral or (2) held by a fund whose shares or interests we are taking as collateral;
- Receiving material non-public information regarding a public or private company when the Firm is known by PWM to be engaged as financial advisor to the company;
- Extending a loan where the use of proceeds of the loan is to acquire a business, its assets or commercial real estate in excess of 25% or to acquire 5% or more of a public company. It is understood that PWM teams today are required to call the Control Room in advance of any purchase of 1% or more of a public company;
- Taking a pledge of collateral that will exceed 5% of a public company; or
- Taking a pledge of collateral that will exceed 15% of a private company or fund.
- 

NOTE: Loans of $10 Million and below need not be raised to Central Conflicts but should be reviewed with PWM Management and/or PWM Legal for legal, reputational and client relationship issues.

## Whom Do I Contact to Launch A Check?

- Americas:      ▪ Tamilla Ghodsi/Haley Park/Lilia Saslekova/David Webb

## How Do I Launch A Check?

E-mail, voicemail or call Securities Division Conflicts with required transaction information described below. However, e-mails or other written communication should **not** be used for vetting conflicts because it is unrealistic to expect that all relevant information will be properly captured in written communications, particularly e-mail, and they may create a misleading record of our thought processes and deliberations.



## What Information Do I Need to Provide to Conflicts?

Confidential Supervisory Information

1

The following are guidelines for information to be included in every conflict clearance check as well as information on specific opportunities:

| [ Additional information ] |
|---|
| Company Name |
| Private/Public (Ticker) |
| Company Descriptions: |
| • What does the company do? |
| • Market Cap/Levered Market Cap? |
| • Significant shareholders?  Sponsor ownership? |
| • Is the Company in financial distress or nearing bankruptcy? |
| • Is the Company on the RTL? |
| Is PWM receiving confidential information? |
| Other GS Roles: |
| • Is IBD or another area of the firm (e.g., PIA/REPIA) involved in this transaction/with the Company? |
| • Has PWM had any contact with other areas of the firm regarding this opportunity? |
| Third parties: |
| • Source of opportunity? |
| Timing: |
| • Status/Timing of transaction |
| • Time sensitivity of the check |

| Transaction Specific Information (as included) | |
|---|---|
| **New Loan** | Transaction Description: |
| | • Type of loan |
| | • Size (GS/Total) |
| | • Term of financing |
| | • Expected yield |
| | • Use of proceeds: |
| |     o If for acquisitions, please include descriptive information on Targets |

**When Do I Launch A Check?**

- Prior to the occurrence of any of the events described above in Situations Requiring Conflicts Clearance.  (Negotiating the terms of a confidentiality agreement prior to receipt of conflicts clearance is permitted, however, receipt of confidential information is not.)
- Strike balance between (i) waiting until enough is known about a potential transaction for the check to be meaningful, and (ii) avoiding formally or informally committing the firm, misleading a client, or incurring too many expenses, before seeking clearance.

**What are the Types of Conflicts Checks' Clearances?**

**Clearance** – PWM is clear to pursue an opportunity.  PWM should inform Central Conflicts if it makes the loan, passes on the opportunity or if the transaction is placed "on hold".  PWM should check in with Central Conflicts if either (1) the terms or structure of the transaction materially change or (2) more than 6 months has passed since PWM received conflicts clearance and the transaction becomes active after having been inactive for a period of time.

**Permission to Receive Confidential Information** – enables PWM to receive confidential information but does not constitute clearance to pursue an opportunity.  PWM MAY NOT COMMIT THE FIRM, FORMALLY OR INFORMALLY.  PWM must come back to Central Conflicts within 10 calendar days to provide us with a status update in order to let us know if its interest in this opportunity is 1) continuing, 2) on hold, or 3) dead.  Full clearance will need to be obtained at such time (even if before the 10 day period has elapsed) as PWM determines to pursue the opportunity.



Kinder Morgan/El Paso

Team Segregation

(Question 8)

Confidential Supervisory Information

**Cabrera, Erickson**

| | |
|---|---|
| **From:** | Migdal, Samantha |
| **Sent:** | Friday, February 24, 2012 1:12 PM |
| **To:** | Park, Dave (IB, 200W/30) |
| **Subject:** | FW: Important Message: El Paso Corporation |

---

**From:** Metz-Dworkin, Abra
**Sent:** Tuesday, September 06, 2011 5:22 PM
**To:** Daniel, Steve; Walker, Cynthia; Kimmel, Robert; Cunningham, James; Cohen, Tomer; Gibbs, Chris
**Cc:** Migdal, Samantha; Watkins, Ramey; Park, Dave (IB, 200W/30); Stuzin, Randy; Stern, Joseph; Hickey, Michael; Chlapowski, Francis S.; Albert, Bruce; Cox, Jason; Huttenlocher, Amanda; Wainer, Michael J.; Tanabe, Yozo; Sachs, Michael
**Subject:** RE: Important Message: El Paso Corporation

Please note the revision below to the individuals with whom information about the company or the potential transaction should not be discussed. Thank you.

---

**From:** Metz-Dworkin, Abra
**Sent:** Tuesday, September 06, 2011 5:06 PM
**To:** Daniel, Steve; Walker, Cynthia; Kimmel, Robert; Cunningham, James; Cohen, Tomer; Gibbs, Chris
**Cc:** Migdal, Samantha; Watkins, Ramey; Park, Dave (IB, 200W/30); Stuzin, Randy; Stern, Joseph; Hickey, Michael; Chlapowski, Francis S.; Albert, Bruce; Cox, Jason; Huttenlocher, Amanda; Wainer, Michael J.; Tanabe, Yozo; Sachs, Michael
**Subject:** Important Message: El Paso Corporation

As members of the team advising El Paso Corporation (the "Company") on a recent acquisition proposal made by Kinder Morgan Inc. (the "Potential Transaction"), please be advised that you are subject to the following restrictions until advised otherwise by Conflicts or Compliance:

- **Information relating to the Company or the Potential Transaction should not be discussed with the following individuals:**

  Henry Cornell
  John Daly
  Scott Lebovitz
  Elizabeth Overlay
  Sal Pareja
  David Phelan
  Ken Pontarelli
  Suhail Sikhtian
  Javier Velez-Gomez

- Do not forward this email to anyone without the prior authorization of Conflicts, Legal or Compliance.

1

- Please contact Samantha Migdal with any questions or requests to add individuals to the deal team, and do not share information with such individuals until you have been advised by Conflicts, Legal or Compliance that you may do so.

In addition to the restrictions described above, you are also subject to all other IBD and Goldman Sachs policies, including the policies relating to the Chinese Wall and only sharing information with others on a need-to-know basis.  Failure to comply with the above guidelines and Goldman Sachs policies could result in serious consequences for you and the firm.

**Cabrera, Erickson**

| | |
|---|---|
| **From:** | Migdal, Samantha |
| **Sent:** | Friday, February 24, 2012 1:13 PM |
| **To:** | Park, Dave (IB, 200W/30) |
| **Subject:** | FW: Important Message: Kinder Morgan |

**From:** Watkins, Ramey
**Sent:** Wednesday, September 28, 2011 10:29 AM
**To:** Overbay, Elizabeth; Sikhtian, Suhail; Daly, John S; Pareja, Salvador; Velez-Gomez, Javier; Pontarelli, Ken; Lebovitz, Scott; Phelan, Dave; Cornell, Henry
**Cc:** Migdal, Samantha; Watkins, Ramey; Park, Dave (IB, 200W/30); Stuzin, Randy; Stern, Joseph; Hickey, Michael; Chlapowski, Francis S.; Albert, Bruce; Cox, Jason; Huttenlocher, Amanda; Wainer, Michael J.; Tanabe, Yozo; Sachs, Michael
**Subject:** FW: Important Message: Kinder Morgan

The names in red font below indicate changes to the list of individuals with whom you may not discuss the Company. Please note that this list of individuals includes Robert Kimmel, Dan Shefter and Bruce Schwartz, who have historically been involved in, but are not currently staffed on, work with Kinder Morgan.

