# FEDERAL RESERVE BANK *of* NEW YORK

33 LIBERTY STREET, NEW YORK, NY 10045-0001

**DAVID L. GROSS**
COUNSEL AND VICE PRESIDENT

October 11, 2013

**FILED ON ECF AND SENT VIA ELECTRONIC MAIL**
**(Abrams_NYSDChambers@nysd.uscourts.gov)**

Hon. Ronnie Abrams, U.S.D.J.
United States District Court
    for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Room 2203
New York, NY 10007

Re:   **Carmen Segarra v. Federal Reserve Bank of New York**
      **Civil Action No.: 13-CV-7173 (RA)**

Dear Judge Abrams:

The Federal Reserve Bank of New York (the "New York Fed") respectfully submits this letter in the above-referenced matter in support of our emergency application for a protective order. The New York Fed's position is that portions of the complaint and attachments should not be publicly filed because they contain Confidential Supervisory Information ("CSI") under 12 C.F.R. Part 261 and must therefore be removed from public access. The New York Fed also requests that the Court order Plaintiff and her counsel not to publish any other CSI without further order of the Court.

The Second Circuit enumerated the steps a district court must take when deciding whether documents may be removed from public access in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006). Under the Second Circuit's framework, the first step is to determine whether the documents at issue are "judicial documents." *Id.* at 119. "Judicial documents" are those documents filed with the court that are "relevant to the performance of the judicial function and useful in the judicial process." *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) ("Amodeo I"). If the court determines that the documents are "judicial documents," the court must assess the weight to be given to the presumption in favor of public access to the documents. *Lugosch*, 435 F.3d at 119. The weight assigned must be "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995) ("Amodeo II"). Finally, "after determining the weight of the

FEDERAL RESERVE BANK *of* NEW YORK

Hon. Ronnie Abrams, U.S.D.J.
October 11, 2013
2

presumption of access, the court must balance competing considerations against it. . . . Such countervailing factors include but are not limited to the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure." *Lugosch*, 435 F.3d at 120 (quoting *Amodeo II*, 71 F.3d at 1050) (internal quotation marks omitted).

The Second Circuit has held that "the mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access." *Amodeo I*, 44 F.3d at 145. The documents filed in the appendices to the complaint in this matter are not judicial documents; they are bank supervisory materials that fall into two categories: (i) internal New York Fed e-mails and memoranda evaluating an institution that the New York Fed supervises; and (ii) documents provided to the New York Fed by Goldman Sachs, a supervised institution. These documents are all CSI. *See* 12 C.F.R. §§ 261.2(c)(1)(i) and (iii) (defining "[c]onfidential supervisory information" to include "any information derived from [or] related to" "reports of examination, inspection and visitation, confidential operating and condition reports" or "[a]ny documents prepared by, on behalf of, or for the use of . . . a Federal Reserve Bank"). These documents show that at the time she left the employ of the New York Fed, she purloined property of the Board of Governors of the Federal Reserve System. *See* 12 C.F.R. 261.22(e) ("All confidential supervisory information made available under this section shall remain the property of the Board. <u>Any person in possession of such information shall not use or disclose such information for any purpose other than that authorized by the General Counsel of the Board without his or her prior written approval.</u>") (emphasis added).

But assuming that the Court finds that these documents are "judicial documents," and the common law presumption of access attaches, the competing considerations against public disclosure in this matter outweigh the presumption. There is no question that the documents in the appendices are CSI: several of them are stamped as "Confidential Supervisory Information." Memos that were written by Plaintiff are designated by her as "Restricted FR," meaning that she understood how sensitive they were and that they were both: (i) never to be disclosed to the public; and (ii) property of the Federal Reserve System. ("Restricted FR" is the Federal Reserve System's second-highest classification level. Documents containing that designation may not be publicly disclosed without authorization.) By publishing these documents with the Complaint, Plaintiff has engaged in a flagrant and clear violation of Federal law.

Even under the *Lugosch* First Amendment analysis, "the presumption of access . . . can be overcome . . . by specific, on-the-record findings that higher values necessitate a narrowly tailored sealing." *Lugosch*, 435 F.3d at 126. In fact, the Second Circuit acknowledged that something like the attorney-client privilege might well be a sufficiently compelling reason to warrant a narrow sealing order like the one we seek here. *Id.* at 125. The bank examination privilege has been widely acknowledged. *See In re Bankers Trust Co.*, 61 F.3d 465, 471 (6th Cir.

