UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

CARMEN M. SEGARRA,                           :
                                             :
        Plaintiff,                           :
                                             : ECF CASE
        v.                                   :
                                             : 13-CV-07173 (RA)
FEDERAL RESERVE BANK OF                      :
NEW YORK, MICHAEL SILVA,                     : ORAL ARGUMENT REQUESTED
MICHAEL KOH, and                             :
JOHNATHON KIM,                               :
                                             :
        Defendants.                          :
------------------------------------------------------------ x


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE COMPLAINT

Thomas C. Baxter, Jr.
General Counsel and Executive Vice President
Federal Reserve Bank of New York
33 Liberty Street
New York, NY 10045


*Of Counsel*
David Gross
Thomas M. Noone

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT ....................................................................1

STATEMENT OF FACTS ...........................................................................3

ARGUMENT ..............................................................................................6

    I.  Plaintiff Has Failed to State a Claim Under Section 1831j ..........................................7

        A.  Section 1831j does not create liability for the Individual Defendants...................7

        B.  Plaintiff has not alleged a protected activity............................................8

        C.  Plaintiff's allegations are implausible..................................................13

    II.  Plaintiff Has Failed to State a Claim under New York's
        Consumer Protection Law....................................................................17

    III. Plaintiff Has Failed to State a Claim for Breach of an Implied Contract ...................19

    IV. Plaintiff Has Failed to State a Claim for Wrongful Termination in
        Violation of Public Policy.....................................................................21

    V.  Plaintiff is Not Entitled to Reinstatement or Front Pay .................................22

    VI. The New York Fed is Not Liable for Punitive Damages.............................24

CONCLUSION.........................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Armand Schmoll, Inc. v. Fed. Reserve Bank of N.Y.*, 286 N.Y. 503 (1941) ................................19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................7, 16

*Bank One, Texas, N.A. v. Taylor*, 970 F.2d 16 (5th Cir. 1992)......................................................24

*Barbosa v. Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210 (S.D.N.Y. 2010) ...................6

*Bollow v. Fed. Reserve Bank of San Francisco*, 650 F.2d 1093 (9th Cir. 1981).........................21

*Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533 (D.C. Cir. 1986) ............................... 10-11

*Caruso v. City of New York*, No. 06 Civ. 5997, 2013 U.S. Dist. LEXIS 138643
    (S.D.N.Y. Sept. 26, 2013)........................................................................................21

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ....................................................................... 9-10

*Commerce Fed. Sav. Bank v. Fed. Deposit Ins. Corp.*, 872 F.2d 1240 (6th Cir. 1989) ......... 24-25

*Cosgrove v. Fed. Home Loan Bank*, No. 90 Civ. 6455, 1999 U.S. Dist. LEXIS 7420
    (S.D.N.Y. Mar. 22, 1999) ................................................................................ 7-8, 13

*Cruz v. NYNEX Info. Resources*, 263 A.D.2d 285 (1st Dep't 2000) ............................................18

*Daniels v. Fed. Reserve Bank of Chicago*, No. 98 C 1186, 2004 U.S. Dist. LEXIS 3412
    (N.D. Ill. Mar. 3, 2004)...........................................................................................20

*Fasano v. Fed. Reserve Bank of N.Y.*, 457 F.3d 274 (3d Cir. 2006)................................... 8, 18-19

*Fidelity Fed. Sav. and Loan Ass'n v. De La Cuesta*, 458 U.S. 141 (1982) ..................................10

*Genesco Entm't, Div. of Lymutt Indus., Inc. v. Koch*, 593 F. Supp. 743 (S.D.N.Y. 1984)............18

*Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988) ..............................................................19

*Harrison v. Fed. Deposit Ins. Corp.*, No. 92-CV-0304E, 1993 U.S. Dist. LEXIS 18924
    (W.D.N.Y. Apr. 16, 1993) ........................................................................................25

*Hicks v. Resolution Trust Corp.*, 767 F. Supp. 167 (N.D. Ill. 1991) ..............................................8

*Hollander v. American Cyanamid Co.*, 895 F.2d 80 (2d Cir. 1990)................................................16

*In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001) ...........................7

*In re Sparkman*, 703 F.2d 1097 (9th Cir. 1983)................................................................................25

*Jaffe v. Fed. Reserve Bank of Chicago*, 586 F. Supp. 106 (N.D. Ill. 1984)..................................20

*Kinopf v. Triborough Bridge & Tunnel Auth.*, 6 Misc. 3d 73
   (N.Y. App. Term, 2d Dep't 2004) ...................................................................................18

*Kroske v. US Bank Corp.*, 432 F.3d 976 (9th Cir. 2005) ...............................................................20

*Massachusetts v. Hills*, 437 F. Supp. 351 (D. Mass. 1977) ...........................................................25

*Mays v. Tennessee Valley Auth.*, 699 F. Supp. 2d 991 (E.D. Tenn. 2010) ..................................25

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ..............................................................19

*McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352 (1995) ........................................... 22-23

*Mele v. Fed. Reserve Bank of N.Y.*, 359 F.3d 251 (3d Cir. 2004).................................................20

*Missouri Pacific R.R. Co. v. Ault*, 256 U.S. 554 (1921) ...............................................................24

*Moodie v. Fed. Reserve Bank of N.Y.*, 831 F. Supp. 333 (S.D.N.Y. 1993) .................................20

*Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293 (1983) .................................................... 21-22

*Murray v. Visiting Nurse Servs.*, 528 F. Supp. 2d 257 (S.D.N.Y. 2007)......................................16

*Nowlin v. Resolution Trust Corp.*, 33 F.3d 498 (5th Cir. 1994) .....................................................8

*Obradovich v. Fed. Reserve Bank of N.Y.*, 569 F. Supp. 785 (S.D.N.Y. 1983)...........................21

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
   85 N.Y.2d 20 (1995) ......................................................................................................17

*Reconstruction Fin. Corp. v. J. G. Menihan Corp.*, 111 F.2d 940 (2d Cir. 1940)........................24

*Rinaldi v. United States*, 434 U.S. 22 (1977)................................................................................10

*Rohweder v. Aberdeen Production Credit Ass'n.*, 765 F.2d 109 (8th Cir. 1985) .........................25

*Royal Bank of Canada v. Fed. Deposit Ins. Corp.*, 733 F. Supp. 1091 (M.D. Pa. 1990) .............25

*Smith v. Russellville Production Credit Ass'n*, 777 F.2d 1544 (11th Cir. 1985) ..........................25

*Starr International Co. v. Fed. Reserve Bank of N.Y.*, 906 F. Supp. 2d 202
(S.D.N.Y. 2012) ...........................................................................................19

*United States v. Halpin*, No. 88-0215, 1989 U.S. Dist. LEXIS 1051
(E.D.N.Y. Jan. 12, 1989) .............................................................................25

*United States v. Reeves*, 891 F. Supp. 2d 690 (D.N.J. 2012) .........................................10

*White v. Dep't of the Air Force*, 391 F.3d 1377 (Fed. Cir. 2004)....................................15