**From:** Metz-Dworkin, Abra
**Sent:** Tuesday, September 06, 2011 5:06 PM
**To:** Sikhtian, Suhail; Daly, John S; Pareja, Salvador; Velez-Gomez, Javier; Pontarelli, Ken; Lebovitz, Scott; Lowenstein, Allison; Phelan, Dave; Cornell, Henry
**Cc:** Migdal, Samantha; Watkins, Ramey; Park, Dave (IB, 200W/30); Stuzin, Randy; Stern, Joseph; Hickey, Michael; Chlapowski, Francis S.; Albert, Bruce; Cox, Jason; Huttenlocher, Amanda; Wainer, Michael J.; Tanabe, Yozo; Sachs, Michael
**Subject:** Important Message: Kinder Morgan

As members of teams that cover or otherwise work with Kinder Morgan Inc. (the "Company"), please be advised that you are subject to the following restrictions until advised otherwise by Conflicts or Compliance:

- **Information relating to the Company should not be discussed with the following individuals:**

    Tomer Cohen
    Steve Daniel
    Chris Gibbs
    Robert Kimmel
    Murat Konuk
    Neil McCann
    Bruce Schwartz
    Dan Shefter
    Cynthia Walker

- Do not forward this email to anyone without the prior authorization of Conflicts, Legal or Compliance.

1

- Please contact Samantha Migdal with any questions or requests to add individuals to the deal team, and do not share information with such individuals until you have been advised by Conflicts, Legal or Compliance that you may do so.

In addition to the restrictions described above, you are also subject to all other IBD and Goldman Sachs policies, including the policies relating to the Chinese Wall and only sharing information with others on a need-to-know basis.  Failure to comply with the above guidelines and Goldman Sachs policies could result in serious consequences for you and the firm.

2

26

 

## MEMORANDUM – FRBNY/DFS RESTRICTED

**TO:**　　　　　　FILES
**FROM:**　　　　　CARMEN SEGARRA
**INSTITUTION:**　GOLDMAN SACHS
**SUBJECT:**　　　GS REPUTATIONAL RISK ISSUES
**DATE:**　　　　　NOVEMBER 9, 2011 3:00 pm

### Administrative

*Attendees:*

**Goldman Sachs ("GS"):** Michael Keats, Tom Riggs, and Norman Feit

**New York State Department of Financial Services ("DFS"):** Grace Gonzalez

**Federal Reserve Bank of New York ("FRBNY"):** Leslie Sperber, Johnathon Kim, Matthew Hertzog, Carmen Segarra

**Federal Deposit Insurance Corporation ("FDIC"):** None

### Minutes

Johnathon leads off: We know that reputational risk is VIP for Goldman. We are trying to understand the rationale for conflict of interest determinations, who are the decision makers, etc.

Norman: We are just lawyers, we advice from time to time on conflicts of interest issues. We have a group that manages conflicts on a daily basis. It's a worldwide group that reports to the Executive Office. Gwen Libstag heads it, and has been leading it since Norman joined GS in 1992. Everything that we are going to be talking about flows through that group. That group will analyze the situation and if necessary, say no, or set parameters, which can range from such things as consenting adult letters from clients to setting up teams [such as red and blue teams] to institutional internal walls. The group has evolved as the firm has evolved. In 1992 it was a simple set up, no buy side worries, only US law issues – now it is much more evolved, covers buy and sell side, US and other foreign jurisdictions.




Tom: We must differentiate between actual versus perceived conflicts

Norman: Kinder Morgan as an example. We have a longtime simultaneous relationships with El Paso [Advisory] and Kinder [Merchant Banking]. After the IPO GS still had a 19% interest in KM, but also had a team working with El Paso discussing possible spin-offs. When Rich Kinder approached GS as part of the transaction to purchase El Paso it was obvious to everyone that we could not advise El Paso. The question was: do we abandon the client, despite the longstanding relationship and vast institutional knowledge? It was decided that Morgan Stanley would come in, as senior advisor. We had a very narrow, circumscribed role that kept us out of the boardroom and all negotiations. In addition, GS did not offer a fairness opinion on the offer either. All that process of what the roles would be and where the line would be drawn was made by Gwen. No one has come to top the offer made, which is the ultimate barometer of fairness. Shareholder litigation caught on the GS maintains an interest in KM and was named as an advisor to El Paso in the disclosure documents. The complaints filed however, do not highlight the fact that our role was extremely circumscribed. We now have litigation in Texas and Delaware. The ethical and reputational risk analysis was done by Gwen at the right time.

Johnathon: Who were the decision makers? Would legal have been involved?

Norm: I was the principal advisor at GS for conflicts for 10 years, I still do it from time to time, but Randy Stuzin now does the day to day as the IMD lawyer. He worked at Cravath, focused on equity capital markets, now is co-general counsel in London. Anyone relevant would have been brought on board and would have been present to make the decision.

Tom: Gwen's group contains former lawyers.

Johnathon: Is Gwen an attorney?

Tom: No.

Norm: When items are presented before the Conflicts Group: There are several layers of analysis done, first: Business Selection, who you would rather work for – the buyer, the seller; then, reputational risk – which elements, the "Wall Street Journal" test; third: legal obstacles – what are the issues involved. Sensitivity to market perception is, the hurdle for number 2, is so high that rarely is a decision made on the third factor.

Johnathon: Business selection and conflicts, are those two separate groups?

Tom: No, they are the same group. They have very varied and sophisticated backgrounds.

Norm: As business gets more complex, more factors go into the decision making. The conflicts group has access to the CLYDE database, but they have their own sophisticated system they use to make their determinations. [He highlights the potential multiple touch points, and that these guys focus on them]

Johnathon: Can we get a copy of the group's policy document? Charter?

---

2




Grace: Checklist?

Tom: Yes. It's probably more than one document – there is no one policy per se.

Norm: Some of the information is automated. I seriously doubt they have policies and procedures that are detailed.

Tom: They do have policies and procedures [that lay down the basic parameters] my suspicion is there is more than one.

Johnathon- Could you give me a narrative on Solyndra?

Michael : We were their financial advisor in 2008, placement agent for them, we were going to be the lead in their IPO. We were not retained to be their restructuring advisor per se, but we were around.

Norm: A conflicts check would have been done.

Johnathon: So it's an appearance of a conflict.

Michael: Yes. We actually lost $7 million dollars in fees because we kept deferring them as we knew they were trying to raise money.

Johnathon: And Capmark?

Michael: In Capmark we definitely have a conflicts issue. Our relationship with Capmark began in 2005. We've been lending to them from time to time. In May 2009 GS had an equity stake of less than 20% in Capmark and a member on the board. we also had a non-control letter. Capmark restructured all of their debt in 2009 outside of bankruptcy court, and 5 months later filed for bankruptcy. The secured creditors reached a settlement. A preference action against GS was raised first in DE and now in NY (we suspect because they are trying to get away from a tough judge in DE)because GS' unsecured debt was rollup into a secured facility. The issue is that somehow because we had people on the board the lenders must have exerted undue influence to give GS preferential treatment.

Johnathon: Who was the lead arranger?

Michael: I want to say Citi, but it may have been JP Morgan Chase. We saw that this company was under distress, we raised it internally with Gwen, and her group issued an order to prevent conversations with the GS director. There are emails that evidence that the conflicts check was performed, and that it worked, because the director received an email and he responded "can't talk".

Norman: If you remove our director, it's the same situation that arises in these types of bankruptcies and restructurings. You should speak with Jen Ford – she is the Chief Compliance Officer in the investment banking division that helps administer these precepts like Chinese walls.