FEDERAL RESERVE BANK *of* NEW YORK

Hon. Ronnie Abrams, U.S.D.J.
October 11, 2013
3

1995); *In re Subpoena Served Upon Comptroller of Currency*, 967 F.2d 630, 633-34 (D.C. Cir. 1992); *Linde v. Arab Bank, PLC*, No. 04 Civ. 2799, 2009 WL 3055282, at *1 (E.D.N.Y. Sept. 21, 2009); *Bank of China v. St. Paul Mercury Ins. Co.*, No. 03 Civ. 9797, 2004 WL 2624673, at *4 (S.D.N.Y. Nov. 18, 2004). The bank examination privilege, like the attorney-client privilege, exists so that supervised institutions (the equivalent of clients) share their most sensitive, confidential information with their supervisor (the equivalent of an attorney). In fact, the Congress amended Federal law by passing the Regulatory Relief Act of 2006, Section 607 of which enables supervised institutions to share information protected by the attorney-client privilege with their supervisors without the sharing constituting a waiver. 12 U.S.C. § 1828. The obvious policy reason is to encourage such a communication between the supervised and the supervisor. The current law shows the convergence between the attorney-client privilege and the bank examination privilege.

Federal law is very clear on the subject. CSI may not be communicated by any Federal Reserve employee without the permission that is required by the regulation. Ms. Segarra had no permission. She purloined CSI when she was discharged by the New York Fed, and now seeks to use the Court as an enabler of further wrongful communication of that information. In effect, her complaint is a vehicle for that further wrong. The incantation of a "public right to know" cannot ever be a license to discharged employees that they may violate Federal law simply by filing a complaint in Federal court.

Moreover, the Federal Reserve has shown zero tolerance for employee disrespect of the rules of Federal law that protect bank examination material. We attach an allocution before Judge Pauley of a former New York Fed employee who pleaded guilty to a criminal information for stealing confidential supervisory information. *United States v. Garzon*, 98-CR-1500, at 14-17 (S.D.N.Y June 4, 1999). Judge Pauley's acceptance of the plea in *Garzon* shows that this court recognizes such conduct as criminal. *See* Exhibit 1. We cannot turn a blind eye to Ms. Segarra's substantially similar conduct here.

Before concluding, the New York Fed must address one piece of material information that was omitted from Ms. Stengle's letter of October 11, 2013. In that letter, Ms. Stengle "opened the door" on settlement discussions that began with a letter sent to the New York Fed's General Counsel on behalf of Ms. Segarra. While Ms. Segarra has now publicly communicated some of those discussions, she has not communicated her demand that the New York Fed pay her over $7 million. Obviously, she believes that the "right to know" has a multi-million-dollar price tag. She is incorrect that the New York Fed never met with her prior counsel: I met with him on several occasions. But she is correct that we had no interest in that kind of "settlement" proposal.

FEDERAL RESERVE BANK *of* NEW YORK

Hon. Ronnie Abrams, U.S.D.J.
October 11, 2013
4

     Ms. Segarra has a right to have her case adjudicated in this Court, and we are ready and willing to litigate and prove she was discharged for good reason. We are not saying that she cannot put on proof of her claim. But the case must be litigated within the bounds of Federal law, and Ms. Segarra does not get to decide what law she will and will not follow. We ask the Court to instruct the parties as to what Federal law says, and to issue a narrow sealing order protecting the bank examination privilege by sealing the parts of the complaint that contain it, paragraphs 16, 17, 20-34, 36-39, 41-43, 46-52, 59-90, 95, 97, 105, and 107, and all of the appendices. Finally, we request that the Court order Plaintiff and her counsel not to publish any other CSI without further order of the Court.

     Thank you for allowing us to be heard earlier today, and thank you for your consideration of our application.