*Yucyco, Ltd. v. Republic of Slovenia*, 984 F. Supp. 209 (S.D.N.Y. 1997)....................................20

## **Statutes**

U.S. Const. art. VI, cl. 2 ................................................................................. 18-19

5 U.S.C. § 553 ............................................................................................. 9-10

12 U.S.C. § 290 ...............................................................................................25

12 U.S.C. § 341 ......................................................................................... 18-20, 22

12 U.S.C. § 1813 ...........................................................................................8, 11

12 U.S.C. § 1831j ............................................................................................ *passim*

16 U.S.C. § 3372 ...............................................................................................10

18 U.S.C. § 641 ...............................................................................................24

18 U.S.C. § 655 ...............................................................................................24

29 U.S.C. § 626 ...............................................................................................22

44 U.S.C. § 1510 ...............................................................................................10

N.Y. Gen. Bus. Law § 349 .............................................................................. 6, 17-18

## **Rules**

Fed. R. Civ. P. 8 ...............................................................................................6

Fed. R. Civ. P. 12(b)(6)....................................................................................1, 25

Defendants Federal Reserve Bank of New York (the "New York Fed") and Michael Silva, Michael Koh, and Johnathon Kim (collectively, the "Individual Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiff Carmen Segarra's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiff presents four purported causes of action, each of which fails to state a claim for the following reasons.

*Federal "whistleblower" statute.*  On its face, 12 U.S.C. § 1831j creates no liability for individual employees of a Federal Reserve Bank.  Plaintiff, therefore, cannot sue the Individual Defendants under this statute.  Plaintiff's claim against the New York Fed fails for two reasons. *First*, Plaintiff has not alleged a protected activity.  Although Plaintiff asserts that she reported a violation of conflict of interest "regulations," the authority to which she refers is an advisory letter, not a regulation.  Even if the Complaint concerned illegal conduct, as opposed to suboptimal practices, Plaintiff's claim that she "provided information" that Goldman Sachs "had no firmwide conflict of interest policy" is belied by her allegation that *someone else* actually provided that information to the New York Fed.  Plaintiff cannot now, in hindsight, seek protection for information that she did not provide.  *Second*, Plaintiff's "whistleblower" claim is implausible owing to numerous contradictions within her pleadings.  Most glaringly, despite Plaintiff's allegation that Goldman Sachs lacked a firmwide conflict of interest policy, she has attached exhibits showing that Goldman Sachs's "nonexistent" policies were, in fact, available on its public website.  Considered in its entirety, the gravamen of the Complaint is not a "whistleblower's" provision of information, but a non-actionable disagreement between a supervised employee and more senior colleagues over how to interpret a Federal Reserve policy.

*New York consumer protection statute.*  Plaintiff cannot bring a "consumer protection" claim against any of the Defendants because the exercise of government supervisory responsibilities is not consumer-oriented conduct—*i.e.*, offering goods and services for sale to the general public.  On its face, the New York statute plainly does not apply to employment disputes, much less the supervision of financial institutions by a federal instrumentality like the New York Fed, whose operations are governed by Congress, not the states.

*Breach of Implied Contract.*  Plaintiff cannot recover against the Individual Defendants for breach of an "implied" employment contract because she does not and cannot allege any contractual privity with them.  Moreover, Plaintiff's allegation that she had an "implied" employment contract with the New York Fed rests on the erroneous legal assertion that she was *not* an "at will" employee, which is expressly contradicted by the Federal Reserve Act.

*Wrongful Termination.*  New York does not recognize the tort of wrongful termination in "at will" employment arrangements.  Even if it did, Plaintiff could not recover against the Individual Defendants because she admits that it was the New York Fed that actually employed her and, *a fortiori*, would be the party compelled to rehire her (the principal relief sought).

*Remedies*.  Plaintiff is not entitled to reinstatement or front pay because she flagrantly violated New York Fed policies, federal regulations, and federal criminal law when she misappropriated and published confidential supervisory information without permission from the Board of Governors of the Federal Reserve System.  This conduct provides independent grounds for termination, and, under settled law, necessarily precludes an equitable right to future employment or front pay.  Finally, the New York Fed is not liable for punitive damages because, as part of the Nation's central bank, it may not be punished absent clear authorization from Congress—a notable omission from the Complaint.

## STATEMENT OF FACTS

The New York Fed is one of twelve regional reserve banks that, along with the Board of Governors and the Federal Open Market Committee, make up the Federal Reserve System, the nation's central bank.  Pursuant to authority delegated by the Board of Governors, the New York Fed supervises numerous financial institutions located within the Second District of the Federal Reserve System, which includes New York State.

The Individual Defendants were, at all relevant times, employees of the New York Fed who worked in its supervisory division.  Mr. Silva served as the Senior Supervisory Officer of the New York Fed team conducting an examination of Goldman Sachs, and Mr. Koh served as the Deputy Supervisory Officer.  Mr. Kim was Plaintiff's immediate supervisor in the Legal & Compliance group within the New York Fed's supervisory division.  The combined tenure of the three Individual Defendants at the New York Fed exceeds 45 years.

Plaintiff, by contrast, worked at the New York Fed for not quite seven months—from October 31, 2011 through May 23, 2012.  Although she is an attorney and worked previously at a number of financial institutions, this was her first position as a bank examiner.  Her first (and only) assignment was to the Goldman Sachs examination team led by Mr. Silva and Mr. Koh, where she was one of approximately 30 examiners.

According to the Complaint, Plaintiff examined several aspects of Goldman Sachs's compliance function and concluded that the firm "*does not have a conflicts of interest policy*, not firmwide, and not for any divisions.  I would go so far as to say they have *never* had a policy on conflicts . . . ."  (Compl. Ex. at 56-57 (emphases added).)  This, apparently, was not news: Plaintiff alleges that "Goldman's lack of a firmwide conflict of interest policy" was "frequently discussed" among her colleagues.  (Compl. ¶ 23.)  She also alleges that Goldman Sachs admitted

its lack of a firmwide conflict of interest policy at several meetings with the New York Fed, including a meeting on December 8, 2011—approximately one month after Plaintiff was hired. (Compl. ¶¶ 22, 24.)  As alleged, Goldman Sachs's December 8 admission was made not to Plaintiff directly, but rather to a group of examiners that included Mr. Silva and Mr. Kim (Compl. Ex. at 39), who instructed her to organize the meeting (Compl. ¶ 23).  Plaintiff further alleges that the Individual Defendants predicted that news of Goldman Sachs's lack of a conflict of interest policy would cause that firm to "explode" and would trigger a "run off" of "consumers and clients."  (Compl. ¶¶ 30-31.)  Just how the results of a confidential examination would ever become public is, however, left to the imagination.