---

3



Johnathon: [Questions them on their reserve methodology, and the recent communication indicating they had increased their reserves] Quarterly regulatory disclosures have disclosed that GS has increased its estimate of "reasonably possible" losses from legal claims by 30% in the third quarter. We do have an outstanding meeting request for GS to provide an overview of the legal reserve methodology and estimable losses. Curtis was to have scheduled the meeting but we understand that he is leaving GS. Has he left the institution yet?

Norman: Yes

Johnathon: We will give you the literature that Curtis and I went through and we can follow-up with Tom.

Norman: [Goes into a description of the factors they take into consideration when producing that report. Expounds on the abstract concept of remoteness and likelihood and the difference between those two.]

Johnathon: Who does Gwen report to in the Executive Office?

Norman: Lloyd or Gary, not sure. She also sits in the Business Standards Committee or whatever that is called.

---

4

FRB/DFS Restricted

## FEDERAL RESERVE BANK of NEW YORK

OFFICE MEMORANDUM

|  | | | DATE | December 29, 2011 |
|---|---|---|---|---|
| TO | File | | SUBJECT | GS IMD Compliance Overview |
| FROM | Carmen M Segarra | | | |

## RESTRICTED FR

*Bus/Con Function: IMD Compliance*
*Type of Contact: Presentation   (see attachment)*
*Date of Contact: 6 December 2011*
*Institution Rep: Andrea Kern, Brian Quinn, Una Neary, Michael Richman, Kathy Voigts*
*SSO Team Rep: Johnathon Kim, Leslie Sperber, Carmen Segarra*
*Other Rep: Grace Gonzalez (NYS-DFS), Pete Domansky (FDIC)*
*Description: GS IMD Compliance Overview*

### Key Meeting Exchanges

- Michael: "don't want to confuse you with all the legal entities". We support 7,000 people at the Federation level: GSAM about 2,000, AYCO about 1500, and about 1000 in PWM, of which 500 of those are brokers, each having about 40 relationships, about 10 million AUM per client. PWM provides brokerage, advisory, and wealth planning, as well as sells GSAM and open architecture 3rd party products. Capital Markets people are wholesalers (manufacture and distribute products to the sales force) – they technically sit in PWM, but touch all areas.
- Michael: AYCO was purchased by GS about 7-8 years ago. 6 offices – US only. High margin, very profitable. Offer tax planning, estate planning, insurance, and products manufactured by GS. They had no compliance depth when GS bought them – now they have 25 compliance people. They report to their GC and have a dotted line into GS, "but they are very integrated although they don't show up in the statistics". PWM bring AYCO employees in to meet with their clients and sell their discreet area of expertise.
- Michael: GSAM: manages every asset class in every part of the world, creates product, distributes product all in one. They sell also through 3rd party distributors (about 1300 distributors). Their core business is institutional sales. They have a portfolio management business (the asset manager's bread and butter), hedge fund (ex: Amaranth), GSIP (another hedge fund cylo), and 3rd party business- review, select, and process 3rd party managers, pools managers and then sell their expertise ("AIMS" business); private placement sales of hedge funds.
- Michael: does not believe that there is a need to comply with consumer compliance laws with respect to the PWM clients due to the size of their portfolios. "We don't view the PWM business as retail because of the high net worth of the individuals involved"... "even though technically speaking they are retail".
- Michael: 166 compliance officers in PWM, and in the low 90's for GSAM. No global head of compliance for PWM, but there is one for GSAM. Compliance effort for PWM based out of London. They have 3 people in Switzerland (including AML people), 1 person in Frankfurt, and people in Italy, France, Dubai, and they coordinate with the compliance people in London. In Asia – Hong Kong is the core; in the US, the core is NY. 12 offices – in Brazil they have people onsite.

FEDERAL RESERVE BANK of NEW YORK
**Restricted FR**
December 29, 2011

### Key Meeting Exchanges

- Michael: Bangalore – performs routine work, centralized functions which are operational in nature. This is for cost reasons. In the US the business is more advisory, in Asia it is almost all trading, Europe is in between (50/50). We would like Europe and Asia to have a mix of business closer in percentages to that of the US.
- Michael: GSAM does have a global head of compliance. Their hub is London, but do have people sprinkled across multiple countries. Asia is more complicated. We are present in more countries. Japan, India, China, Korea have very different regulatory standards from those of the US. In the US business, every compliance officer is in New York, with the exception of one person in Brazil.
- Michael: Acknowledges that the IMD risk assessments are high level and indicates they are trying to go deeper. Recognizes that each business needs to dig in and customize and this will in turn drive training and monitoring.
- Michael: Some monitoring is centralized – such as trading; some is not – PWM has over 70 independent surveillances. We use the same desktop as the brokers: "It's cool. The depth you can get is unreal". GSAM has its own monitoring systems.
- Michael: We do a lot of training to business and compliance people. We work together with GSU, example, with new hire training; global compliance, AML. We also do division specific training, which is customized both to the business and to the region.
- Michael: With respect to conflicts, GSAM is more impacted than PWM. For example, who gets the opportunity within GSAM – between the clients and the Firm. Another example: Fixed Income- covered from a mutual fund, hedge fund perspective. Which one of our fund of funds gets the allocation? How do they vote proxies? They may find themselves in opposite sides of the same transaction. When does an idea go to a fund, a client, or the trader's account?
- Michael: PWM – does all of its trading with GSAM, although increasingly using 3rd parties. Acknowledges they have been having hiccups in best execution.
- Michael: With respect to suitability, we are "regigering" because regulators around the world are tightening up. They are in the process of collecting the information now. FSA's attitude is that if it is not in the file, it did not happen. We do focus on derivatives for suitability. GSAM – not a lot you can do with third parties, though China and India do force them to do suitability on 3rd party clients and vendors. For PWM, it is difficult because the clients do not tell us everything they have.
- Michael: We do a lot with marketing materials, marketing emails, etc.
- Michael: Bribery – Definitely a lot of work there. Sales and marketing deals with cross-border issues. We looked at the 30 highest travel jurisdictions and put together rules, including gift and entertainment. In the emerging markets we are still trying to figure out what the rules are. For example in Korea information sharing barriers are high. We have gotten permission to do only some surveillance outside Korea. In India and China they also have high information sharing barriers. We can't see other entities' files, but we are responsible for due diligence. In Japan, there is no information sharing outside of Japan so it's all done locally. For PWM – in Asia and Europe it's all done locally.

FEDERAL RESERVE BANK of NEW YORK
**Restricted FR**
December 29, 2011

## Key Meeting Exchanges

- Michael: Supervision – "we in compliance do not want to be the supervisors" … "our job is to make the business people better supervisors"… We are trying to put together a better matrix for the business supervisors. SWAM – system for GSAM were reports are pushed out to the business. Reports are pushed out to PWM as well.
- Michael: Regulatory Reform- "Depressing how we are going to get all this done, and how we are going to make money again". Bigger impact on GSAM than PWM. GSAM – limits the business they can do, revenues from PE and hedge funds. FACTA – 3rd party distributors are a challenge. It's a challenge to ID them and to keep track of it and implement it.
- Michael: Confidential Information – GSAM is separated from the rest of the firm to prevent "trading ahead". Portfolio managers go to board meetings.  We have to develop systems to better monitor confidential information. …"expert networks and virtual data rooms" is a new challenge since now we have to track that too. This is complicated and difficult to maintain.
- Michael: Reliance on Vendors – GSAM  distributors, sub-advisors in mutual funds, hedge funds, PE, printers, custodians, transfers, agents, proxy makers, etc. 206(4)(3) testing program under the mutual fund rules.
- Michael: Client Data – really a PWM issue. Phishing attempts, client emails compromised. Lots of attempts at impersonating clients, reengineering client data to penetrate our systems. Our clients are resistant to "tokens" that other retail banks have imposed to better improve security.
- Michael: (to question regarding Bangalore personnel make-up) We have 37 people in Bangalore, 27 support IMD globally, and work with US, Europe, and Asia in all businesses. 6 of those are for PWM, the rest (21) are for GSAM. Compliance also has dedicated technology people. IMD – estimated 23 GSAM, and estimate 13 for PWM – almost all located in Bangalore, a few in London.