Respectfully submitted,

David Gross
Counsel and Vice President


cc:    Linda J. Stengle, Esq., Counsel for Plaintiff (via e-mail to linda@lindastengle.com)
       Thomas C. Baxter, Jr., Esq., General Counsel, Federal Reserve Bank of New York
       Thomas M. Noone, Esq., Attorney, Federal Reserve Bank of New York

# Exhibit 1

964SGARZ                                                          1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          98 Cr. 1500

5    MAURICIO GARZON,

6              Defendant.

7    ------------------------------x

8                                          June 4, 1999
                                           9 a.m.
9
     Before:
10
                    HON. WILLIAM H. PAULEY, III,
11
                                           District Judge
12
                           APPEARANCES
13
     MARY JO WHITE
14        United States Attorney for the
          Southern District of New York
15   DAVID GREENWALD,
          Assistant United States Attorney
16
     MARK R. HELLERER, ESQ.
17        Attorney for Defendant

18

19

20

21

22

23

24

25
```

964SGARZ                                                                2

1           (Case called)

2           THE COURT:  Would counsel give their appearances

3    for the record.

4           MR. GREENWALD:  David Greenwald for the

5    government.

6           MR. HELLERER:  Mark Hellerer from Winthrop

7    Stimson for the defendant, Mr. Garzon.

8           THE COURT:  Good morning, Mr. Hellerer.

9           I am informed, Mr. Hellerer, that the defendant

10   has an application in this matter.  What is that

11   application?

12          MR. HELLERER:  It's not actually an application,

13   your Honor.  We are here on a misdemeanor information that

14   was filed with the court on our last appearance and Mr.

15   Garzon is prepared today to plead guilty to that misdemeanor

16   information.

17          THE COURT:  All right.

18          Very well.  Is this plea pursuant to a plea

19   agreement?

20          MR. GREENWALD:  Yes, your Honor.

21          THE COURT:  Would you hand up an executed copy,

22   Mr. Greenwald, and I will ask my deputy to mark it as Court

23   Exhibit 1, and then pass it up to me for my inspection.

24          All right, at this time I am going to ask my

25   courtroom deputy to administer the oath to the defendant,

964SGARZ                                                                    3

1    Mr. Garzon.

2              (Defendant sworn)

3    BY THE COURT:

4         Q.    Mr. Garzon, do you understand that you are now

5    under oath and that if you answer any of my questions

6    falsely your false or untrue answers may later be used

7    against you in another prosecution for perjury or making a

8    false statement?

9         A.    I do, your Honor.

10        Q.    Mr. Garzon, what is your full name?

11        A.    Mauricio Garzon.

12        Q.    How old are you?

13        A.    35.

14        Q.    How far did you go in school?

15        A.    Graduate program in business.

16        Q.    From what college or university?

17        A.    New York University.

18        Q.    Did you obtain a degree?

19        A.    Masters in business administration.

20        Q.    Are you able to read, write, speak and understand

21   English?

22        A.    Yes.

23        Q.    Are you now or have you recently been under the

24   care of a doctor or a psychiatrist?

25        A.    No, sir.

964SGARZ                                                          4

1          Q.    Have you ever been treated or hospitalized for

2     any mental illness or any type of addiction, including drug

3     or alcohol addiction?

4          A.    No, sir.

5          Q.    In the past 24 hours have you taken any drugs,

6     medicine or pills or have you drunk any alcohol?

7          A.    No, sir.

8          Q.    Is your mind clear today, Mr. Garzon?

9          A.    Yes, it is, your Honor.

10         Q.    Are you feeling all right today?

11         A.    Yes.

12         Q.    Are you represented by counsel?

13         A.    Yes, sir.

14         Q.    And who is that?

15         A.    Mr. Mark Hellerer.

16               THE COURT:  Mr. Hellerer, do you have any doubt

17    as to Mr. Garzon's competence to plead at this time?

18               MR. HELLERER:  No, your Honor.

19         Q.    Now, Mr. Garzon, your attorney has informed me

20    that you wish to enter a plea of guilty.  Do you wish to

21    enter a plea of guilty?

22         A.    Yes, sir.

23         Q.    Have you had a full opportunity to discuss your

24    case with your attorney and to discuss the consequences of

25    entering a plea of guilty?

964SGARZ                                                               5

1          A.     Yes, sir.

2          Q.     Are you satisfied with your attorney,

3     Mr. Hellerer, and his representation of you in this matter?

4          A.     Yes, sir.

5                 THE COURT:  On the basis of Mr. Garzon's

6     responses to my questions and my observations of his

7     demeanor here in my courtroom this morning, I find that he

8     is fully competent to enter an informed plea at this time.