In Plaintiff's view, Goldman Sachs's lack of a conflict of interest policy violated "SR 08-8," an advisory letter published in 2008 by the Board of Governors' Division of Bank Supervision and Regulation (hence, "SR").[1]  SR 08-8 contains "clarification as to the Federal Reserve's views" regarding "a firmwide approach to compliance risk management and oversight."  (Declaration of David Gross ("Gross Decl.") Ex. A at 2.)  The letter advises, among other things, that supervised financial institutions "should have effective compliance risk management programs that are appropriately tailored to the organizations' risk profiles," which may "vary considerably."  (*Id* at 3.)  Especially for "[l]arger, more complex banking organizations" (*id.*), SR 08-8 recommends "compliance policies," a defined term with two components: (1) a firmwide policy applicable to "all employees throughout the organization," and (2) more tailored policies for "specific business lines."  (Gross Decl. Ex. A at 11-12 n.4.)

---

[1] According to the Board of Governors' website, SR Letters "address significant policy and procedural matters related to the Federal Reserve System's supervisory responsibilities" and are "a means of disseminating information to banking supervision staff at the Board and the Reserve Banks, as well as to supervised banking organizations."  (Gross Decl. Ex. B ("About SR Letters," *available at* http://www.federalreserve.gov/bankinforeg/srletters/about.htm).)

Plaintiff's "finding" about a lack of conflict of interest policies allegedly received attention from many others at the New York Fed, including the two most senior officers in charge of the Goldman Sachs supervisory team (Mr. Silva and Mr. Koh) and colleagues in the Legal & Compliance group (including Mr. Kim).  Many meetings were held to discuss her findings, both internally and with Goldman Sachs.  (*See, e.g.*, Compl. ¶¶ 24, 29, 49, 52, 63, 79, and 83.)  The issue was even vetted with the Operating Committee ("OC"), a system-wide committee for large institution oversight established by the Board of Governors.  (Compl. Ex. at 55.)  In the end, however, the Defendants took issue with Plaintiff's conclusions in two respects. *First*, Plaintiff had not analyzed Goldman Sachs' conflict of interest policies sufficiently to support her conclusions.  For example, according to the exhibits appended to the Complaint, Mr. Kim and Mr. Silva wrote to Plaintiff in May 2012 that it was premature to jump to a conclusion about Goldman Sachs's policies because "due diligence has not been completed" (*id.* at 56) and "we have not even submitted our . . . follow-up questions" (*id.* at 55).  *Second*, written conflict of interest policies—including eponymous sections of a firmwide "Code of Business Conduct and Ethics" (Gross Decl. Ex. C at 4-5) and "Report of the Business Standards Committee" (Gross Decl. Ex. D at 16-25)—were available on Goldman Sachs's public website.  (Compl. Ex. at 55-56.)  As Mr. Silva wrote to Plaintiff, the existence of those public documents raised "serious questions in my mind as to your judgment in reaching and communicating conclusions without a sound basis in the supervisory process and before the due diligence and vetting process is complete."  (*Id.* at 55.)

Soon after her exchange of email with Mr. Silva and Mr. Kim in May 2012, the New York Fed fired Plaintiff for cause.  Plaintiff was *not* fired because she identified a possible violation of law or regulation.  Indeed, her pleading demonstrates on its face that her concerns

about Goldman Sachs had the attention of very senior management, who investigated her

concerns but disagreed with her conclusions.  Even Mr. Silva, for whom Plaintiff reserves her

sharpest criticism, wrote to Plaintiff in May 2012 that further investigation of Goldman Sachs

was warranted:

> [A]s examiners, we can and should point out ways the firm's [Conflict of Interest] policy
> needs to be improved, or be better organized, or be better documented in the event that,
> after conducting appropriate due diligence and vetting of our conclusions, we find it to be
> deficient in any of these respects.  Perhaps [Goldman Sachs's Conflict of Interest]
> policies should be more like the ones for [other banks] that you mention. (*Id.* at 55.)

Approximately 17 months after she was fired, Plaintiff sued the New York Fed and three

former colleagues for wrongful termination.[2]  Plaintiff's core claim of wrongful termination is

divided into four distinct purported causes of action: (1) a violation of the Federal Deposit

Insurance Corporation Improvement Act of 1991, as amended and codified at 12 U.S.C. § 1831j

("section 1831j"); (2) a violation of New York's "consumer protection" law, N.Y. Gen. Bus.

Law § 349; (3) breach of an implied employment contract; and (4) a common law tort of

wrongful termination in violation of public policy.  Not one of these purported claims is

cognizable, for the reasons addressed below.

## ARGUMENT

Under Rule 8 of the Federal Rules of Civil Procedure, a complaint must be "facially

plausible" and "give fair notice to the defendants of the basis for the claim."  *Barbosa v.

Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210, 215 (S.D.N.Y. 2010) (quotation marks

omitted).  A claim is facially plausible when it contains "factual content that allows the court to

---

[2] As the Court is aware, the Complaint and its exhibits contain confidential supervisory
information, which is protected from public disclosure by federal regulations.  *See* Gross Decl.
Ex. E (Letters to the Court dated October 10, 2013 and October 11, 2013.)  Notwithstanding
these regulations, Plaintiff published unredacted copies of her Complaint, including the
attachments, to members of the news media before filing her lawsuit.

draw the reasonable inference that the defendant is liable for the misconduct alleged," a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  In reviewing a motion brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, legal conclusions, as opposed to factual allegations, need not be credited, *id.* at 678, and factual allegations that are (a) inconsistent with other allegations in the pleadings, or (b) inconsistent with documents referenced in the pleadings, are not presumed to be true.  *See, e.g.*, *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) (stating that the court will not credit allegations that are "contradicted either by statements in the complaint itself or by documents upon which its pleadings rely").

## I.      Plaintiff Has Failed to State a Claim Under Section 1831j.

### A.      Section 1831j does not create liability for the Individual Defendants.

The Individual Defendants may not be sued under section 1831j because that statute does not create liability for individual employees of a Federal Reserve Bank.  *See Cosgrove v. Fed. Home Loan Bank*, No. 90 Civ. 6455, 1999 U.S. Dist. LEXIS 7420, at *24 (S.D.N.Y. Mar. 22, 1999) ("Section 1831j has no provision imposing liability upon individuals or permitting remedies against individuals.").  Instead, section 1831j prohibits federal bank supervisors— specifically, a "Federal banking agency, Federal home loan bank, [or] Federal reserve bank"— from firing an employee for reporting "any possible violation of any law or regulation."  12 U.S.C. § 1831j(a)(2).  Former employees who were terminated in violation of section 1831j(a)(2) may sue their former employers to enforce their right against unlawful discrimination, *see id.* at § 1831j(b), but the available relief is expressly directed at the employer, "which committed the

violation," *id.* at § 1831j(c), and not the people who do the employer's work.[3]

So far as Defendants are aware, every court to consider the issue has concluded, as Judge Patterson did in *Cosgrove*, that there is no individual liability under section 1831j.  *See, e.g.*, *Fasano v. Fed. Reserve Bank of N.Y.*, 457 F.3d 274, 283 n.11 (3d Cir. 2006) (collecting cases); *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 502-03 (5th Cir. 1994) (observing that section 1831j applies to only "two types of actors," depository institutions and federal bank supervisors); *Hicks v. Resolution Trust Corp.*, 767 F. Supp. 167, 172 (N.D. Ill. 1991) (dismissing claims under section 1831j against "individual defendants in both their official and individual capacities"). Indeed, *Hicks* observed that 12 U.S.C. § 1813, which defines the terms used in section 1831j, includes a defined term for "institution-affiliated party" that included "directors, officers, employees or controlling stockholders."  *Hicks*, 767 F. Supp. at 172.  Congress, however, did not include that class of defendants in section 1831j.