FEDERAL RESERVE BANK of NEW YORK
**Restricted FR**
December 29, 2011

### Follow-Ups

- ☐ Follow-Up: Obtain details on all legal entities utilized by these two business lines.
- ☐ Follow-Up: procedures followed by PWM when bringing AYCO employees in to meet with clients.
- ☐ Follow-Up: in-depth cross-border review of GSAM and PWM, including rules, regulations, personnel org charts, Bangalore operations.
- ☐ Follow-Up: head of compliance IMD (Michael) does not believe that there is a need to comply with consumer laws with respect to PWM clients. No official head of compliance for PWM – trees up directly to the head of IMD (Michael).
- ☐ Follow-Up: get a true organizational chart reflecting actual personnel on the ground around the world for GSAM and PWM..
- ☐ Follow-Up: copies of IMD risk assessments.
- ☐ Follow-Up: select a couple of training modules for review.
- ☐ Follow-Up: Conflicts of Interest
- ☐ Follow-Up: Best execution and PWM
- ☐ Follow-Up: Suitability and vendor management for IMD
- ☐ Follow-Up: Marketing materials and emails and international rules compliance.
- ☐ Follow-Up: in-depth review of supervision and supervisory reports
- ☐ Follow-Up: FACTA, Dodd- Frank, Insider Trading, Client Data Privacy, etc.

## FEDERAL RESERVE BANK of NEW YORK

OFFICE MEMORANDUM

| | | | | DATE | December 29, 2011 |
|---|---|---|---|---|---|
| TO | | File | | SUBJECT | GS CARMA (Risk Assessment) System Overview |
| FROM | | Carmen M Segarra | | | |

### RESTRICTED FR

*Bus/Con Function: Bank Compliance*
*Type of Contact: Presentation*
*Date of Contact: 8 December 2011*
*Institution Rep: Una Neary, Andrea Kern, Wendy Peters*
*SSO Team Rep: Johnathon Kim, Leslie Sperber, Carmen Segarra,*
*Other Rep: Grace Gonzalez (NYS-DFS), Rusell Damitz, Pete Domasky (FDIC)*
*Description: GS CARMA system overview – risk assessment tracking system for GS*

### Key Meeting Exchanges

- Una: CARMA – stands for Compliance Assessment Risk Management Application – started early 2009 in response to GS becoming a BHC. It is intended to be a more formalized structure for risk assessments. (In response to question from J. Kim regarding who were the stakeholders in the development): Senior Compliance representatives across all divisions, headed by Una Bradley (who is now in London) in her capacity as Chief of Staff of the head of compliance and outside consultants (ICS) Alan Cohen, including Alan Cohen's direct reports (Michael Richmond, J. Moss). All compliance officers. It is intended to replicate what we call risk assessment.
- Wendy: Global system. Over 2000 rules and regulations, over 200 risks are classified (in 3 categories – very granular), 29 categories, 6 key risk themes: material (1)NPI; (3)AML/BS; (4)regulatory market abuse; (6)consumer compliance.
- Wendy/Una: there is an applicability matrix that is now part of CARMA. [We are now taken through a series of screen shots, which illustrate the following fields: #/theme/categories/type/regulatory description/regulator/regions/countries/last updated by/. Also Mitigants tab screen shot; Reports tab screen shot; Tools tab screen shot; Reports tab breakdown screen shot: Business Line or Desk/ Assessment type/categories/regions/desks: Private Lending. Then, it breaks down further into the following categories: theme/category/risk/risk description/desk/regulation/inherent overall risk (this is a 5 point scale)/inherent regulatory risk summary/training and communication/T&C ranking/ supervisory oversight.]
- Wendy/Una (in response to question from J. Kim as to how does GS know they have captured everything): "The objective is to capture the key ones. We leave out the ones that are marginally applicable or extremely low risk." (In response to J. Kim's question regarding what was the decision making process?): "We looked at the regulations and decided which were the relevant ones" For example, "Reg E (wire transfers), Reg B are not applicable to us". An evaluation was done". This formalized what policies and procedures they were already focusing on. It is a dynamic tool.

35

FEDERAL RESERVE BANK of NEW YORK
**Restricted FR**
December 29, 2011

## Key Meeting Exchanges

- Una (In response to J. Kim's question regarding – what about the initial scrub of the laws and regulations? Was it done by just compliance? What did you do?) : "yes. We worked with outside counsel. We know what we do. We worked with ICS. We get data feeds from regulatory sources whose operations are to update regulations". We get the updates on a weekly basis. We understand that our job as compliance officers is to know this. Compliance owns the responsibility, use outside counsel and we also use our inhouse counsel as well.
- Una (In response to P. Domasky question regarding how many jurisdictions are in the data base) :"don't know exactly but I think it's 34."
- Una (In response to J. Kim question regarding what does GS do to ensure it is ok globally): We have local compliance officers that are expected to sign in and get the feeds from the local countries where they are working.
- Una (in response to P. Domasky question regarding if GS is setting up a branch in China): We are talking about it. We are working with outside counsel. (In response to question from P. Domasky regarding how much lead time): We are not allowed to go into the country without knowing that all Federation group members have signed off. Even if we are scaling down in that country, we make sure to have adequate compliance coverage. New Activities Committee process product memos have great detail. "If compliance is not comfortable it doesn't go forward". We perform the risk assessments at that time. The CARMA tool is updated annually or as needed if the risk changes.
- [Review a new screen shot, whose categories are as follows: internal, external testing ranking/ policies and procedures/ policies and procedures ranking/ systematic surveillance and monitoring/ overall mitigant rating/ residual overall risk/]. Una: advocates for subjectivity and not ranking. Una does not want to rank. She is comfortable that the compliance officers have judgment. For example, if the system puts and automatic hard block, then all the training doesn't matter. We use guidance – please refer to the 2010 risk assessment methodology handout. Wendy: GSAM relies on a different type of mitigant. (In response to J. Kim's question regarding lack of mathematical baseline – there is a "ranking" in people's minds – how can you be sure that there is consistency?) Wendy: the review process. The compliance officer presents the findings to the compliance supervisor. Divisional compliance heads review the findings through regular meetings. They don't have official sign off.
- Una: there is no audit trail in the system. We can pull data cross divisionally but we don't do it too often. Court Colombic has centralized mitigants that apply across all divisions. But in some businesses some risks are more important than others.
- Wendy (In response to question by P. Domasky regarding any required actions in the reports produced by CARMA. Also, can you sort by ranking?) : Yes. The reports are downloadable to excel. She walks us through the summary report of the report. Shows us samples of the Inherent Risk Rating report and Residual Risk Rating report. Navigates back to the regulatory tab, shows us the inventory of regulations, which can be pulled by regulatory agency. The tool can also sort by the tasks that they apply to. Navigates to Asset Management at J. Kim's request. Indicates that compliance officers are the ones who populate this tool. The mitigants are owned by the businesses.