9          Q.     Mr. Garzon, before I accept any plea from you I

10    am going to ask you certain questions.  My questions are

11    intended to satisfy me that you wish to plead guilty because

12    you are guilty and that you fully understand the

13    consequences of your plea.  I am now going to describe to

14    you certain rights that you have under the Constitution and

15    laws of the United States which rights you will be giving up

16    if you enter a plea of guilty.  Please listen carefully.

17                If you do not understand something I am saying or

18    describing, stop me and either I or your attorney,

19    Mr. Hellerer, will explain it to you more fully.

20                Under the Constitution and the laws of the United

21    States you have the right to a speedy and public trial by a

22    jury on the charges against you which are contained in the

23    misdemeanor information.  Do you understand that?

24         A.     Yes, sir, I do.

25         Q.     If there were a trial, Mr. Garzon, you would be

964SGARZ                                                         6

1     presumed innocent and the government would be required to

2     prove you guilty by competent evidence and beyond a

3     reasonable doubt.  You would not have to prove that you were

4     innocent at a trial.  Do you understand that?

5          A.    Yes, sir.

6          Q.    If there were a trial a jury composed of 12

7     people selected from this district would have to agree

8     unanimously that you were guilty.  Do you understand that,

9     Mr. Garzon?

10         A.    Yes, sir.

11         Q.    If there were a trial you would have the right to

12    be represented by an attorney and if you could not afford

13    one an attorney would be provided to you free of cost, do

14    you understand that?

15         A.    Yes, I do.

16         Q.    If there were a trial, Mr. Garzon, you would have

17    a right to see and hear all of the witnesses against you and

18    your attorney could cross examine them.  You would have a

19    right to have your attorney object to the government's

20    evidence and offer evidence on your behalf if you so desired

21    and you would have the right to have subpoenas issued or

22    other compulsory process used to compel witnesses to testify

23    in your defense.  Do you understand that?

24         A.    Yes, sir.

25         Q.    If there were a trial, Mr. Garzon, you would have

964SGARZ                                                                    7

1     the right to testify, if you wanted to, but no one could

2     force you to testify if you did not want to.  Further, no

3     inference or suggestion of guilt could be drawn if you chose

4     not to testify at a trial.  Do you understand that?

5          A.    Yes, sir.

6          Q.    Do you understand that by entering a plea of

7     guilty today you are giving up each and every one of the

8     rights that I have described, that you are waiving these

9     rights and that you will have no trial?

10         A.    I do, sir.

11         Q.    Do you understand that you can change your mind

12    right now and refuse to enter a plea of guilty?

13         A.    Yes, sir.

14         Q.    You do not have to enter this plea if you do not

15    want to for any reason.  Do you understand this fully, Mr.

16    Garzon?

17         A.    Yes, I do.

18         Q.    Now, Mr. Garzon, have you received a copy of the

19    misdemeanor information?

20         A.    Yes, I have.

21         Q.    And have you read it?

22         A.    Yes.

23         Q.    And did your attorney, Mr. Hellerer, discuss the

24    information with you?

25         A.    Yes, he did, sir.

964SGARZ                                                                    8

1        Q.    Do you waive my reading of the information word

2   for word here in open court?

3        A.    Yes, sir.

4        Q.    Now, do you understand that the information

5   charges you with, while being an assistant bank examiner,

6   unlawfully taking property of value in possession of banks

7   that were members of the Federal Reserve system in violation

8   of Title 18 of the United States Code, Section 655?

9        A.    I do, sir.

10       Q.    And do you understand that you have a

11  constitutional right to be charged by an indictment rather

12  than by an information?

13       A.    Yes, sir.

14       Q.    An indictment, Mr. Garzon, would be from a grand

15  jury and not like the information, simply a charge by the

16  prosecutor.  Do you understand that you have waived the

17  right to be charged by an indictment and that you have

18  consented to being charged by an information of the

19  government?

20       A.    Yes, sir.

21       Q.    And do you waive this right voluntarily and

22  knowingly?

23       A.    Yes, I do.

24       Q.    Mr. Garzon, do you understand that if you did not

25  plead guilty the government would have to prove each and

964SGARZ                                                    9

1    every part or element of the charge in the information

2    beyond a reasonable doubt at a trial?

3         A.    Yes, I do.

4         Q.    And do you understand that the government would