**B.     Plaintiff has not alleged a protected activity.**

As it applies to the instant case, activity protected by section 1831j occurs where "any employee . . . provid[es] information to [a Federal Reserve Bank] regarding any possible violation of any law or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety by . . . any depository institution."  12 U.S.C. § 1831j(a)(2).  Plaintiff asserts that the New York Fed fired her for two

---

[3] The lone exception to the general rule that only institutions are liable under section 1831j(a)(2) concerns "*any person* who is performing, directly or indirectly, any function or service on behalf of the [*Federal Deposit Insurance*] *Corporation* ["FDIC"]."  During the "savings and loan crisis" of the late 1980s, the FDIC met the temporarily increased need for supervisors of thrifts by engaging contractors to perform its supervisory functions.  Congress determined that employees of those contractors, who were performing delegated responsibilities, should enjoy the same degree of "whistleblower" protection as federal employees.  *See* 139 Cong. Rec. H10162, 103rd Cong. (1st Sess. 1993) (discussing liability for "FDIC contractors and bank regulators").  The inclusion of this exception, however, only proves the general rule.  Congress chose not to create similar liability for "any person" working on behalf of a Federal Reserve Bank.

reasons: "[1] finding Goldman did not have a firmwide conflicts of interest policy in compliance with SR 08-8 and [2] refusing to change her examination findings." (Compl. ¶ 97.) Neither reason constitutes protected activity, and so neither reason is sufficient to state a claim.

The first alleged basis for Plaintiff's termination—"finding Goldman did not have a firmwide conflicts of interest policy in compliance with SR 08-8"—does not constitute protected activity for two reasons.

*First*, Plaintiff's assertion that SR 08-8 is a "conflict of interest regulation[]" (Compl. ¶ 95) is legally erroneous. Section 1831j requires a plaintiff to have "provided information . . . regarding any possible violation of any law or regulation." SR 08-8, however, is an *advisory letter*, not a regulation. The Administrative Procedures Act ("APA"), which provides the procedural prerequisites for exercising regulatory authority, requires that an agency "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," consider those views, publish a statement of purpose, and provide an opportunity to petition for the "issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(c)-(e). *See also Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979) ("[T]he promulgation of . . . regulations must conform with any procedural requirements imposed by Congress. . . . The pertinent procedural limitations in this case are those found in the APA."). By contrast, "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice," are exempt from public notice and comment requirements. 5 U.S.C. § 553(b).

The distinction between regulation and policy is important in several respects. Valid, properly promulgated regulations have the force and effect of law, the same as a statute, because of the opportunity for public notice and comment, which the Supreme Court has characterized as a "quasi-legislative" element. *Chrysler Corp.,*441 U.S. at 302. Administrative policies and

guidance, which lack the same procedural safeguards, are not legally binding.  *See, e.g.*, *Rinaldi v. United States*, 434 U.S. 22, 29 (1977) (requiring courts to be "receptive, not circumspect" of a Department of Justice policy on duplicative prosecutions).  Thus, unlike agency guidance, a properly promulgated regulation of a federal banking agency, like the Federal Reserve, may override and preempt any inconsistent state law.  *See Fidelity Fed. Sav. and Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 153 (1982).  Agency policy and guidance, therefore, is *not* published in the Code of Federal Regulations, which is reserved for regulations with "legal effect."  *See* 44 U.S.C. § 1510 (authorizing a "complete codification[] of the documents of each agency of the Government having general applicability and *legal effect*") (emphasis added); *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 539 (D.C. Cir. 1986) (Scalia, J.) ("The real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations . . . .").[4]

   SR 08-8, which was not promulgated according to APA procedures or published in the Code of Federal Regulations, reflects the views of the department within the Board of Governors responsible for the supervision of financial institutions.  It is important and persuasive, and gives supervised financial institutions some indication of what bank examiners expect, but it is not a binding agency regulation enacted by the Board of Governors following a period of public notice

---

[4] The bright-line distinction between regulations and policies was illustrated in a recent decision from the District of New Jersey interpreting a federal criminal statute that had, as a statutory predicate, a "violation of *any law or regulation* of any State."  *United States v. Reeves*, 891 F. Supp. 2d 690, 691 (D.N.J. 2012), quoting 16 U.S.C. § 3372(a)(2)(A) (emphasis added).  The defendant had been indicted for the unlawful interstate transportation of oysters, and the predicate was a violation of New Jersey's oyster harvest quota.  The quota and related "Terms and Conditions" appeared in an official state publication, but were not included in a regulation enacted pursuant to the procedural requirements of New Jersey's Administrative Procedures Act.  *Id.* at 704-06 (outlining the notice, comment, publication, and response requirements to enact regulations in New Jersey).  Because the oyster quota was not contained in a regulation, the charges predicated on the oyster quota were dismissed.  *Id.* at 706-07.

and comment.  A quick survey of SR 08-8 confirms its forward-looking, advisory nature.  *See Brock*, 796 F.2d at 538 (examining the language used in a Department of Labor policy to assess the intent of the agency, such as the use of "may" versus "will").  The letter "strongly encourages" large financial institutions to devote adequate resources to address compliance challenges, states "expectations" for compliance with the "principles" outlined by the Basel Committee, and aims to provide "clarification as to the Federal Reserve's views regarding certain compliance risk management and oversight matters."  (Gross Decl. Ex. A at 2.)  SR 08-8 goes on to recommend that large, complex banking organizations "*should* generally implement firmwide compliance risk management programs," and supplies an illustrative list of the topics that these programs "*should* include." (*Id.* at 4 (emphases added).)  To be clear, the supervisory expectations in SR 08-8 are important standards for financial institution oversight, which explains the letter's promulgation.  *See supra*, n.1.  But the letter does not purport to establish new binding regulations to which financial institutions "must" or "shall" adhere.  Because SR 08-8 is not a "law" or "regulation," Plaintiff cannot allege protected activity by reporting a violation by Goldman Sachs of mere guidance.[5]

        *Second*, accepting the allegations in the Complaint as true, it was *Goldman Sachs*, not Plaintiff, who reported its lack of a firmwide conflict of interest policy directly to the New York Fed.  Plaintiff alleges that at a meeting on December 8, 2011, which was attended by Mr. Silva and Mr. Kim (Compl. Ex. at 39), "*Goldman* stated that it had no firmwide conflict of interest