FEDERAL RESERVE BANK of NEW YORK
**Restricted FR**
December 29, 2011

### Key Meeting Exchanges

- Wendy (cont): AML and CTG are cross-divisional, so mitigants are owned and populated by the owners. Compliance officers have the ability to select which mitigant is applicable from the drop down menu. They can also use the "add" button to add new mitigants to the mitigants list. Not everyone has permission to do this. (In response to question from J. Kim regarding how is access granted): Wendy has "God-like" access, Una has read-only access. The process is the compliance officer sends a ticket to technology, who in turn sends it to Wendy's team, who then go in and populate the tool. (In response to question from J. Kim regarding how often do you update the tool): constantly. Una adds: we are always adding. "I talk to other colleagues and benchmark with competitors".
- Una (In response to question from P. Domasky regarding can you go back and after any regulatory action see how it looked at the time of the action?): Yes. We looked back for Abacus. Also for Consumer Compliance. (In response to question from P. Domasky regarding do you have residual risk worse than 3?), Wendy indicates: "can't remember for the Bank. We have had 4's, but that would be actionable right away." She doesn't think any risk is above 3 for a prolonged period of time.
- Una/Wendy (In response to question from J. Kim regarding training on CARMA -- who? When?): it's a very small number of people. Wendy – in PWM its 2 people; in GS Bank, it's 3 people. In the securities division it's a wider range. Una traveled to UK and Asia to present it in person. Wendy indicates that technology also did a number of training sessions. As new people come onboard, either Wendy or technology trains them. They also use webcasts. They indicate that Una Bradley owned this before Wendy. She is now in London.
- Andrea: (In response to question from G. Gonzalez regarding if there is a separate tool to track actionable items): SIMPL is the system they use to track actionable items.

FEDERAL RESERVE BANK of NEW YORK
**Restricted FR**
December 29, 2011

#### Follow-Ups

- ☐ Follow-Up: find out what risk themes 2 and 5 are.
- ☐ Follow-Up: review the list of people who use CARMA and the type of training they get.
- ☐ Follow-Up: risk assessment issue capturing methodology, including: sample new activity risk assessment tool population, scrubbing of list of laws and regulations – why only 34 jurisdictions.
- ☐ Follow-Up: given their emphasis on subjectivity vs ranking, review their methodology for ability to establish consistency across multiple activities.
- ☐ Follow-Up: why is there no audit trail in the system?
- ☐ Follow-Up: interaction between CARMA and SIMPL.

# FEDERAL RESERVE BANK of NEW YORK

OFFICE MEMORANDUM

| | | | **DATE** | December 29, 2011 |
|---|---|---|---|---|
| **TO** | File | | **SUBJECT** | GS Conflicts of Interest Compliance Overview |
| **FROM** | Carmen M Segarra | | | |

## RESTRICTED FR

*Bus/Con Function: Conflicts of Interest - Compliance*
*Type of Contact: Presentation   (see attachment)*
*Date of Contact: 8 December 2011*
*Institution Rep: Gwen Libstag, Randy Stuzin, Tom Riggs, Una Neary, Dave Park, Tamila Ghodsi, John*
*                    McGuire, Fergal O'Driscoll, Andy Chisholm*
*SSO Team Rep: Michael Silva, Susan Goldberg, Johnathon Kim, Leslie Sperber, Carmen Segarra, Ari*
*                    Cohen, Mathew Blake*
*Other Rep: Grace Gonzalez (NYS-DFS), Pete Domansky (FDIC)*
*Description: GS Conflicts of Interest Compliance Overview*

### Key Meeting Exchanges

- Gwen: "… function started 100 years ago… in the context of M and A. As business evolved, it grew from a merger to a Firmwide function". "Firmwide since 2004". Gwen is a member of the Management Committee and reports to Gary. Compliance department does the Chinese wall; Gwen's group does the transactional "when what we do with one client is in conflict with another".
- Gwen: "…we follow our own principles" (slide 2) – 3rd point is particularly important to us. We work very closely with legal.
- Gwen: we get conflict checks from various areas of the firm. "We are just a piece of the larger reputational risk infrastructure."" We tend to see things upfront. We create links so that we loop in other committees. As issues evolve we use the linking to escalate. It is the business line responsibility to come to us, we make sure they do so through training.
- Gwen: We review all committee memos, we speak to the lawyer and review what they provide, when teams create projects, we make sure that we get a link to the project. We have final say.
- Gwen: Compliance and Audit backtest. We built a firmwide computer system that tracks issues raised and all trading exposures and all businesses. Dates back to 2003. Example: if we take an advisory mandate, we will continue to write research, we will continue to make the markets.
- Gwen: PR risk is subjective, the only consistency is the people involved.
- Gwen (in response to question requesting more information on how they resolved the Kinder/El Paso conflict): We are sole advisor to El Paso. We are also a longtime advisor to Kinder. Sole advisor for the contemplated spinoff. Kinder made the approach to El Paso. "No one could have anticipated that El Paso would do that." Then we had the conversation. We laid out for the Board in excruciating detail the situation. There was a debate. R Stuzin: We have board meeting minutes and email confirmation.
- Gwen: We treat ERISA pension funds different from Alternative Investments and the Merchant Bank. We discussed the recusal with the head of the MB and IB divisions.

FEDERAL RESERVE BANK of NEW YORK
**Restricted FR**
December 29, 2011

### Key Meeting Exchanges

- Gwen: "Compliance is not involved in the consultation process." R. Stuzin: "They only get involved in the implementation of the decision."
- R Stuzin (in response to question regarding the open seating arrangement layout): different lawyers from different divisions sit together. T. Riggs: There are no Chinese Walls within the legal department. R Stuzin: We don't separate Compliance people either. Gwen: It would be terrible if they were separated.
- Gwen: One of the trickiest parts for the teams is to figure out when to "phone home". When does general marketing become so specific that they need to phone home before the hard stop of client engagement letter signature process comes into play. Sometimes they have to sign confidentiality agreements.
- Gwen (slides page 11) they are [as in, they have rolled out these conflict checks] already in the Securities, Merchant Banking, and Investment Banking Divisions. The next frontier is the Investment Management Division. Last week we did the refresher training of our teams (according to Tamila). John McGuire: We have integration with legal.
- T. Riggs: (in response to more Kinder Morgan questions) "We found ourselves in that position because of the composition of the businesses of the divisions." R. Stuzin: "We have the same model as everyone else in the industry, we just do this better." Gwen (in response to M. Silva's concern that the Fed is worried about the perception that the game is rigged, that the public's confidence in the financial system is not there): "We stand by the Kinder transaction. Everyone benefitted, as determined by an independent auditor." (when asked for the name of the independent auditor) "Morgan Stanley and Evercore".
- Gwen (in response to P. Domanski question regarding if they have a mechanism to divest a holding before taking on an assignment or if they use Chinese walls instead): "Divestiture would be difficult because it is nonpublic information. Once public we put the transaction on the restricted list."
- Tamila (in response to question from S. Goldberg requesting that GS walk us through a declined transaction): "Some are based on reputational risk, for example: pornography, bankruptcy advisory, restructurings." Gwen: when the buy side comes in, but we are close to the other side… "the bulk of our issues are IBD vs. IBD issues"… "it is all fact dependent". "The process is the same as for approval, it is escalated to Gary" and then the decision is made. "Our process is not a black box."
- Gwen (in response to question from L. Sperber as to whether they have financial information on hand when making a conflicts decision): "Yes, we have it and take it into consideration. We are not a legal or compliance function. We don't hold ourselves to be that kind of a function." R Stuzin: "This is why it's called business selection. They do both."
- Gwen: indicates that if it is a true conflict, "I don't let money guide me".
- Gwen (in response to question from J. Kim regarding who determines compensation): the Finance Group determines this group's compensation.
- Gwen (in response to M. Silva's question indicating that the Fed has similar issues internally, and that the Fed has certain routines that it enters into to determine breaches of the law and what is your system for doing this?): "Internal audit does backcheck."

FEDERAL RESERVE BANK of NEW YORK
**Restricted FR**
December 29, 2011

### Key Meeting Exchanges

- Gwen (cont): "We find out occasionally from committees, from clients who complain." The most severe ones end up in Employee Relations. Sometimes its inadvertent – the intent factor is important for GS. (M. Silva follows up with question regarding how often these cases end up in Employee Relations): 1 in 4 or 5 years. Gwen's team (in response to question from M. Silva regarding audit): 5% of the situations.