5    be required to prove that you were a bank examiner or an

6    assistant bank examiner, that you had stolen or unlawfully

7    taken or unlawfully concealed money, notes, drafts, bonds or

8    securities, or any other property of value from a bank or

9    banking institution which is a member of the Federal Reserve

10   system or insured by the Federal Deposit Insurance

11   Corporation or a branch or agency of a foreign bank or an

12   organization operating under Sections 25 or 25(a) of the

13   Federal Reserve Act, do you understand that?

14        A.    Yes, sir.

15        Q.    Do you understand that the maximum possible

16   penalty of the crime to which you are entering a plea of

17   guilty is one year of imprisonment, plus a maximum fine of

18   the greatest of $100,000, twice the gross pecuniary gain

19   derived from the offense or twice the gross pecuniary loss

20   to persons other than yourself resulting from the offense,

21   do you understand that?

22        A.    Yes, sir, I do.

23        Q.    And do you also understand that you would be

24   subject to a special assessment of $25?

25        A.    Yes, sir.

964SGARZ                                                          10

1      Q.    And supervised release of a maximum term of one

2  year?

3      A.    Yes, sir.

4      Q.    And supervised release, Mr. Garzon, means that

5  you will be subject to monitoring when you are released from

6  prison, the monitoring to be under terms and conditions

7  which could lead to reimprisonment without a jury trial for

8  all or part of the term of supervised release without credit

9  for time previously served on post-release supervision if

10  you violated the terms and conditions of supervised release,

11  do you understand that?

12      A.    I do.

13      Q.    Do you understand that if I accept your guilty

14  plea and adjudge you guilty that adjudication may deprive

15  you of valuable civil rights, such as the right to vote, the

16  right to hold public office, the right to serve on a jury

17  and the right to possess any kind of firearm?

18           MR. HELLERER:   Your Honor, I think for a

19  misdemeanor information that is not accurate.

20           THE COURT:   I think you are correct on that,

21  Mr. Hellerer, and I withdraw that statement, Mr. Garzon,

22  recognizing that this information supersedes the prior

23  information and only charges you with a misdemeanor.

24      Q.    Under current law, Mr. Garzon, there are

25  sentencing guidelines that judges must follow in determining

964SGARZ                                                           11

1      your sentence.

2                Have you talked with your attorney, Mr. Hellerer,

3      about the sentencing guidelines?

4          A.    Yes, sir.

5          Q.    Do you understand that the court will not be able

6      to determine your guideline sentence until after a

7      presentence report has been completed by the U.S. Probation

8      office and you and the government have had a chance to

9      challenge any of the facts reported by the probation office?

10         A.    Yes, sir.

11         Q.    Do you further understand that even after it is

12     determined what guideline range applies to your case I have

13     the authority in some circumstances to impose a sentence

14     that is higher or lower than the sentence called for by the

15     guidelines?

16         A.    Yes, sir.

17         Q.    Do you understand that if you are sentenced to

18     prison parole had been abolished and you will not be

19     released any earlier on parole?

20         A.    Yes, sir.

21         Q.    Do you understand that if your attorney or anyone

22     else has attempted to estimate or predict what your sentence

23     will be, that their estimate or prediction could be wrong?

24         A.    Yes, sir.

25         Q.    No one, Mr. Garzon, not even your attorney or the

964SGARZ                                                          12

1   government, can nor should give you any assurance of what

2   your sentence will be.  Your sentence cannot be determined

3   until after the probation office report is completed and I

4   have ruled on any challenges to the report and determined

5   whether I believe there are grounds to depart up or down

6   from the guideline range, do you understand this?

7        A.    I do.

8        Q.    Do you also fully understand that even if your

9   sentence is different from what your attorney or anyone else

10  told you it might be or if it is different from what you

11  expect, you will still be bound to your guilty plea and you

12  will not be allowed to withdraw your plea of guilty?

13        A.    I do, your Honor.

14        Q.    Now, I have been given a plea agreement dated May

15  20, 1999 which has been marked as Court Exhibit 1.

16              Have you signed this plea agreement, Mr. Garzon?

17        A.    Yes, sir.

18        Q.    Did you read this agreement prior to signing it?

19        A.    I did.

20        Q.    Did you discuss it with your attorney,

21  Mr. Hellerer, prior to the time you signed it?

22        A.    I did.

23        Q.    And did you read it at the time you signed it?