---

[5] We also note that, as a technical matter, "Goldman Sachs" is not a "depository institution," as defined in Title 12, Chapter 16 of the United States Code.  As a financial institution holding company, The Goldman Sachs Group, Inc. is a "depository institution holding company," which is a separately defined term.  12 U.S.C. § 1813(w)(1).  By contrast, a "depository institution" means "any bank or savings association," *id.* at 1813(c)(1), and neither of those terms is defined to include a holding company, *see id.* at 1813(a)(1) ("bank") and (b)(1) ("savings association").  To the extent that a "firmwide" conflict of interest policy refers to the Goldman Sachs holding company, Plaintiff has failed to state a claim under section 1831j.

policy" (Compl. ¶ 24).  Mr. Silva then held a follow-up meeting where he "expressed alarm" about what he had just heard.  (Compl. ¶ 30.)  As pleaded, therefore, Plaintiff happened to attend a meeting at which the admission occurred; she herself did not provide that information.  Indeed, Plaintiff also alleges that "Federal Reserve[] employees *frequently discussed* Goldman's lack of a firmwide conflict of interest policy" (Compl. ¶ 23 (emphasis added)), which presumably led her supervisors to request the December 8 meeting (Compl. ¶ 24).  If a lack of a conflict of interest policies was "frequently discussed" prior to December 8, by which time Plaintiff had worked at the New York Fed for only *one month*, it is hard to imagine how Plaintiff "blew the whistle" on Goldman Sachs.  On its face, section 1831j does not permit a former employee to claim retrospectively that she was fired because *someone else* provided information to a Federal Reserve Bank.  Plaintiff, therefore, cannot state a claim based on information provided to the New York Fed by Goldman Sachs.

Plaintiff's second alleged basis for termination—"refusing to change her examination findings" (Compl. ¶ 97)—is not actionable because the statute protects the *provision of information*, not a disagreement between an employee and other more senior officials over the supervisory consequences of that information.  *See* 12 U.S.C. 1831j(a)(2) (prohibiting dismissal or discrimination "because the employee . . . provided information").  Were it otherwise, a "whistleblower" statute could be invoked anytime a supervised employee disagrees with the judgment of his supervisors and thereafter feels the supervisors are holding the disagreement against the employee.  Moreover, Plaintiff does not and cannot allege that the responsibility for the New York Fed's conclusions regarding a supervised financial institution belonged to her. Throughout her Complaint, Plaintiff repeatedly refers to "*her* examination," "*her* bank examination," "*Carmen's* examination," or "*her* multiple ongoing examinations" of Goldman

12

Sachs, appropriating for herself what was the prerogative of the Federal Reserve.  (*See, e.g.*, Compl. ¶¶ 46-50, 64, 88, 90, and 105.)  It was the duty of officials more senior than Plaintiff to decide on the findings of the examination.  As Judge Patterson observed in a similar case, involving a bank examiner working for the Federal Home Loan Bank of New York:

> Plaintiff's position that her findings were not incorporated, or not incorporated accurately, into the final reports issued by the FHLBNY is of no consequence here and is insufficient to raise a triable issue of fact.  *It is the examiner-in-charge who decides what findings are properly supported in the workpapers and put in the Report of Examination, not the individual examiners working under his or her supervision.*  As part of a team of individual examiners, plaintiff had no authority to insist that the Report of Examination be prepared in any specific manner.

*Cosgrove*, 1999 U.S. Dist. LEXIS 7420 at *48-49 (emphasis added, record citations omitted).

### C.    Plaintiff's allegations are implausible.

Plaintiff's Complaint is replete with contradictions, and when they are arrayed and aggregated, these contradictions undermine the plausibility of her claim.  Most glaringly, Plaintiff alleges that, in December 2011, Goldman Sachs admitted that it "had no firmwide conflict of interest policy."  (Compl. ¶ 24.)  Goldman Sachs apparently made the same statement—that "it had no firmwide conflict of interest policy"—"on several occasions from November [*sic*] 8, 2011, through May 23, 2012."  (Compl. ¶ 22.)  Indeed, in May 2012, Plaintiff transmitted the same information to the Individual Defendants: "Just to confirm, Goldman Sachs does not have a conflicts of interest policy, not firmwide, and not for any divisions.  I would go so far as to say they never had a policy on conflicts, based on the dates of the documents provided to us for review."  (Compl. Ex. at 56-57.)  Yet, an exhibit that Plaintiff attached to her Complaint shows that Goldman Sachs had a firmwide conflict of interest policy, the components of which were published on the firm's public website.  Mr. Silva's email of May 13, 2012 contains hyperlinks to and excerpts from Goldman Sachs's (1) "Code of Business Conduct and

Ethics," which addresses personal conflict of interests, and (2) "Report of the Business Standards Committee," which summarizes the conflict of interest policies for particular business divisions. (Compl. Ex. at 55-56; Gross Decl. Exs. C at 4-5 & D at 16-25.)  The Court may note that SR 08-8 recommends precisely this type of program for large, complex financial institutions:

> Compliance policies refer to both: (1) firmwide compliance policies that apply to *all employees* throughout the organization as they conduct their business and support activities; and (2) the more detailed, *business-specific policies* that are further tailored to, and more specifically address, compliance risks inherent in specific business lines and jurisdictions of operation, and apply to employees conducting business and support activities for the specific business line and/or jurisdiction of operation.  (Gross Decl. Ex. A at 11-12 n.4 (emphases added).)

The existence of Goldman Sachs's conflict of interest policies is not a trivial inconsistency.  It contradicts the core allegation of the Complaint: that Goldman Sachs "had no firmwide conflict of interest policy" (Compl ¶¶ 22, 24), at any time, neither firmwide nor "for any divisions" (Compl. Ex. at 57).  And, for the purpose of a motion to dismiss, the pleading contains on its face a coherent reason for why Plaintiff was dismissed:  She rushed to judgments that even her own evidence refuted.

At best, Plaintiff can allege that Goldman Sachs's conflict of interest policies were inadequate.  (*Compare* Compl. ¶ 24 ("Goldman stated it had no firmwide conflict of interest policy.") *with* Compl. ¶ 97 ("Goldman did not have a firmwide conflicts of interest policy *in compliance* with SR 08-08.") (emphasis added).)  But any theory that Plaintiff was fired because of a disagreement over the meaning of SR 08-8 is inconsistent with facts within the pleadings. Most notably, on May 13, 2012, a few days before Plaintiff was fired, Mr. Silva wrote to Plaintiff that the New York Fed should continue to "point out ways the firm's COI policy needs to be improved, or be better organized, or be better documented," and should consider adopting another firm's policies as a model.  (Compl. Ex. at 55.)  This statement, which Plaintiff does not

and cannot allege was false, shows on its face that there was ongoing discussion about whether Goldman Sachs's policies complied with SR 08-8 and belies any allegation that Plaintiff was fired because of her "finding" about a non-compliant policy.  More fundamentally, a disagreement between a supervised employee and more senior colleagues over the application of a Federal Reserve policy is not whistleblowing activity—*i.e.*, the provision of information regarding illegal activity.  Under Plaintiff's unique view of section 1831j, any such disagreement in the context of a bank examination would become a federal "whistleblower" case.  In the context of organizational employment, however, it is normal for more experienced and seasoned officials to substitute their judgment for that of less experienced employees.  The plain meaning of the words that Congress used in section 1831j—a violation of any "law or regulation"— reveals that Congress did not intend to treat a mere substitution of judgment as a cognizable whistleblower claim.[6]

Setting aside the existence of Goldman Sachs's conflict of interest policies, many of the other contradictions and inconsistencies within the Complaint coalesce around Plaintiff's theory that the New York Fed wanted to protect Goldman Sachs from the "implications of Goldman's failure to properly manage conflicts of interest, should those failures become known to consumers and clients."  (Compl. ¶ 30.)  (*See also* Compl. ¶ 11 (describing connections between the New York Fed and Goldman Sachs).)  These contradictions cast doubt on whether Plaintiff's Complaint is plausible on its face and makes "common sense."  *Iqbal*, 556 U.S. at 679.