- Gwen: it will happen that a deal takes place that is different from the deal we had originally cleared/approved. Dormant deals "wake up" and the bankers never tell us. (In response to M. Silva question regarding what happens to the banker – does the bonus get docked, for example): the bankers are supposed to refresh. Once authority is given they keep it. What we may consider dormant may not be what the client thinks is dormant. (In response to question from J. Kim regarding having time stops on a project) " we have a flag but not an automatic ticket pulled".

- Gwen: "People view us as commercial partners. We are not perceived as cops. We are woven into the business. We want them to come to us early. The smartest bankers come to us early because of client trust".

- Gwen: founded the group, and has been in charge of it the whole time ..." I have been in charge [of this group] longer than some people in this room have been alive". She relies a lot on her team. She sees only 5% of what her team deals with. She loves that it is a small group. Indicates they have policies and have best practices training. Every time they make a mistake, they send around a memo containing lessons learned/best practices.

- Gwen (in response to question from S. Goldberg question regarding how do the team separation procedures work? Does it influence the set up of the shop?): in Kinder we separated the information and the team. Other times we will make a disclosure. Sometimes the clients make us agree that if a team works for one side it will not work for the other for X period of time. Each team lead meets with their sub-team on a daily basis, in a group setting so people can learn from each other.

- John confirms that they do not keep meeting notes of their internal meetings. Solutions, however are captured in the CAPS system. Fergal: we built functionality in the system to have alerts regarding the disclosures and scripts that will be delivered as a result of decisions made. David: 70-80% of the checks are ok. Of the remaining, 5% get elevated to Gwen.

- Gwen (In response to question regarding who heads each committee): Bruce Albert heads the control room and Chinese Wall. There is no separate committee firmwide for reputational risk.

- Gwen (in response to question regarding the Facebook vetting process): often clients want funds into these investments. R Stuzin: we clearly disclosed to the clients in the documents. Multiple lawyers get involved in the 80% of the cases. The 5% are dealt with by R. Stuzin and Gwen. In their estimation, IMD and IBD have most of the conflicts. Tom: there are other lawyers who cover derivatives. There is more junior level attention for the 80% of the cases – but his team is specialized.

- Gwen: Indicates they are an independent committee, they report to Gary. Decisions are documented through CAPS system and Company Query. They do have a veto power and a veto process. The group is global in nature, but legal and compliance are not represented in it.

FEDERAL RESERVE BANK of NEW YORK
**Restricted FR**
December 29, 2011

### Follow-Ups

- ☐ Follow-Up: request meeting with Chinese Wall Compliance.
- ☐ Follow-Up: procedures followed to obtain feedback from legal and compliance.
- ☐ Follow-Up: meeting to review their issues tracking system (CAPS, Company Query). Select a few issues – approved and denied transactions - and test them.
- ☐ Follow-Up: review their training.
- ☐ Follow-Up: dig deeper into Kinder Morgan – El Paso
- ☐ Follow-Up: why is the Compliance Division not involved in Conflict of Interest determinations?
- ☐ Follow-Up: seating charts. Why are there no Chinese Walls for the legal and compliance people? Client Confidentiality, Privacy, Insider Trading issues.
- ☐ Follow-Up: training on when general marketing has "gone too far" and team needs to "phone home". Why is the deal that is completed allowed to be so different from the deal that is initially approved? Why no hard stops on dormant deals?
- ☐ Follow-Up: Dig deeper into their backchecking mechanisms.
- ☐ Follow-Up: Dig deeper into the Chinese Wall and control room; reputational risk; Ethics Officer. Also – any recusal mechanisms? Why no divestiture mechanism? What exactly is the conflict check mechanism and its escalation procedures? Why is the conflicts group not headed by an attorney? Should Finance be responsible for the conflicts team pay and bonus?

| Firm | Legal & Compliance Year(s) | Inherent Risk | Board & Sr Management Oversight | Policies, Procedures & Limits | Risk Monitoring & MIS | Internal Controls | Overall RM & Controls | Impact | Management CAMELS/C | CRA | Consumer | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2011 | | | | | | | | | | | |
| | 2010 | | | | | | | | | | | |
| | 2011 | High | 2 | 2 | 2 | 2 | 2 | 3 | 1 | 2 | 2 | |
| | 2010 | High | 2 | 2 | 2 | 2 | 2 | 3 | 1 | 2 | 2 | |
| | 2011 | High | 3 | 3 | 3 | 3 | 3 | 2 | 2* | N/A | 3 | |
| | 2010 | Considerable | 3 | 3 | 3 | 3 | 3 | 2 | 2* | N/A | 3 | |
| | 2011 | High | 3 | 3 | 3 | 3 | 3 | 3 | 3 | TBD | 3 | |
| | 2010 | High | 3 | 3 | 3 | 3 | 3 | 3 | 3 | TBD | 3 | |
| | 2011 | Considerable | 3 | 3 | 3 | 3 | 3 | | N/A | N/A | 2 | |
| | 2010 | Considerable | 3 | 3 | 3 | 3 | 3 | 3 | N/A | N/A | 2 | |
| | 2011 | Considerable | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 1 | 1 | |
| | 2010 | Considerable | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 1 | 1 | |
| | 2011 | Considerable | 3 | TBD | 3 | TBD | TBD | TBD | 3 | 2 | 4 | |
| | 2010 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 3 | N/A | |
| Goldman Sachs | 2011 | Considerable | 3 | 3 | 3 | 3 | 3 | 2 | 2 | TBD | 3 | |
| | 2010 | Considerable | 3 | 3 | 3 | 3 | 3 | 2 | 2 | TBD | 3 | |
| | 2011 | High | 3 | 3 | 3 | 3 | 3 | TBD | TBD | TBD | TBD | |
| | 2010 | High | 3 | 3 | 3 | 3 | 3 | TBD | TBD | TBD | TBD | |
| | 2011 | High | 2 | 2 | 2 | 3 | 2 | 2 | 2 | TBD | TBD | |
| | 2010 | High | 2 | 2 | 2 | 3 | 2 | 2 | 2 | TBD | TBD | |
| | 2011 | | | | | | | | | | | |
| | 2010 | | | | | | | | | | | |
| | 2010 | High | 3 | 3 | 3 | 4 | 4 | N/A* | TBD | TBD | 2 | * Corporate Functions to assess |
| | 2010 | High | 3 | 3 | 3 | 4 | 3 | 3 | TBD | N/A | N/A | |
| | 2011 | High | 3 | 2 | 3 | 3 | 3 | TBD | TBD | *TBD | *TBD | * Lead OCC |
| | 2010 | High | 3 | 2 | 3 | 3 | 3 | 2 | 2 | *TBD | *2 | * Lead OCC |

RATING

1= Strong
2= Satisfactory
3= Fair
4= Marginal
5= Unsatisfactory
N/A= Not Applicable

Inherent
High
Considerable
Moderate
Low

43

25 April 2012

Att: G. Winstag; G. Palin; U. Neary, A. Cohen, R. Sturzin . 1 D. Joan

M. Silva, R. (NYS) ; Greer Gonzalez, Hae Ban Kim ; Umi ; Jane Ford ;

DRM   G. Erkes, (SEC) ; Susan McGinn (SEC) Dave Park ;

P. Galbraz, J. McCarthy, J Christian Kind.

David Solomon - leads

ET Res./RM. transaction

We take the conversation very seriously but we are repairing our policies, procedures & we are reaching out to our clients, Primary function is to watch we can & should do.

We pride ourselves in our strong capabilities. Proud to strength of the relationships we have

we now know we need to be extremely transparency. we believe we served the industry in our transparency

the BCCG has brought much clarity.