24        A.    Yes, I did.

25        Q.    Did you fully understand this agreement before

964SGARZ                                                                13

1    you signed it?

2         A.    Yes, sir.

3         Q.    Does this letter agreement, Court Exhibit 1,

4    constitute your complete and total understanding of the

5    entire agreement between the government, your attorney and

6    you?

7         A.    Yes, sir.

8         Q.    Is everything about your plea and sentence

9    contained in this agreement?

10        A.    Yes, sir.

11        Q.    And has anything been left out?

12        A.    No, sir.

13        Q.    Has anyone offered you any inducements or

14   threatened you or forced you to plead guilty or to enter

15   into this plea agreement which is Court Exhibit 1?

16        A.    No, sir.

17        Q.    Do you understand that as part of this plea

18   agreement you are giving up or waiving your right to appeal

19   if I sentence you within the guidelines range?

20        A.    I do, sir.

21        Q.    Do you understand that I am completely free to

22   disregard any position or recommendation by your attorney or

23   by the government as to what your sentence should be and

24   that I have the ability to impose whatever sentence I

25   believe is appropriate under the circumstances and

1   guidelines and you will have no right to withdraw your plea?

2       A.    I do.

3            THE COURT:  Mr. Hellerer, do you know of any

4   valid defense that would prevail at trial or do you know of

5   any reason why your client should not be permitted to plead

6   guilty?

7            MR. HELLERER:  No, your Honor.

8            THE COURT:  Is there an adequate factual basis to

9   support this plea of guilty, Mr. Hellerer?

10           MR. HELLERER:  We believe so, your Honor.  I

11  think the government believes so as well.

12           THE COURT:  Mr. Greenwald, in the government's

13  view, is there an adequate factual basis to support this

14  plea of guilty?

15           MR. GREENWALD:  Absolutely, your Honor.

16      Q.    Mr. Garzon, please tell me what you did in

17  connection with the crime to which you are entering a plea

18  of guilty?

19      A.    Yes, sir.  While I worked at the Federal Reserve

20  Bank as part of my job responsibilities I took certain

21  documents home to work on them and kept --

22      Q.    You have to speak up.  I am having trouble

23  hearing you.

24      A.    While working for the Federal Reserve Bank as

25  part of my job responsibilities I took certain documents

964SGARZ                                                    15

1    home to work on them and kept those documents after I left

2    the Federal Reserve and some of those documents were of a

3    confidential nature.

4         Q.    And when did you do this?

5         A.    I worked at the Federal Reserve between 1995

6    and 1997.

7         Q.    And where did you work at the Federal Reserve

8    Bank, what branch of the Federal Reserve Bank did you work

9    at?

10        A.    The Federal Reserve Bank of New York.

11        Q.    Here in the Southern District of New York in

12   lower Manhattan?

13        A.    Yes, sir.

14        Q.    And at that time what was your position at the

15   Federal Reserve Bank?

16        A.    It was assistant bank examiner.

17        Q.    And did you know at the time that you were taking

18   these documents home that that was unlawful?

19             MR. HELLERER:  One moment, your Honor.

20             (Pause)

21        A.    The taking of the documents it was my

22   understanding it was illegal to take the documents and to

23   keep them after I left.  I understand it was illegal.

24        Q.    So is it your testimony that you took documents

25   home while employed and after you left the Federal Reserve

964SGARZ                                                    16

1    Bank you never returned those documents to the Federal

2    Reserve Bank?

3         A.    Yes, sir.

4         Q.    Is that correct?

5         A.    That is correct.

6         Q.    And when you failed to return those documents to

7    the Federal Reserve Bank, did you know that that was wrong?

8         A.    I knew it was wrong.

9              MR. GREENWALD:  If your Honor can just confirm

10   that among the documents the defendant failed to return were

11   documents that belonged to banks that were members of the

12   Federal Reserve system.

13        Q.    What kind of documents did you fail to return to

14   the Federal Reserve Bank upon your departure from the employ

15   of the Federal Reserve Bank?

16        A.    Internal policies and procedures, some

17   documentations for pricing model testing, just internal

18   manuals for procedures written by the banks.

19        Q.    What banks were these?

20        A.    They were Chase Manhattan Bank, Bankers Trust,

21   Chemical Bank and J.P. Morgan, sir.

22        Q.    And you knew those institutions to be members of

23   the Federal Reserve system?

24        A.    I did.

25              THE COURT:  Would the government please summarize

964SGARZ                                                                              17