---

[6] Plaintiff has not alleged that her "findings" demonstrated "gross mismanagement," another type information protected under section 1831j.  Any such belated assertion would fail because "gross mismanagement" means "such serious errors . . . that a conclusion the [entity] erred is not debatable among reasonable people," and not "[m]ere differences of opinion between an employee and his agency superiors as to the proper approach to a particular problem."  *White v. Dep't of the Air Force*, 391 F.3d 1377, 1381-1382 (Fed. Cir. 2004) (interpreting the Whistleblower Protection Act).

*First*, in May 2012, just ten days before she was fired, Mr. Silva wrote to Plaintiff that he had personally raised Plaintiff's "finding" at a "vetting session with the [Operating Committee]," only to be told afterwards that the policies were, in fact, posted on Goldman Sachs's website. (Compl. Ex. at 55.)  If the Defendants sought to protect Goldman Sachs, why would Mr. Silva elevate Plaintiff's finding to a committee of the Board of Governors or, as noted above, recommend to Plaintiff that Goldman Sachs's policies be reviewed further?

*Second*, Plaintiff alleges that, during the six months that followed Goldman Sachs's alleged admission, she conducted extensive work on that firm's management of conflicts of interest, including three document requests (Compl. ¶ 21) and innumerable meetings, both internally and with Goldman Sachs (*see, e.g.*, Compl. ¶¶ 24, 29, 49, 52, 63, and 79).  She also appears to have had regular and direct contact with the most senior examiner on the supervisory team, Mr. Silva (Compl. ¶ 49), and free communication with the Legal & Compliance group (Compl. ¶ 65).  If the Defendants sought to protect Goldman Sachs, why would they have allowed Plaintiff to pursue the conflict of interest matter for six months?[7]

*Third*, the state of Goldman Sachs's conflict of interest policies was well-known to its "consumers and clients."  For one thing, each of the deals "investigated" by Plaintiff received extensive public attention before, during, and after her employment at the New York Fed. Indeed, Plaintiff quotes from a February 29, 2012 decision from the Delaware Chancery Court, which criticized Goldman Sachs for a conflict of interest in a deal concerning Kinder Morgan.

---

[7] In addition, although temporal proximity between protected activity and discharge may be a basis to infer a causal connection, a six-month gap is too long to create that inference.  *See Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (finding no causation where three months elapsed between filing an agency complaint and the alleged discrimination); *Murray v. Visiting Nurse Servs.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (stating that "two to three months between the protected activity and the adverse employment action does not allow for an inference of causation").

(Compl. ¶¶ 53-58.)  The decision by Chancellor Strine was widely reported in the mainstream media, *see, e.g.*, Andrew Ross Sorkin, "As an Advisor, Goldman Sachs Guaranteed Its Payday," *The New York Times*, March 6, 2012, at B1 (Gross Decl. Ex. F), and it defies reason to speculate that Federal Reserve officials were helping Goldman Sachs hide its well-known business conduct.  In addition, Goldman Sachs's conflict of interest policies were available for public inspection on the firm's website.  (Compl. Ex. at 55-56.)  An investor, client, or enterprising reporter could review the policies and determine whether the firm had adequate safeguards to avoid conflicts of interest.

*Fourth*, it is unclear how the "run off" allegedly forecast by Mr. Silva and Mr. Koh (Compl. ¶ 31) would come to pass if the New York Fed's supervisory conclusions about Goldman Sachs's conflict of interest policies were *confidential* supervisory information.

These contradictions do not merely render Plaintiff's claim unlikely.  They cast significant doubt on whether her claim makes common sense.  Because Plaintiff has not pleaded a plausible theory to explain the alleged retaliation, her section 1831j claim must be dismissed.

## II.    Plaintiff Has Failed to State a Claim under New York's Consumer Protection Law.

Plaintiff's state law "consumer protection" claim must be dismissed because the exercise of government supervisory responsibilities is not "consumer-oriented conduct," which is the touchstone of the New York statute.  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995).  Section 349(a) of the New York General Business Law prohibits "[d]eceptive acts or practices in the conduct of any *business, trade or commerce or in the furnishing of any service* in this state."  (Emphasis added.)  On its face, the statute does not apply to employment disputes, much less the governmental supervision of financial institutions.  Instead, "[t]he typical violation contemplated by the statute involves an

individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising." *Genesco Entm't, Div. of Lymutt Indus., Inc. v. Koch*, 593 F. Supp. 743, 751 (S.D.N.Y. 1984) (Weinfeld, J.).  The critical nexus is to some consumer-oriented conduct, "consumer" being the operative word.  *See Cruz v. NYNEX Info. Resources*, 263 A.D.2d 285, 289 (1st Dep't 2000) ("In New York law, the term 'consumer' is consistently associated with an individual or natural person who purchases goods, services or property for personal, family or household purposes." (quotation marks omitted)).  Thus, section 349 did not provide a cause of action against the Triborough Bridge and Tunnel Authority for overcharges to his E-ZPass account because the defendant was "performing an essential governmental function"—the collection of a toll—which was not a "consumer oriented transaction."  *Kinopf v. Triborough Bridge & Tunnel Auth.*, 6 Misc. 3d 73, 74 (N.Y. App. Term, 2d Dep't 2004).  For the same reason, an employment dispute arising out of government supervision of a financial institution cannot give rise to a claim for consumer protection.  Indeed, the entity that Plaintiff alleges offered "consumer" services (Goldman Sachs) is not even a party to this lawsuit.