ET Paso - 15 yr rel.   In 2006 became anti-raid advisor. we made

we have advised bain ET for many years

we had several conversations with ET re our investment in KMI

we intend to act as ET lead & exclusive advisor

KMI suggested merger.   We when referred upon ET our conflicts ; highlighted need for 2nd advisor

ET "Tooke" insisted that we continue to advise "ET

we analyzed the transaction proposed & strategic options

ET decided to move forward with spring.

the majority of work & Guincy was already completed before on June KMI under our approach

We accepted the ET proposal as advice

We thought that S. Daniels

G. Winstag.

conflict is a contextual judge . The decisions our

to us prior to accepting an assignment. We assign one of
our senior members to lead the investigation

we do think the cos polices + procedures when followed
we recognize at midnight.

These are the things we considered when making the [capacity] decision
① our pre-existing interests                 [ not a friendly decision, we
②                                              were told we need your
                                               decision immediately ]

② Influence + economic interest — we needed to isolate
the influence to our banking team + our banking synergies
had no impact of _____ _____ _____ _____ we secured the
board seats.

Economic interest — debate actually on the board ec. interest
we have in KKR.

③ we sought a lot of lawyers to take a look a this
    R. Strauss,  D. Greenwood (Deputy GC) + Dave Thomas
    from MBD.  also Wachtell Lipton

④ elevation  even though we knew we legally could do
    it, we knew there would be reputational issues
    G. Stern, D. Mirar were involved in the discussions before
    we decided to accept

⑤ We knew we need but Recused a board member ② transparency
    ③ retention as advisor

They chose to use MS ; we had no involvement
documentation — given the company had asked us to
do certain things we included bespoke language in
the letter

    We sent out buVal/red team members ___ memos
    + team separation

⑥ Personal trading — the board was not informed about
    the S.D. position.
        unfortunately we believe that across the street MS is
    also.

SEC - clarifies - we are discussing holdings

Mike - it's not industry practice to take into account the personal holdings of individuals

A Cohen - we have policies on personal trading but not integrated into the conflicts process

It was a different conference - everyone is thinking of this anchor

SEC - (main guy) - on this specific case, as part of the materiality review, where these holdings i or not correct

G. Palm - similar arguments migrate.

the policies may have migrated, his job may have migrated, over the years there is

there

SEC - did any of the deal team members have knowledge of it.

D. Solomon - J. P. did - he did raise it internally

A. Cohen - in terms of the timeline, when we made the investment, it was reviewed + approved, + he did raise his hand in the latter part of Sept which we take as a positive fact of recognition

in retrospect, it should've been disclosed

D. Solomon - we haven't integrated people's holdings, but it's complicated

but we are working to rectifying it

P. Sloan - pre-Board's commentary it this had been revealed to the board, they would have said this is not material, this is not relevant.

We missed it because of our process, not our policies.

U. - please clarify

D. - S. D. bought shares in 2003, in 2012 - he still had shares → paid dividends, in shares not cash

S. D. bought scores of 2004 - ~~Kith Shares~~

position went away in 2007

    invested in MBD fund cost — not subject to personal
trading or private investment policies.

SEC memo jus — I thought his holdings where looked at were cleared
to be immaterial, is that right?

G. Palm — no that's not right

SEC — was not a point call

D. Solom — no process

SEC — was it it was raised, was there a process or
did the process did not work?

G. Palm — there was no process

D. Solomon — as part of our remediation

i. N. had had the right approach when he made all the
investments. The COI checks were cleared. S.D.
raised it after that.

SEC — because holdings was not part of the COI process

GS — yes

D. Solom — the MBD investment is a loan so a mutual fund
investment

A. Cohen — ④

    ① doing different, we will we get better

    ③ access counsel & congress this y we put of the into
flow

    ④ we in now issuing it or this regime will end
up as disclosure & trust further tightening of restriction
on what banker can do, this dialogue in industry

    ⑤ what we have done in escalate to CEO level
in these business who has to approve the trades.

D. Solom — we are thinking about this. Thresholds by banker
have tightened over time.

    example: these told its what restriction began to NOTPhe-
would you restrict the bankers from investors in hedge fund or
also.?

G. Palm - we have discussed some barriers regarding what is natural / not natural .; we talked about the wine retrees

"E judge no economic interest a key determing factor? So one retired judge said no in light of what Fosches was "doing

we have done this in recognition that things have changed. we are looking at all these permutations & problems

G. Libstay - had we known about the position of the dean, we would have discussed it to the board, but we would have made the same decision

G. Palm - what we would have ~~done~~ clone is tell the the Fini

SEC we would like to get briefed on the new developments
SEC examiners. looking for you | how the process will evolve

M, Certici -
G. ① - G. Libstay. our group.
     mechanism by which we communicate our expectations

     what they need to do & how to follow it &
     the mechanism will tell them what to bring to us &

     training mechanism
     Rn Stunio - also in the bureau reports

G. Libstay - issues that we vat - agency & agency signing issue some discussed issues, transition issues, influence.
     we don't want to limit people so what they are suppored to tell won us

48

I could not come up with every one

G. Palm - if you take one dictionary but it has a basic meaning.

G. Libstag - we don't want to hits

A - Cohen - different approach

G. Libstag - the traders are not aware of half the news but we are vetting

SEC - story release on individuals

D. Solomon - many types of conflict checks that are done before we engage in activities

G. Libstag - representing as it relates to trading changes

J. Stregoin - we don't rely solely on traders to decide when we need to engage in compliance activity.

G. Libstag ➤


D. Solom - you can't staff a project until you clear conflicts

G. Palm - it you are engaging in a dialogue if you are involved in any type of transaction at all you are supposed to check under conflicts

G. Libstag - can sure we pass this, 80% get them later then wid enter ⬤

SEC -

    [to debate]


G. Libstag - we are talking about a corpse scheme - asking them to declare - we have been doing this is a stopgap.

    If I were to get to know everyone's position that has complications.

G. R. - it will take us a while to figure f....... out

G. Palm - you can do everything perfect + then things
change, we rely on being
ex: new b. ddle .... us .... that changes our
dynamics.

G. Libstag - our position is that it's a case by case
these are not legal judgments
its not static.

Da Gross - think about the conflicts definition
we don't think of conflicts as manageable
+ not manageable.
it all has to do with what the client
thinks, what

G. Palm -

D. Salomon - it is easier to say no to something, ie
you are starting on ..... to where you
have already been involved.
if you are in the middle of something

A. Cohen -

D. Solon - there are plenty of things we say no to, there
are plenty of things we tell our clients about

U. Neary - we would not put it in the policy anyway,
it is up to conflicts to decide.

G. Palm - part of the bankers evaluation - compensation
taskforce and their compliance

D. Solomon - ..... compensation policies

G. Palm - we can give you copies of 360 review forms.
and the manager .... evaluation.

U. Neary - loop back to Brian O'Hawthorne who has
into an
be there employee review .....

50

if for any reason they did something, conduct flag
HR is involved in discussing them with the managers.
A- Cohen - a conflicts failure would _____
A. Cohen before you take MNPI, you go on conflicts
      and check. I would use the form
   "Chinese wall" because most things occur on the
      private side.

R- Stone - there is a ____, and closer in time but things
      openly and new

G. Libstag - [___ of COI, recordkeeping procedures]
      we have CA35.
         it allows us to look at all assignments &
      actions of the.


③ G. Conversely -
      G. Saez - I can't
      G. Libstag - we had a policy that governed all
      the activities. We tried to give the businesses
      their own policy
      G. Park - we can give you the generic one
         & they were subject to global policies
   [G. points out the discrepancy]
   ve
   Q ④
      G. Libstag - there is very little that conflicts does
         that is not in coordination legal & compliance
         & we document in CA35.
      D. Park -
      G. will get those to us [the ones that they
         are for.
   Q ⑤  D. Park - client calls in and says "
      we have x and we want to sell it" →                      51

we log it in EABi + then decide what to do

Q. 6
A Cohen - — we will check the next public filing
if for example
pretty well thought out + rigorously overseen by
legal + counsel.   Tom is involved, by, is involved

(7)   A. Cohen —
any information that is material.