1    its evidence against the defendant?

2            MR. GREENWALD:  Yes.

3            The government's evidence against the defendant

4    would consist primarily of the introduction of documents

5    seized pursuant to a search warrant from the defendant's

6    home and from his workplace that the government would prove

7    by competent evidence came from examinations that the

8    defendant had worked on.

9            Q.   Mr. Garzon, how do you now plead to the charge in

10   the information, guilty or not guilty?

11           A.   Guilty, sir.

12           Q.   Are you pleading guilty because you are guilty?

13           A.   Yes, sir.

14           Q.   Are you pleading guilty voluntarily and of your

15   own free will?

16           A.   I am.

17           THE COURT:  Mr. Hellerer, do you wish me to make

18   any further inquiries of Mr. Garzon?

19           MR. HELLERER:  No, your Honor, I don't think any

20   further inquiry is required.

21           THE COURT:  Does the government wish me to make

22   any further inquiries of the defendant?

23           MR. GREENWALD:  No, your Honor.

24           THE COURT:  Mr. Garzon, because you acknowledge

25   that you are guilty as charged in the information and

1    because I find you know your rights and are waiving them

2    knowingly and voluntarily, and because I find your plea is

3    entered knowingly and voluntarily and is supported by an

4    independent basis in fact containing each of the essential

5    elements of the offense, I accept your guilty plea and

6    adjudge you guilty of the offense to which you have pleaded.

7            Now, the U.S. Probation office will next prepare

8    a presentence report to assist me in sentencing you.  You

9    will be interviewed by the probation office.  It is

10   important that the information you give the probation

11   officer be truthful and accurate.  The report is important

12   in my decision as to what your sentence will be.  You and

13   your attorney have a right and will have an opportunity to

14   examine the report, challenge or comment upon it, and to

15   speak on your behalf before sentencing.

16           I am going to fix September 10, 1999 at 2:30 as

17   the date and time for sentencing in this matter.

18           Do either counsel have any applications with

19   respect to or requests to alter any bail conditions?

20           MR. HELLERER:  If I may just have a moment, your

21   Honor.

22           THE COURT:  Certainly.

23           (Pause)

24           MR. HELLERER:  Your Honor, since the intervening

25   period between now and the sentencing is over the summer

1    months, Mr. Garzon would like to have his bail geographical

2    limitations extended so that he can visit family in

3    California and in Massachusetts over the course of the

4    summer and I don't believe that the government has any

5    objection to that request.

6              THE COURT:  Mr. Greenwald.

7              MR. GREENWALD:  No objection.

8              THE COURT:  Very well.  I am going to modify the

9    geographic limitations on Mr. Garzon's bail conditions to

10   extend them to include California and Massachusetts for the

11   purpose of Mr. Garzon visiting with members of his family

12   who reside in those states and I will note that Mr. Garzon

13   has appeared here on each occasion when the court has

14   required his appearance and I have previously allowed Mr.

15   Garzon to travel outside of the United States for a business

16   purpose with the consent of both counsel in this matter.

17             So I am modifying his bail conditions to that

18   extent.

19             Now, Mr. Garzon, do you understand that if you

20   fail to return to my courtroom for sentencing on the day and

21   time set that you will be guilty of a criminal act for which

22   you could be sentenced to imprisonment separate and apart

23   from and in addition to any other sentences you might

24   receive for the crime to which you have just pleaded guilty?

25             THE DEFENDANT:  I do, sir.

964SGARZ                                                             20

1          THE COURT:  And do you further understand that

2     all of the conditions on which you were released up to now

3     continue to apply except that I have extended the geographic

4     limitations and a violation of any of those conditions can

5     be severe?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  Then I will fully expect to see you

8     in my courtroom on the date of sentencing and I will at this

9     time advise counsel and you, Mr. Garzon, that when the date

10    of sentencing comes around we will not be in this courtroom

11    but we will be in courtroom 618 in this building, just four

12    floors above where we are presently sitting.  So I will

13    expect to see you in courtroom 618 on September 10, 1999.

14          Is there anything further that we need to address

15    at this time?

16          MR. HELLERER:  I don't believe so, your Honor.

17          MR. GREENWALD:  No, your Honor.

18          THE COURT:  Very well.

19          Thank you, gentlemen.

20

21

22                              -  -  -

23

24

25