Plaintiff's section 349 claim against the New York Fed must also be dismissed because it is barred by the Supremacy Clause of the United States Constitution.  U.S. Const. art. VI, cl. 2.  As part of the central bank of the United States, the New York Fed is an instrumentality of the federal government,[8] and the scope of its liability for employment lawsuits is established by the

---

[8] Federal courts routinely characterize Federal Reserve Banks as "instruments" or "instrumentalities" of the United States because of their important governmental function.  *See, e.g.*, *Fasano*, 457 F.3d at 281-82 (summarizing "strong arguments" in favor of recognizing a Federal Reserve Bank as an instrumentality of the federal government); *Starr International Co. v. Fed. Reserve Bank of N.Y.*, 906 F. Supp. 2d 202, 231 (S.D.N.Y. 2012) (listing the tests for instrumentality status and concluding that the New York Fed "satisfies all of these standards, including the most stringent").  *See also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 422

Federal Reserve Act of 1913, 12 U.S.C. § 341, and federal anti-discrimination statutes.  In order

for states or municipalities to superimpose additional liability on a federal instrumentality,

Congress must provide "clear and unambiguous" authorization for such regulation.  *See*

*Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988) ("It is well settled that the activities

of federal installations are shielded by the Supremacy Clause from direct state regulation unless

Congress provides 'clear and unambiguous' authorization for such regulation.").  *Accord*

*Armand Schmoll, Inc. v. Fed. Reserve Bank of N.Y.*, 286 N.Y. 503, 506 (1941) ("The Federal

Reserve Bank is a federal agency exercising powers conferred by federal statute and performing

duties imposed upon it by federal statute in a field which, under the Constitution of the United

States, is within the sole and exclusive jurisdiction of the federal government.").  No provision of

federal law suggests, much less clearly and unambiguously states, that state consumer protection

laws should govern the employment or supervisory practices of Federal Reserve Banks.[9]

Without such authorization, Plaintiff cannot state a claim against the New York Fed.

## III.    Plaintiff Has Failed to State a Claim for Breach of an Implied Contract.

Plaintiff cannot maintain her claim for breach of an implied employment contract against

the three Individual Defendants because she lacks privity of contract.  A claim for breach of

contract ordinarily lies against a contracting party.  *See generally Yucyco, Ltd. v. Republic of*

*Slovenia*, 984 F. Supp. 209, 215 (S.D.N.Y. 1997).  Plaintiff, however, does not and cannot allege

---

(1819) (describing the Second Bank of the United States, then the Nation's central bank, and its branches as a "convenient, a useful, and essential instrument in the prosecution of [the Nation's] fiscal operations").

[9] Nor would such a provision make sense.  If Federal Reserve Banks across the country would be required to conform their conduct to different standards set by the laws of each state in which they operate, instead of to the uniform standards set by federal law, state governments would be allowed to dictate the terms by which Federal Reserve Banks, through their employees, carry out their vital central banking functions—a perverse result that could not have been intended by Congress and should not be allowed by this Court.

that she had an employment contract with the Individual Defendants; indeed, she admits that her employer was the New York Fed (Compl. ¶ 16).

Plaintiff's breach-of-contract claim against the New York Fed fails as a matter of law because Plaintiff was an "at will" employee who was not subject to an employment contract. The Federal Reserve Act provides that "officers and employees" of Federal Reserve Banks may be "dismiss[ed] at pleasure," 12 U.S.C. § 341 (Fifth), which is synonymous with "at will" employment. *See Moodie v. Fed. Reserve Bank of N.Y.*, 831 F. Supp. 333, 336-37 (S.D.N.Y. 1993) (describing Federal Reserve Banks as "employers at will"); *Daniels v. Fed. Reserve Bank of Chicago*, No. 98 C 1186, 2004 U.S. Dist. LEXIS 3412, at *26 n.3 (N.D. Ill. Mar. 3, 2004) (stating that the Federal Reserve Act created an "at-will employment situation"); *see also Kroske v. US Bank Corp.*, 432 F.3d 976, 984 (9th Cir. 2005) (concluding that, under the National Bank Act, "a bank's power to dismiss at pleasure is analogous to dismiss at will, implying the absence of a contractual relationship between employer and employee") (internal quotation marks omitted).  The New York Fed's statutory right to dismiss employees "at pleasure" is fundamentally inconsistent with a contractual employment relationship, in which an employee has a contractual right to retain employment.  *See Mele v. Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 255 (3d Cir. 2004) ("[T]he Federal Reserve Act precludes enforcement against a Federal Reserve Bank of an employment contract that would compromise its statutory power to dismiss at pleasure, and prevents the development of a reasonable expectation of continued employment."); *Jaffe v. Fed. Reserve Bank of Chicago*, 586 F. Supp. 106, 107-08 (N.D. Ill. 1984) ("Courts uniformly hold that [the Federal Reserve Act] precludes the enforcement of any employment contract against a Federal Reserve Bank and prevents the development of any reasonable expectation of continued employment.").

There is no basis to support Plaintiff's legal assertion that section 1831j fundamentally changes the nature of "at will" employment at Federal Reserve Banks.  (Compl. ¶ 118.)  Section 1831j does not alter the fundamental right of an employee to "walk away" from a job, or the general right of a Federal Reserve Bank to fire the employee with or without cause.  It merely prohibits firing for certain causes.  To the extent that Plaintiff also asserts that any of the New York Fed's employee policies—communicated "in writing and verbally"—create an implied employment contract (Compl. ¶ 119), the possibility of abrogating the Federal Reserve Act by private contract was long ago considered and rejected.  *See Obradovich v. Fed. Reserve Bank of N.Y.*, 569 F. Supp. 785, 790 (S.D.N.Y. 1983) (Weinfeld, J.) ("The Court holds, therefore, that the 'dismiss at pleasure' provision of the Federal Reserve's corporate powers statute restricts the Federal Reserve's power to contract with *all employees*.  Any implied contract based upon the Federal Reserve's personnel rules would exceed the Federal Reserve's authority, and be unenforceable."); *Bollow v. Fed. Reserve Bank of San Francisco*, 650 F.2d 1093, 1098 (9th Cir. 1981) ("[N]o process or tenure rights are conferred on reserve bank employees by [the Federal Reserve Act]. . . . [A]ttempts to create such rights by reference to independent sources are violative of the statute and void thereunder.").

## IV.    Plaintiff Has Failed to State a Claim for Wrongful Termination in Violation of Public Policy.

Plaintiff's claim for the tort of wrongful termination in violation of public policy must be dismissed because "New York does not recognize a tort of wrongful discharge for at-will employment."  *Caruso v. City of New York*, No. 06 Civ. 5997, 2013 U.S. Dist. LEXIS 138643, at *77 (S.D.N.Y. Sept. 26, 2013) (Abrams, J.).  *See also Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 301 (1983) (declining, in the context of an "at will" employment arrangement, to recognize a tort for "abusive discharge . . . where employees have been discharged for disclosing

21

illegal activities on the part of their employers").  As explained above, Plaintiff was unquestionably an "at will" employee, and the status of her employment arrangement is fixed by federal law.  Even if Plaintiff could bring this tort against the New York Fed, her claim against the Individual Defendants must be dismissed for the independent reason that Plaintiff could only be fired by her employer, the New York Fed (Compl. ¶ 16), not by any of her co-employees. Indeed, two of the three Individual Defendants—Mr. Silva and Mr. Koh—are not even alleged to have been Plaintiff's supervisors.  Although any institution necessarily acts through its employees, the power of a Federal Reserve Bank to "dismiss at pleasure" is expressly vested by statute in the *institution*, not any particular individuals.  12 U.S.C. § 341.  Moreover, only the New York Fed may reinstate Plaintiff, which is the principal relief sought.  (Compl. ¶ 115.)