(8)

G. Libstag—    where you start the process you have
to give us certain information   what we are saying
is that we don't want here + toute conversation
the result is documented in CASS.
we want a complete understandable records.

(9)   G.    —
blue team / red team — its about "do not talk"

(10)   G. Libstag
turnaround time is very important to us
be are in constant communication with them
we have been working on reducing turnaround time
but not at the expense of making mistakes.
escalation disputes are resolved

D. Solomon   be have 100-150 emails a week
~~from~~ more   250-300 a week

52

(11) ISD people + MSD people are discussing information/
ideas all the time

1) Schan — write not confidential information.

(12) G. Lipky — it would be in the documents you
have.
what gets documented would be in CMS.

(13) . We don't recall to

D. Salva — company decides it wants to go public equity
offer.

(14) — stepped? we will get them to you.

(15)
J. Sturin — we

has below + be going.

SEC — lead guy — we would like to be a part of the development
of the new policies + procedures.

SEC — don't report.

April 30, 2012
7:30 pm

#16- Proposed questions - none

Various thoughts -

54

**Re: Conflicts of Interest**
Michael Silva  to: Carmen Segarra                                05/13/2012 11:32 PM

Carmen:

I have to tell you that I am very troubled by this string of messages.

How can you tell me that L&C is working on issuing an MRIA and MRA's when your L&C Team Leader tells me in his message below that COI due diligence has not been completed? Also, how can it be that L&C is working on issuing an MRIA and MRA's when we have not even submitted our El Paso follow-up questions? Especially when I personally told you that our lawyers have indicated to me that it is not clear that all of our proposed El Paso questions have a clear basis in law or established regulatory standards? I have told you several times Carmen that as examiners, we do not get to be judge and jury. There is a process that has to be followed before we can issue supervisory findings like MRIAs and MRA. I find your failure to follow that process very troubling.

I am also troubled by some things I have learned since Friday's vetting of our annual assessment of the firm.

I don't know if you were on the line for Friday's vetting session with the OC, but at one point the Team was asked, as part of a discussion about reputational risk, whether GS has a Code of Conduct. I replied that they do not have a written code of conduct. I also stated that they do not a written conflict of interest policy, relying in part on statements that you have made repeatedly to me - statements which you reiterated in your message below. However, it was pointed out to me after the vetting session that in fact, GS has a written Code of Conduct. Moreover, in light of your repeated and quite adamant assertions that Goldman has no written conflict of interest policy, you can understand why I was surprised to find a "Conflict of Interests Section" (pasted below) in Goldman's Code of Conduct that seems to me to define COI, prohibit COIs, and instruct employees what to do about COIs. In addition, this weekend, I reviewed Goldman's Business Standards Report, where it discusses in detail the types of conflicts that can occur between the firm's interests and the interests of its clients and establishes extensive policies and procedures to guard against such conflicts. In light of these documents, repeated statements that you have made to me that GS does not have a COI policy AT ALL are debatable at best, or alternatively, plainly incorrect.

Of course, as examiners, we can  and should point out ways the firm's COI policy needs to be improved, or be better organized, or be better documented in the event that, after conducting appropriate due diligence and vetting of our conclusions, we find it to be deficient in any of these respects. Perhaps GS' COI policies should be more like the ones for Barclay's and Morgan Stanley that you mention. But, as far as I know, your L&C management has not even seen those policies, much less made a determination that those policies set the standard that all supervised institutions should be held to. But even assuming that the Federal Reserve had determined that all supervised institutions should have COI policies like the ones that Barclay's and MS have, it seems difficult to make  a blanket statement such as you have made that GS has no COI policy AT ALL when a cursory review of the public web site reveals a lot of material that directly addresses COI. Moreover, the existence of the written GS COI materials that I have discussed, which are easily available, combined with the absence of clearly established Federal Reserve standards in this area, have caused me to raise serious questions in my mind as to your judgement in reaching and communicating conclusions without a sound basis in the supervisory process and before the due diligence and vetting process is complete.

Mike

For your information, the Code of Conduct can be found on the public GS web site at:
http://www.goldmansachs.com/investor-relations/corporate-governance/corporate-governance-documents
/revise-code-of-conduct.pdf.

55

**Personal Conflicts of Interest**
A personal conflict of interest occurs when your private interest improperly interferes with the interests of the firm. Actions or relationships that create personal conflicts of interest are prohibited, unless approved by the firm. It is important that you carefully consider whether any of your activities or relationships, including business or volunteer positions outside the firm, could cause a conflict (or the appearance of a conflict) with the interests of the firm. Even if an activity seems unrelated to your role at the firm, you may be required to obtain pre-approval before engaging in it. The Compendium provides detailed guidance on when and how preapproval is obtained. Additionally, personal gain and advantage must ever take precedence over your obligations to the firm. You must never use or attempt to use your position at the firm to obtain any improper personal benefit (including loans or guarantees of obligations or gifts, from any person or entity) for yourself, family member(s) or any other individual or group. If you are aware of a transaction or relationship that could reasonably be expected to give rise to a conflict of interest or perceived conflict of interest, you should discuss the matter promptly with an appropriate ethics contact. When in doubt, raise the question for appropriate consideration.

Also FYI, the Business Standards Committee Report can be found at:
http://www.goldmansachs.com/who-we-are/business-standards/committee-report/business-standards-committee-report-pdf.pdf

Conflicts of interests between the firm and its clients are discussed on pages 16 to 26.

| | | |
|---|---|---|
| Johnathon J Kim | Carmen, I understand from Mike that he informe... | 05/11/2012 05:41:09 PM |

From:     Johnathon J Kim/NY/FRS
To:       Carmen Segarra/NY/FRS
Cc:       Michael Silva/NY/FRS@FRS
Date:     05/11/2012 05:41 PM
Subject:  Re: Conflicts of Interest

Carmen,

I understand from Mike that he informed you that a follow-up set of COI questions is being worked on with FRBNY legal, and that we expect them to be finalized for delivery next week. Given that the COI due diligence has not been completed, and that your initial findings have not yet been reviewed and vetted with the all of the relevant FISG stakeholders, it's premature to represent that "L&C is working on issuing an MRIA ..., as well as other MRAs ...." Let's try not to front-run the supervisory process.

Regards,

Johnathon

| | | |
|---|---|---|
| Carmen Segarra | Hi! I heard that conflicts of interest came up as a... | 05/11/2012 12:49:01 PM |

From:     Carmen Segarra/NY/FRS
To:       "Michael Silva" <Michael.Silva@ny.frb.org>, "Tamara Marcopulos"
          <Tamara.Marcopulos@ny.frb.org>, "Michael Koh" <Michael.Koh@ny.frb.org>, "Johnathon Kim"
          <Johnathon.Kim@ny.frb.org>
Date:     05/11/2012 12:49 PM
Subject:  Conflicts of Interest

Hi!

I heard that conflicts of interest came up as a topic in today's vetting session. Just to confirm, Goldman

56

Sachs does not have a conflicts of interest policy, not firmwide, and not for any divisions. I would go so far as to say they have never had a policy on conflicts, based on the dates of the documents provided to us for review.  What they do have for some, but not all divisions are business selection procedures which they have labeled as also applying to conflicts, but which in fact only cover certain aspects of the business selection process and are incomplete. I am happy to circulate Barclay's and Morgan Stanley's Conflicts of Interest policy so you guys can get a sense of what such a policy actually looks like - let me know! L and C is working on issuing an MRIA to this effect, as well as other MRAs related to this topic.  It is one of the many reasons why we downgraded them in the policies and procedures area. I am happy to provide you with extensive documentation to support these conclusions - again, let me know if you want me to forward! I hope this helps!

All the best,
Carmen