## V.      Plaintiff is Not Entitled to Reinstatement or Front Pay.

Plaintiff is not entitled to reinstatement or front pay because of her own wrongdoing, which was discovered after the New York Fed fired her.  Although reinstatement is a remedy available under many federal employment statutes, the Supreme Court has held that where a defendant learns in the course of litigation of an independent ground to fire a former employee, neither reinstatement nor front pay is an appropriate remedy.  *See McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 361 (1995).

The circumstances of the instant case are strikingly similar to the facts in *McKennon*.  In that case, a former employee sued her employer under the Age Discrimination in Employment Act of 1967 ("ADEA"), which authorized courts to grant reinstatement, front pay, and other equitable relief.  *See* 29 U.S.C. § 626(b).  During the course of litigation, the plaintiff admitted that she had "copied several confidential documents bearing upon the company's financial condition" during the last year of her employment as a form of "insurance and protection"

against being fired on the basis of her age. *McKennon*, 513 U.S. at 355. As soon as her former employer learned of her conduct, it informed the plaintiff that her actions violated company policies and were independent grounds for termination. *Id.* When the case reached the Supreme Court, the only question presented was whether reinstatement could be an appropriate remedy where a plaintiff would otherwise be ineligible for further employment. The Court unanimously concluded that, in balancing the equities to determine whether reinstatement was practicable, "the employee's wrongdoing becomes relevant . . . to take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing." *Id.* at 361 (quotation marks and citation omitted). If a plaintiff admitted to misappropriating confidential information in violation of company policy, and if termination were an ordinary and expected response to this type of violation, then "*as a general rule in cases of this type, neither reinstatement nor front pay* is an appropriate remedy. It would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds." *Id.* at 361-62 (emphasis added).

The instant case concerns not just a violation of internal policies, but a potential crime. Under federal law, confidential supervisory information is the property of the Board of Governors and may not be used without permission from the Board. (*See* Gross Decl. Ex. E.) Without even seeking—much less actually receiving—permission from the Board of Governors, Plaintiff published unredacted confidential supervisory information in her Complaint, both in substantive pleadings and as attached exhibits. And, prior to initiating this lawsuit, Plaintiff circulated her Complaint, including its confidential attachments, to the news media. Plaintiff's actions violate federal criminal law, *see* 18 U.S.C. §§ 641 (theft of government property) and

655 (theft of property of value by bank examiner), and federal regulations (*see* Gross Decl. Ex. E).  It would be, in the Supreme Court's words, "inequitable and pointless" to order that she be reinstated, or to compel the New York Fed to bear the cost (in the form of front pay) for Plaintiff's reckless conduct.  In this regard, it is important to note that Plaintiff could have obtained the same information lawfully through discovery with appropriate protective measures.  But she did not.  To the extent that Plaintiff might have been entitled to reinstatement and front pay under Section 1831j or any common law claim, she has forfeited that right.

**VI.     The New York Fed is Not Liable for Punitive Damages.**

Finally, Plaintiff cannot recover punitive damages from the New York Fed because she has not pointed to any Congressional authorization for a civil penalty, which is required where a defendant is a federal instrumentality.  *See Missouri Pacific R.R. Co. v. Ault*, 256 U.S. 554, 563 (1921) (stating that "Congress is not to be assumed to have adopted the method of fines paid out of public funds to insure obedience to the law," and establishing the presumption that "[t]he purpose for which the government permitted itself to be sued was compensation, not punishment").  Courts in virtually every federal circuit have applied *Ault*'s presumption that federal agencies or instrumentalities are not liable for punishment without Congress's clear approval—a sensible presumption avoiding the absurd effect of inflicting punishment on the taxpayer.[10]  The New York Fed is unquestionably a federal instrumentality owing to its role as an

---

[10] *See, e.g.*, *Reconstruction Fin. Corp. v. J. G. Menihan Corp.*, 111 F.2d 940, 942 (2d Cir. 1940) (stating that, under *Ault*, a "sue and be sued" provision did not "sanction the recovery of penalties" against a federal instrumentality); *Bank One, Texas, N.A. v. Taylor*, 970 F.2d 16, 33-34 (5th Cir. 1992) (no punitive damages liability for the FDIC absent unequivocal Congressional authorization); *Commerce Fed. Sav. Bank v. Fed. Deposit Ins. Corp.*, 872 F.2d 1240, 1247-48 (6th Cir. 1989) (same); *Smith v. Russellville Production Credit Ass'n*, 777 F.2d 1544, 1550 (11th Cir. 1985) ("[A] federal agency or instrumentality of the United States cannot be liable for punitive damages unless Congress makes a special provision permitting such damages."); *Rohweder v. Aberdeen Production Credit Ass'n*, 765 F.2d 109, 113 (8th Cir. 1985) (same); *In re*

24

important component of the Nation's central bank.  *See supra* n.8.  Moreover, its earnings after the deduction of expenses are paid to the United States Treasury.  *See* 12 U.S.C. § 290.  Section 1831j(c), which enumerates the relief available to whistleblowers, expressly provides only *remedial* relief, and never mentions punishment.  Accordingly, the New York Fed is not liable for punitive damages under that statute or any of Plaintiff's other causes of action.

## CONCLUSION

For the reasons set forth herein, the Complaint should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated: November 14, 2013
      New York, New York

Thomas C. Baxter, Jr.
General Counsel and
  Executive Vice President
Federal Reserve Bank of New York
33 Liberty Street
New York, NY 10045

By: /s/ David Gross
David Gross (DG-3372)
Counsel and Vice President
Ph.: 212-720-2356
Fax: 212-720-8709
david.gross@ny.frb.org

Thomas M. Noone (TN-0616)
Attorney
Ph.: 212-720-7743
Fax: 212-720-8709
thomas.noone@ny.frb.org

---

*Sparkman*, 703 F.2d 1097, 1100-01 (9th Cir. 1983) (same); *Mays v. Tennessee Valley Auth.*, 699 F. Supp. 2d 991, 1030 (E.D. Tenn. 2010) (same); *Harrison v. Fed. Deposit Ins. Corp.*, No. 92-CV-0304E, 1993 U.S. Dist. LEXIS 18924, at *1 (W.D.N.Y. Apr. 16, 1993) ("FDIC, as an instrumentality of the United States, is immune from punitive damages."); *United States v. Halpin*, No. 88-0215, 1989 U.S. Dist. LEXIS 1051, at *4 (E.D.N.Y. Jan. 12, 1989) ("[F]ederal courts have long held that neither a penalty nor punitive damages may be recovered against the United States and its agencies and instrumentalities absent express Congressional approval."); *Massachusetts v. Hills*, 437 F. Supp. 351, 354 (D. Mass. 1977) (same).