UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

CARMEN M. SEGARRA,                                    :
                                                      :
      Plaintiff,                                      :
                                                      : ECF CASE
      v.                                              :
                                                      : 13-CV-07173 (RA)
FEDERAL RESERVE BANK OF                               :
NEW YORK, MICHAEL SILVA,                              : ORAL ARGUMENT REQUESTED
MICHAEL KOH, and                                      :
JOHNATHON KIM,                                        :
                                                      :
      Defendants.                                     :

-------------------------------------------------------------- x


### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT


Thomas C. Baxter, Jr.
General Counsel and Executive Vice President
Federal Reserve Bank of New York
33 Liberty Street
New York, NY 10045


*Of Counsel*
David Gross
Thomas M. Noone

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS .........................................................................................3

ARGUMENT ..............................................................................................................6

    I.    Plaintiff Has Failed to State a Claim Under Section 1831j ......................................7

        A.    Section 1831j does not create liability for the Individual Defendants...............7

        B.    Plaintiff has not alleged a protected activity.......................................................8

        C.    Plaintiff's allegations are implausible.............................................................12

    II.    Plaintiff Has Failed to State a Claim under New York's Consumer Protection Law......................................................................................16

    III.    Plaintiff Has Failed to State a Claim for Breach of Contract ...................................19

    IV.    Plaintiff Has Failed to State a Claim for Wrongful Termination in Violation of Public Policy.........................................................................................21

    V.    Plaintiff Has Failed to State a Claim for Negligence in Employment.....................21

    VI.    Plaintiff Has Failed to State a Claim for Conspiracy...............................................22

    VII.    Plaintiff is Not Entitled to Reinstatement or Front Pay ..........................................22

    VIII.    The New York Fed is Not Liable for Punitive Damages.........................................24

CONCLUSION.........................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

## <u>Cases</u>

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................... 6-7, 14

*Bank One, Texas, N.A. v. Taylor*, 970 F.2d 16 (5th Cir. 1992).....................................24

*Barbosa v. Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210 (S.D.N.Y. 2010) ...................6

*Bollow v. Fed. Reserve Bank of San Francisco*, 650 F.2d 1093 (9th Cir. 1981)..........................20

*Bouchard v. New York Archdiocese*, 719 F. Supp. 2d 255 (S.D.N.Y. 2010)..........................21-22

*Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533 (D.C. Cir. 1986) ....................................10

*Caruso v. City of New York*, No. 06 Civ. 5997, 2013 U.S. Dist. LEXIS 138643
   (S.D.N.Y. Sept. 26, 2013)........................................................................................21

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ............................................................9

*Commerce Fed. Sav. Bank v. Fed. Deposit Ins. Corp.*, 872 F.2d 1240 (6th Cir. 1989) ...............24

*Cosgrove v. Fed. Home Loan Bank*, No. 90 Civ. 6455, 1999 U.S. Dist. LEXIS 7420
   (S.D.N.Y. Mar. 22, 1999) .....................................................................................7, 12

*Cruz v. NYNEX Info. Resources*, 263 A.D.2d 285 (1st Dep't 2000) ............................................17

*Fasano v. Fed. Reserve Bank of New York*, 457 F.3d 274 (3d Cir. 2006)............................ 7-8, 17

*Fed. Reserve Bank of Boston v. Comm'r of Corps. & Taxation*, 499 F.2d 60
   (1st Cir. 1974) .......................................................................................................18

*Fidelity Fed. Sav. and Loan Ass'n v. De La Cuesta*, 458 U.S. 141 (1982) ....................................9

*Genesco Entm't, Div. of Lymutt Indus., Inc. v. Koch*, 593 F. Supp. 743 (S.D.N.Y. 1984)............17

*Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988) ........................................................18, 21

*Harrison v. Fed. Deposit Ins. Corp.*, No. 92-CV-0304E, 1993 U.S. Dist. LEXIS 18924
   (W.D.N.Y. Apr. 16, 1993) ......................................................................................25

*Hicks v. Resolution Trust Corp.*, 767 F. Supp. 167 (N.D. Ill. 1991) ...............................................8

*In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001) ..........................7

*In re Sparkman*, 703 F.2d 1097 (9th Cir. 1983)..................................................................25

*Jaffe v. Fed. Reserve Bank of Chicago*, 586 F. Supp. 106 (N.D. Ill. 1984)...................................19

*Kinopf v. Triborough Bridge & Tunnel Auth.*, 6 Misc. 3d 73
    (N.Y. App. Term, 2d Dep't 2004) ...................................................................................17

*Massachusetts v. Hills*, 437 F. Supp. 351 (D. Mass. 1977) ........................................................25

*Mays v. Tennessee Valley Auth.*, 699 F. Supp. 2d 991 (E.D. Tenn. 2010) ...................................25

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ....................................................... 17-18

*McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352 (1995) ............................................ 22-23

*Mele v. Fed. Reserve Bank of New York*, 359 F.3d 251 (3d Cir. 2004)..........................................19

*Missouri Pacific R.R. Co. v. Ault*, 256 U.S. 554 (1921) ............................................................24

*Moodie v. Fed. Reserve Bank of New York*, 831 F. Supp. 333 (S.D.N.Y. 1993)............................19

*Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293 (1983) ........................................................21

*Nowlin v. Resolution Trust Corp.*, 33 F.3d 498 (5th Cir. 1994) ...................................................8

*Obradovich v. Fed. Reserve Bank of New York*, 569 F. Supp. 785 (S.D.N.Y. 1983)...................20

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
    85 N.Y.2d 20 (1995) .....................................................................................................16

*Reconstruction Fin. Corp. v. J. G. Menihan Corp.*, 111 F.2d 940 (2d Cir. 1940)........................24

*Rinaldi v. United States*, 434 U.S. 22 (1977)...............................................................................9

*Rohweder v. Aberdeen Production Credit Ass'n.*, 765 F.2d 109 (8th Cir. 1985) .........................25

*Scott v. Fed. Reserve Bank of New York*, 704 F. Supp. 441 (S.D.N.Y. 1989)...............................19

*Smith v. Russellville Production Credit Ass'n*, 777 F.2d 1544 (11th Cir. 1985)..................... 24-25

*Starr International Co. v. Fed. Reserve Bank of New York*, 906 F. Supp. 2d 202
    (S.D.N.Y. 2012) ...................................................................................................... 17-18

*United States v. Halpin*, No. 88-0215, 1989 U.S. Dist. LEXIS 1051
    (E.D.N.Y. Jan. 12, 1989) ..................................................................................25

*United States v. Reeves*, 891 F. Supp. 2d 690 (D.N.J. 2012) ........................................10

*White v. Dep't of the Air Force*, 391 F.3d 1377 (Fed. Cir. 2004) ..................................8

## Statutes

U.S. Const. art. I ............................................................................................................18

U.S. Const. art. VI ...........................................................................................................17

5 U.S.C. § 553 ..................................................................................................................9

12 U.S.C. § 221 ..........................................................................................................18, 25

12 U.S.C. § 248 ..........................................................................................................12, 22

12 U.S.C. § 290 ...............................................................................................................25

12 U.S.C. § 341 ...............................................................................................................19

12 U.S.C. § 483 ..........................................................................................................12, 22

12 U.S.C. § 503 ...............................................................................................................25

12 U.S.C. § 1813 ...........................................................................................................8, 11

12 U.S.C. § 1831j ..................................................................................................... *passim*

16 U.S.C. § 3372 .............................................................................................................10

18 U.S.C. § 641 ...............................................................................................................24

18 U.S.C. § 655 ...............................................................................................................24

44 U.S.C. § 1510 .............................................................................................................10

N.Y. Gen. Bus. Law § 349 .......................................................................................6, 16-17

## Rules

Fed. R. Civ. P. 8 ...............................................................................................................6

Fed. R. Civ. P. 12(b)(6) ..........................................................................................1, 6-7, 25

## <u>Other Authorities</u>

139 Cong. Rec. H10162, 103rd Cong. (1st Sess. 1993) .................................................................7

Restatement (Second) of Contracts § 71 ......................................................................................20

Defendants Federal Reserve Bank of New York (the "New York Fed") and Michael Silva, Michael Koh, and Johnathon Kim (collectively, the "Individual Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiff Carmen Segarra's Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Each of Plaintiff's six causes of action fails to state a claim for the following reasons.

*Federal "whistleblower" statute.* This claim remains unchanged from the original Complaint and fails for the same reasons. The Individual Defendants are not liable because 12 U.S.C § 1831j creates no liability for individual employees of a Federal Reserve Bank. As for the New York Fed, Plaintiff's claim fails for two reasons. *First*, Plaintiff has not alleged a protected activity. As it applies to this case, Section 1831j requires Plaintiff to allege that she was fired because she reported information about a violation of "any law or regulation" by a "depository institution." Plaintiff, however, alleges that she was fired for reporting that Goldman Sachs—a *holding company*, not a "depository institution"—violated an *advisory letter*, not a "law or regulation," by not having a "firmwide conflict of interest policy." More fundamentally, Section 1831j protects the provision of information about wrongdoing, not disagreements between a junior bank examiner and more senior colleagues over the supervisory consequences of that information. *Second*, Plaintiff's "whistleblower" claim is implausible owing to numerous contradictions within her pleading. Most glaringly, the allegation that Goldman Sachs did not have any conflict of interest policy is belied by Plaintiff's own exhibits, which show that the "nonexistent" policies were, in fact, available on Goldman Sachs's public website. Considered in its entirety, the gravamen of the Amended Complaint is a non-actionable disagreement between a supervised employee and more senior colleagues, not a "whistleblower" claim.

*New York "consumer protection" statute.*  New York's consumer protection law does not apply because it regulates consumer-oriented, commercial conduct, not government supervision of financial institutions by a federal instrumentality like the New York Fed.

*Breach of Contract.*  Under federal law, Plaintiff was an "at will" employee and was not employed by contract.  Plaintiff's new theory that Defendant Kim, her direct supervisor, breached an oral contract to help her fails because Plaintiff has not alleged consideration.

*Wrongful Termination.*  Apart from the fact that New York does not recognize the tort of wrongful termination in "at will" employment arrangements, this claim fails against the Individual Defendants because they did not employ Plaintiff and, *a fortiori*, did not fire her.  It fails against the New York Fed because the authority under the Federal Reserve Act to hire and fire employees "at will" supersedes any state law right to continued employment.

*Negligence in Employment.*  In addition to being trumped by federal law, the New York tort of negligent supervision fails because Plaintiff does not and cannot allege that the New York Fed had knowledge that the Individual Defendants had a propensity for the conduct that caused her injuries, a glaring omission from the Amended Complaint.

*Conspiracy.*  Because this claim rests entirely on Plaintiff's other claims of illegal and tortious conduct, it fails for the same reasons.

*Remedies.*  Plaintiff is not entitled to reinstatement or front pay because she violated New York Fed policies and federal law when she retained and published confidential supervisory information without permission—an independent ground for termination that, under settled law, precludes an equitable right to future employment or front pay.  Finally, the New York Fed is not liable for punitive damages because, as part of the Nation's central bank, it may not be punished absent clear authorization from Congress, which is lacking in this case.

## STATEMENT OF FACTS

The New York Fed is one of twelve regional reserve banks that, along with the Board of Governors and the Federal Open Market Committee, make up the Federal Reserve System, the nation's central bank.  Pursuant to authority delegated by the Board of Governors, the New York Fed supervises numerous financial institutions located within the Second District of the Federal Reserve System, which includes New York State.

The Individual Defendants were, at all relevant times, employees of the New York Fed who worked in its supervisory department.  Mr. Silva served as the Senior Supervisory Officer of the New York Fed team conducting an examination of Goldman Sachs, and Mr. Koh served as the Deputy Supervisory Officer.  Mr. Kim was Plaintiff's immediate supervisor in the Legal & Compliance group within the New York Fed's supervisory department.[1]  The combined tenure of the three Individual Defendants at the New York Fed exceeds 45 years.

Plaintiff, by contrast, worked at the New York Fed for not quite seven months—from October 31, 2011 through May 23, 2012.  (AC ¶ 14.)[2] Although she is an attorney and worked previously at a number of financial institutions, this was her first position as a bank examiner. Her first (and only) assignment was to the Goldman Sachs examination team led by Mr. Silva and Mr. Koh, where she was one of approximately 30 examiners.

According to the Amended Complaint, Plaintiff examined several aspects of Goldman Sachs's compliance function and concluded that the firm "*does not have a conflicts of interest policy*, not firmwide, and not for any divisions.  I would go so far as to say they have *never* had a policy on conflicts . . . ."  (AC Ex. at 56-57 (emphases added).)  This, apparently, was not news:

---

[1] The Legal & Compliance group, which participates in examinations of supervised financial institutions, is not part of the Legal function, which represents the bank in lawsuits.

[2] As used herein, "AC" refers to the Amended Complaint filed on December 4, 2013, and "Compl." refers to the original Complaint filed on October 10, 2013.

Plaintiff alleges that "Goldman's lack of a firmwide conflict of interest policy" was "frequently discussed" among her colleagues (AC ¶ 49), and that Goldman Sachs repeatedly admitted its lack of a firmwide conflict of interest policy (AC ¶ 48).  One such admission occurred at meeting on December 8, 2011—approximately one month after Plaintiff was hired—which was attended by several of Plaintiff's colleagues including Mr. Silva and Mr. Kim.  (AC ¶¶ 49, 51 and Ex. at 39.)  Plaintiff further alleges that the Individual Defendants predicted that news of Goldman Sachs's lack of a firmwide conflict of interest policy would cause that firm to "explode" and would trigger a "run off" of "consumers and clients."  (AC ¶¶ 57-58.)  Just how the results of a confidential examination would ever become public is, however, left to the imagination.

In Plaintiff's view, Goldman Sachs's lack of a conflict of interest policy violated "SR 08-8," an advisory letter published in 2008 by the Board of Governors' Division of Bank Supervision and Regulation (hence, "SR").[3]  SR 08-8 contains "clarification as to the Federal Reserve's views" regarding "a firmwide approach to compliance risk management and oversight."  (Declaration of David Gross ("Gross Decl.") Ex. A at 2.)  The letter advises, among other things, that supervised financial institutions "should have effective compliance risk management programs that are appropriately tailored to the organizations' risk profiles," which may "vary considerably."  (*Id* at 3.)  Especially for "[l]arger, more complex banking organizations" (*id.*), SR 08-8 recommends "compliance policies," a defined term with two components: (1) a firmwide policy applicable to "all employees throughout the organization," and (2) more tailored policies for "specific business lines."  (Gross Decl. Ex. A at 11-12 n.4.)

---

[3] According to the Board of Governors' website, SR Letters "address significant policy and procedural matters related to the Federal Reserve System's supervisory responsibilities" and are "a means of disseminating information to banking supervision staff at the Board and the Reserve Banks, as well as to supervised banking organizations."  (Gross Decl. Ex. B ("About SR Letters," *available at* http://www.federalreserve.gov/bankinforeg/srletters/about.htm).)

Plaintiff's "finding" about a lack of conflict of interest policies allegedly received attention from many others at the New York Fed, including the two most senior officers in charge of the Goldman Sachs supervisory team (Mr. Silva and Mr. Koh) and colleagues in the Legal & Compliance group (including Mr. Kim).  Many meetings were held to discuss her findings, both internally and with Goldman Sachs.  (*See, e.g.*, AC ¶¶ 50, 56, 77, 81, 98, 114, and 119.)  The issue was even vetted with the Operating Committee ("OC"), a system-wide committee for large institution oversight established by the Board of Governors.  (AC Ex. at 55.)  In the end, however, the Defendants disagreed with Plaintiff's conclusions in two respects.  *First*, Plaintiff had not analyzed Goldman Sachs' conflict of interest policies sufficiently to support her conclusions.  For example, according to the exhibits appended to the Amended Complaint, Mr. Kim and Mr. Silva wrote to Plaintiff in May 2012 that it was premature to jump to a conclusion about Goldman Sachs's policies because "due diligence has not been completed" (*id.* at 56) and "we have not even submitted our . . . follow-up questions" (*id.* at 55).  *Second*, written conflict of interest policies—including eponymous sections of a firmwide "Code of Business Conduct and Ethics" (Gross Decl. Ex. C at 4-5) and "Report of the Business Standards Committee" (Gross Decl. Ex. D at 16-25)—were available on Goldman Sachs's public website.  (AC Ex. at 55-56.)  As Mr. Silva wrote to Plaintiff, those public documents raised "serious questions in my mind as to your judgment in reaching and communicating conclusions without a sound basis in the supervisory process and before the due diligence and vetting process is complete."  (*Id.* at 55.)

Soon after this exchange of email in May 2012, the New York Fed fired Plaintiff for cause.  Plaintiff was *not* fired because she identified a possible violation of law or regulation.  Her pleadings demonstrate on their face that her concerns about Goldman Sachs had the attention

of very senior management, who investigated her concerns but disagreed with her conclusions.

Indeed, Mr. Silva *agreed* that Goldman Sachs's policies could be improved:

> [A]s examiners, we can and should point out ways the firm's [Conflict of Interest] policy needs to be improved, or be better organized, or be better documented in the event that, after conducting appropriate due diligence and vetting of our conclusions, we find it to be deficient in any of these respects.  Perhaps [Goldman Sachs's Conflict of Interest] policies should be more like the ones for [other banks] that you mention. (*Id.* at 55.)

Approximately 17 months after she was fired, Plaintiff filed this lawsuit for wrongful termination,[4] which is divided into six purported causes of action: (1) a violation of the Federal Deposit Insurance Corporation Improvement Act of 1991, as amended and codified at 12 U.S.C. § 1831j; (2) a violation of New York's "consumer protection" law, N.Y. Gen. Bus. Law § 349; (3) breach of two employment contracts; and common law torts for (4) wrongful termination in violation of public policy, (5) negligent supervision, and (6) conspiracy.  Not one of these purported claims is cognizable, for the reasons addressed below.

## ARGUMENT

Under Rule 8 of the Federal Rules of Civil Procedure, a complaint must be "facially plausible" and "give fair notice to the defendants of the basis for the claim."  *Barbosa v. Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210, 215 (S.D.N.Y. 2010) (quotation marks omitted).  A claim is facially plausible when it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  On a motion under Rule

---

[4] The original Complaint, the Amended Complaint, and the exhibits to each contain confidential supervisory information, which is protected from public disclosure by federal regulations.  *See* Gross Decl. Ex. E (Letters to the Court dated October 10, 2013 and October 11, 2013.) Notwithstanding these regulations, Plaintiff published unredacted copies of her original Complaint, including the attachments, to members of the news media before filing her pleading.

12(b)(6) of the Federal Rules of Civil Procedure, a court need not credit legal conclusions, as opposed to factual allegations, *Iqbal*, 556 U.S. at 678, or factual allegations that are "contradicted . . . by statements in the complaint itself or by documents upon which its pleadings rely," *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001).

## I.    Plaintiff Has Failed to State a Claim Under Section 1831j.

### A.    Section 1831j does not create liability for the Individual Defendants.

The Individual Defendants may not be sued under Section 1831j because that statute does not create liability for individual employees of a Federal Reserve Bank. *See Cosgrove v. Fed. Home Loan Bank*, No. 90 Civ. 6455, 1999 U.S. Dist. LEXIS 7420, at *24 (S.D.N.Y. Mar. 22, 1999) ("Section 1831j has no provision imposing liability upon individuals or permitting remedies against individuals."). Instead, Section 1831j prohibits federal bank supervisors—specifically, a "Federal banking agency, Federal home loan bank, [or] Federal reserve bank"—from firing an employee for reporting "any possible violation of any law or regulation." 12 U.S.C. § 1831j(a)(2). Former employees who were terminated in violation of Section 1831j(a)(2) may sue their former employers to enforce their right against unlawful discrimination, *see id.* at § 1831j(b), and seek relief from the employer "[that] committed the violation," *id.* at § 1831j(c).[5] So far as Defendants are aware, every court to consider the issue has concluded, as Judge Patterson did in *Cosgrove*, that there is no individual liability under Section 1831j. *See, e.g.*, *Fasano v. Fed. Reserve Bank of New York*, 457 F.3d 274, 283 n.11 (3d

---

[5] The lone exception concerns "*any person* who is performing, directly or indirectly, any function or service on behalf of the [*Federal Deposit Insurance*] *Corporation* ["FDIC"]," 12 U.S.C. § 1831j(a)(2), an amendment that reflects the FDIC's use of contractors to meet the temporarily increased need for supervisors of thrifts after the "savings and loan crisis." *See* 139 Cong. Rec. H10162, 103rd Cong. (1st Sess. 1993) (discussing liability for FDIC contractors). The inclusion of this singular exception, however, demonstrates that Congress chose *not* to create liability for "any person" working for a Federal Reserve Bank.

Cir. 2006) (collecting cases); *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 502-03 (5th Cir. 1994) (observing that Section 1831j applies to only "two types of actors," depository institutions and federal bank supervisors); *Hicks v. Resolution Trust Corp.*, 767 F. Supp. 167, 172 (N.D. Ill. 1991) (dismissing claims under Section 1831j against "individual defendants in both their official and individual capacities"). Indeed, *Hicks* observed that 12 U.S.C. § 1813, which defines the terms used in Section 1831j, includes a defined term for "institution-affiliated party" that included "directors, officers, employees or controlling stockholders." *Hicks*, 767 F. Supp. at 172. Congress, however, did not include that class of defendants in Section 1831j.

**B.    Plaintiff has not alleged a protected activity.**

As it applies to the instant case, activity protected by Section 1831j occurs where "any employee [of a Federal Reserve Bank] . . . provid[es] information . . . regarding any possible violation of any law or regulation . . . by . . . any depository institution." 12 U.S.C. § 1831j(a)(2).[6] As in her original Complaint, Plaintiff asserts that the New York Fed fired her for two reasons: "[1] finding Goldman did not have a firmwide conflicts of interest policy in compliance with SR 08-8 and [2] refusing to change her examination findings." (AC ¶ 151; *see also* AC ¶ 133 (same), Compl. ¶ 97 (same).) Neither reason constitutes protected activity.[7]

---

[6] Although Plaintiff now accuses the New York Fed of "gross mismanagement" by not making reporting lines clear to her (AC ¶ 78), she does not and cannot allege "gross mismanagement" by Goldman Sachs. *See White v. Dep't of the Air Force*, 391 F.3d 1377, 1381-1382 (Fed. Cir. 2004) (defining "gross mismanagement" under the Whistleblower Protection Act to exclude "differences of opinion between an employee and his agency superiors as to the proper approach to a particular problem").

[7] In her Amended Complaint, Plaintiff includes a litany of "Goldman's compliance problems . . . [that] violated other federal laws, rules, and regulations," each of which she claims to have uncovered during her brief tenure at the New York Fed. (AC ¶ 139.) She does not allege, however, that she was fired for reporting violations of any of these authorities, most of which fall under the primary jurisdiction of the U.S. Securities and Exchange Commission in any event.

The first alleged basis for Plaintiff's termination—"finding Goldman did not have a firmwide conflicts of interest policy in compliance with SR 08-8" (AC ¶ 151)—does not constitute protected activity for two reasons: SR 08-8 is an advisory letter, not a "law or regulation"; and Goldman Sachs is a holding company, not a "depository institution."

*First*, SR 08-8 is an *advisory letter*, not a regulation, as asserted in the Amended Complaint (AC ¶ 149). "[T]he promulgation of . . . regulations must conform with any procedural requirements imposed by Congress," which are ordinarily found in the Administrative Procedures Act ("APA"). *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979). The basic procedural prerequisites for exercising regulatory authority under the APA are that an agency (1) "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," (2) consider those views, (3) publish a statement of purpose, and (4) provide an opportunity to petition for the "issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(c)-(e). Valid, properly promulgated regulations have the force and effect of law, the same as a statute, because of the opportunity for public notice and comment, characterized by the Supreme Court as a "quasi-legislative" element. *Chrysler Corp.,* 441 U.S. at 302.

By contrast, "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice," are exempt from public notice and comment requirements, 5 U.S.C. § 553(b), and are not legally binding. *Compare Fidelity Fed. Sav. and Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 153 (1982) (concluding that *regulations* of a federal banking agency may override and preempt any inconsistent state law), *with Rinaldi v. United States*, 434 U.S. 22, 29 (1977) (requiring courts to be "receptive, not circumspect" of a Department of Justice *policy* on duplicative prosecutions). Agency policy and guidance, therefore, is *not* published in the Code of Federal Regulations, which is reserved for regulations with "legal

effect."  *See* 44 U.S.C. § 1510 (authorizing a "complete codification[] of the documents of each agency of the Government having general applicability and *legal effect*") (emphasis added); *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 539 (D.C. Cir. 1986) (Scalia, J.) ("The real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations . . . .").[8]

SR 08-8 was not promulgated according to APA procedures or published in the Code of Federal Regulations.  It is an important statement of policy because it reflects the expectations of the department within the Board of Governors responsible for the supervision of financial institutions, but it is not a binding rule enacted by a federal agency following a period of public notice and comment.[9]  A quick survey of SR 08-8 confirms its forward-looking, advisory nature. *See Brock*, 796 F.2d at 538 (examining the language used in a Department of Labor policy to assess the intent of the agency, such as the use of "may" versus "will").  SR 08-8 "encourages" large financial institutions to devote adequate resources to compliance, states "expectations" for compliance with Basel Committee "principles," and provides "clarification as to the Federal Reserve's views" regarding related matters.  (Gross Decl. Ex. A at 2.)  SR 08-8 recommends that

---

[8] The bright-line distinction between regulations and policies was illustrated in a recent decision from the District of New Jersey interpreting a federal criminal statute that had, as a statutory predicate, a "violation of *any law or regulation* of any State." *United States v. Reeves*, 891 F. Supp. 2d 690, 691 (D.N.J. 2012), quoting 16 U.S.C. § 3372(a)(2)(A) (emphasis added).  The defendant had been indicted for the unlawful interstate transportation of oysters, and the predicate was a violation of New Jersey's oyster harvest quota.  The quota and related "Terms and Conditions" appeared in an official state publication, but were not included in a regulation enacted pursuant to the procedural requirements of New Jersey's Administrative Procedures Act. *Id.* at 704-06 (outlining the notice, comment, publication, and response requirements to enact regulations in New Jersey).  Because the oyster quota was not contained in a regulation, the charges predicated on the oyster quota were dismissed. *Id.* at 706-07.

[9] Indeed, the Board of Governors report quoted by Plaintiff in her Amended Complaint (AC ¶¶ 27-30) describes SR Letters generally, and SR 08-8 in particular, as "supervisory guidance" or "guidance."  (Gross Decl. Ex. F at 3, 6, and 9 ("*Operations Review Report, Federal Reserve Bank of New York, Bank Supervision Group, December 2009*").)  Although stamped "Restricted FR," Congress released this report publicly through the Financial Crisis Inquiry Commission.

large, complex banking organizations "*should* generally implement firmwide compliance risk management programs," and supplies an illustrative list of the topics that these programs "*should* include." (*Id.* at 4 (emphases added).)  These supervisory expectations are important, but SR 08-8 does not contain agency rules to which financial institutions "must" or "shall" adhere. Plaintiff, therefore, cannot maintain her Section 1831j claim—which requires a violation of "law or regulation"—on the basis of an alleged violation of agency guidance like SR 08-8.

*Second*, "Goldman Sachs"—the "firm" in Plaintiff's search for a "firmwide" conflict of interest policy—is not a "depository institution" as defined in Title 12, Chapter 16 of the United States Code.  As a financial institution holding company, The Goldman Sachs Group, Inc. is a "depository institution *holding company*," a separately defined term.  12 U.S.C. § 1813(w)(1) (emphasis added).  By contrast, a "depository institution" means "any bank or savings association," *id.* at 1813(c)(1), and neither of those terms is defined to include a holding company, *see id.* at 1813(a)(1) ("bank") and (b)(1) ("savings association").  Because "firmwide" means across all divisions of The Goldman Sachs Group, Inc., Plaintiff has failed to state a claim.[10]

Plaintiff's other alleged basis for termination—"refusing to change her examination findings" (AC ¶ 151)—is not actionable because the statute protects the *provision of information*, not a disagreement between an employee and other more senior officials over the supervisory

---

[10] The limitation to "depository institutions" makes sense in historical context.  Section 1831j, which was an amendment to the Federal Deposit Insurance Act and originally covered only employees of "federally insured depository institution[s]," *see* 101 P.L. 73, 103 Stat. 183, was one of Congress's responses to the "savings and loan crisis" of the 1980s, in which hundreds of thrifts failed across the country.  Certain deposit liabilities of these depository institutions, unlike the debt of a bank holding company, receive protection in the form of federal deposit insurance from the Federal Deposit Insurance Corporation.  Although amended in 1991 to extend "whistleblower" protection to employees of federal banking regulators, Congress's original focus on rooting out illegal conduct at "depository institutions," which receive federal deposit insurance, remained untouched.

consequences of that information.  *See* 12 U.S.C. 1831j(a)(2) (prohibiting dismissal or

discrimination "because the employee . . . provided information").  Were it otherwise, a

"whistleblower" statute could be invoked anytime a supervised employee disagrees with the

judgment of his supervisors and thereafter feels the supervisors are holding the disagreement

against the employee.  Moreover, Plaintiff lacks any legal basis to assert that the responsibility

for the New York Fed's conclusions regarding a supervised financial institution belonged to her.

Despite acknowledging that the decisions on "supervisory action" and "specific language"

belonged to the New York Fed (AC ¶ 128), Plaintiff persists in referring to "*her* examination,"

"*Carmen's* examination," or "*her* multiple ongoing examinations" of Goldman Sachs (*see, e.g.*,

AC ¶¶ 73-75, 77-79, 85-86, 99, 117, 124, 126, 133, and 138), appropriating for herself what is

rightfully the prerogative of the Board of Governors and the New York Fed, *see* 12 U.S.C. §§

248(a), 483.  *Cf. Cosgrove*, 1999 U.S. Dist. LEXIS 7420 at *48-49 ("It is the examiner-in-charge

who decides what findings are . . . put in the Report of Examination, not the individual

examiners working under his or her supervision.  As part of a team of individual examiners,

plaintiff had no authority to insist that the Report of Examination be prepared in any specific

manner.") (summary judgment).

     **C.**     **Plaintiff's allegations are implausible.**

     The Amended Complaint repeats the many contradictions in the original Complaint,

which—each and together—undermine the plausibility of Plaintiff's claims.  Most glaringly,

Plaintiff alleges that, in December 2011, Goldman Sachs admitted that it "had no firmwide

conflict of interest policy."  (AC ¶ 51.)  Goldman Sachs apparently made the same statement—

that "it had no firmwide conflict of interest policy"—"on several occasions from November

[*sic*][11] 8, 2011, through May 23, 2012."  (AC ¶ 48.)  Indeed, in May 2012, Plaintiff transmitted

the same information to the Individual Defendants: "Just to confirm, Goldman Sachs does not

have a conflicts of interest policy, not firmwide, and not for any divisions.  I would go so far as

to say they never had a policy on conflicts, based on the dates of the documents provided to us

for review."  (AC Ex. at 56-57.)  Yet, an exhibit to the Amended Complaint shows that Goldman

Sachs had a firmwide conflict of interest policy, the components of which were published on the

firm's public website.  Mr. Silva's email of May 13, 2012 contains hyperlinks to and excerpts

from Goldman Sachs's (1) "Code of Business Conduct and Ethics," which addresses personal

conflict of interests, and (2) "Report of the Business Standards Committee," which summarizes

the conflict of interest policies for particular business divisions.  (AC Ex. at 55-56; Gross Decl.

Exs. C at 4-5 & D at 16-25.)  The Court may note that SR 08-8 recommends precisely this type

of program for large, complex financial institutions:

> Compliance policies refer to both: (1) firmwide compliance policies that apply to *all
> employees* throughout the organization as they conduct their business and support
> activities; and (2) the more detailed, *business-specific policies* that are further tailored to,
> and more specifically address, compliance risks inherent in specific business lines and
> jurisdictions of operation, and apply to employees conducting business and support
> activities for the specific business line and/or jurisdiction of operation.  (Gross Decl. Ex.
> A at 11-12 n.4 (emphases added).)

The existence of Goldman Sachs's conflict of interest policies is not a trivial

inconsistency.  It belies the core allegation of the Complaint: that Goldman Sachs "had no

firmwide conflict of interest policy" (AC ¶¶ 51), not at any time, and neither firmwide nor "for

any divisions" (AC Ex. at 57).  And, for the purpose of a motion to dismiss, the pleading

---

[11] It is unclear from the pleadings whether there was a separate meeting on November 8, 2011
(AC ¶ 49), which was approximately one week after Plaintiff was hired (AC ¶ 14), or whether
Plaintiff is referring to the December 8, 2011 meeting convened at the direction of the Individual
Defendants (AC ¶ 50).  The same ambiguity appeared in the first Complaint.  (Compl. ¶¶ 22, 24.)

contains on its face a coherent reason for why Plaintiff was dismissed: She rushed to judgments that even her own evidence refuted.

At best, Plaintiff can allege that she was fired for concluding that Goldman Sachs's conflict of interest policies were *inadequate*. Such a theory, however, is inconsistent with other allegations within the pleadings. Most notably, on May 13, 2012, a few days before Plaintiff was fired, Mr. Silva wrote to Plaintiff that the New York Fed should continue to "point out ways the firm's COI policy needs to be improved, or be better organized, or be better documented," and should consider adopting another firm's policies as a model. (AC Ex. at 55.) Although plaintiff now characterizes this position as "pretext" (AC ¶ 123), that description makes little sense: Mr. Silva *agreed* that the policy should be improved. More fundamentally, a disagreement between a supervised employee and more senior colleagues over the adequacy of a conflict of interest policy is not whistleblowing activity—*i.e.*, the provision of information regarding illegal activity. Under Plaintiff's view of Section 1831j, any such disagreement in the context of a bank examination would become a federal "whistleblower" case. In the context of organizational employment, however, it is normal for more experienced and seasoned officials to substitute their judgment for that of less experienced employees. The plain meaning of the words that Congress used in Section 1831j—a violation of any "law or regulation"—reveals that Congress did not intend to treat a mere substitution of judgment as a cognizable whistleblower claim.

Plaintiff's theory of motive—that the New York Fed wanted to protect Goldman Sachs from the "implications of Goldman's failure to properly manage conflicts of interest, should those failures become known to consumers and clients" (AC ¶ 57, *see also* AC ¶20)—suffers from several other contradictions and inconsistencies. These contradictions cast doubt on whether the Amended Complaint makes "common sense." *Iqbal*, 556 U.S. at 679.

*First*, in May 2012, just ten days before she was fired, Mr. Silva wrote to Plaintiff that he had personally raised Plaintiff's "finding" at a "vetting session with the [Operating Committee]." (AC Ex. at 55.)  If the Defendants sought to protect Goldman Sachs, why would Mr. Silva *elevate* Plaintiff's finding to a committee of the Board of Governors or, as noted above, recommend to Plaintiff that Goldman Sachs's policies be reviewed further?

*Second*, Plaintiff alleges that, during the six months that followed Goldman Sachs's alleged admission, she worked exclusively on that firm's management of conflicts of interest, sending three document requests (AC ¶¶ 46-47) and attending many meetings, both internally and with Goldman Sachs (*see, e.g.*, AC ¶¶ 50, 56, 74, 77, 81, 98, and 114).  She also appears to have had regular and direct contact with the most senior examiner on the supervisory team, Mr. Silva (AC ¶ 77), and free communication with the Legal & Compliance group (AC ¶ 100).  If the Defendants actually sought to protect Goldman Sachs, it would not make common sense that they assigned Plaintiff to examine Goldman Sachs's conflict of interest policies, which they allegedly knew to be deficient (AC ¶49).  Nor would it make sense to have allowed Plaintiff to pursue the matter for *six months*, much less to end the inquiry by firing her.

*Third*, Plaintiff alleges that the Fed pressured her to change "her finding" that Goldman Sachs "had no conflict of interest policy" (AC ¶ 126), yet also pleads that the lack of such a policy was an open secret at the New York Fed (AC ¶ 49).  Indeed, she alleges that Goldman Sachs repeatedly admitted this compliance gap—not only to Plaintiff, but simultaneously to a group of her colleagues and supervisors.  (AC ¶¶ 48, 50-51, and Ex. at 39.)  Plaintiff cannot have it both ways:  She cannot claim she was discriminated against for being a "whistleblower" if the information contained in "her findings" was "frequently discussed" within the New York Fed (AC ¶ 49) and, indeed, was reported directly to other bank examiners.

*Fourth*, the state of Goldman Sachs's conflict of interest policies was well known to its "consumers and clients," and so it defies reason to speculate that Federal Reserve officials were helping Goldman Sachs hide its publicized business conduct. For one thing, Goldman Sachs's conflict of interest policies were available for public inspection on the firm's website. (AC Ex. at 55-56.) For another, each of the deals "investigated" by Plaintiff—in particular, the Kinder Morgan transaction—received extensive public attention in the mainstream media before, during, and after Plaintiff's employment at the New York Fed. (*See, e.g.*, AC ¶ 93.) Investors or clients could review these policies and news stories about the firm's deals and determine for themselves whether the firm had adequate safeguards to avoid conflicts of interest.

*Fifth*, it is unclear how the "run off" allegedly forecast by Mr. Silva and Mr. Koh (AC ¶ 58) would come to pass if the New York Fed's supervisory conclusions about Goldman Sachs's conflict of interest policies were *confidential* supervisory information.

These contradictions do not merely render Plaintiff's claim unlikely. They cast significant doubt on whether her claim makes common sense. Because Plaintiff has not pleaded a plausible theory to explain the alleged retaliation, her Section 1831j claim must be dismissed.

## II.   Plaintiff Has Failed to State a Claim under New York's Consumer Protection Law.

Plaintiff's state law "consumer protection" claim must be dismissed because the exercise of government supervisory responsibilities is not "consumer-oriented conduct," which is the touchstone of the New York statute. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995). Section 349(a) of the New York General Business Law prohibits "[d]eceptive acts or practices in the conduct of any *business, trade or commerce or in the furnishing of any service* in this state." (Emphasis added.) On its face, the statute does not apply to employment disputes, much less to the governmental supervision of

16

financial institutions.  Instead, "[t]he typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising."  *Genesco Entm't, Div. of Lymutt Indus., Inc. v. Koch*, 593 F. Supp. 743, 751 (S.D.N.Y. 1984) (Weinfeld, J.).  The critical nexus is to some consumer-oriented conduct, "consumer" being the operative word.  *See Cruz v. NYNEX Info. Resources*, 263 A.D.2d 285, 289 (1st Dep't 2000) ("In New York law, the term 'consumer' is consistently associated with an individual or natural person who purchases goods, services or property for personal, family or household purposes." (quotation marks omitted)).  Thus, Section 349 did not provide a cause of action against the Triborough Bridge and Tunnel Authority for overcharges to plaintiff's E-ZPass account because the defendant was "performing an essential governmental function"—the collection of a toll—not a "consumer oriented transaction."  *Kinopf v. Triborough Bridge & Tunnel Auth.*, 6 Misc. 3d 73, 74 (N.Y. App. Term, 2d Dep't 2004).  For the same reason, an employment dispute arising out of government supervision of a financial institution cannot give rise to a claim for consumer protection.  Indeed, the entity that Plaintiff alleges offered "consumer" services (Goldman Sachs) is not even a party to this lawsuit.

Plaintiff's consumer protection claim against the New York Fed must also be dismissed because it is barred by the Supremacy Clause of the United States Constitution.  U.S. Const. art. VI, cl. 2.  As part of the central bank of the United States, the New York Fed is an instrumentality of the federal government.[12]  The scope of its liability for employment lawsuits is

---

[12] Federal courts routinely characterize Federal Reserve Banks as "instruments" or "instrumentalities" of the United States because of their important governmental functions.  *See, e.g.*, *Fasano*, 457 F.3d at 281-82 (summarizing "strong arguments" in favor of recognizing a Federal Reserve Bank as an instrumentality of the federal government); *Starr International Co. v. Fed. Reserve Bank of New York*, 906 F. Supp. 2d 202, 231 (S.D.N.Y. 2012) (listing the tests for instrumentality status and concluding that the New York Fed "satisfies all of these standards, including the most stringent").  *See also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 422

established by the Federal Reserve Act of 1913, 12 U.S.C. §§ 221 *et seq.*, and federal anti-discrimination statutes.  In order for states or municipalities to superimpose additional liability on a federal instrumentality, Congress must provide "clear and unambiguous" authorization for such regulation.  *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988) ("It is well settled that the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation.").  No provision of federal law suggests, much less clearly and unambiguously provides, that state consumer protection laws should govern the employment or supervisory practices of Federal Reserve Banks, which would be antithetical to the concept of an independent central bank.[13]  Without such authorization, Plaintiff cannot state a claim against the New York Fed under this state statute.

---

(1819) (describing the Second Bank of the United States, then the Nation's central bank, and its branches as a "convenient, a useful, and essential instrument in the prosecution of [the Nation's] fiscal operations").

[13] Plaintiff's characterizations of the New York Fed as "a private corporation" and a "private bank" (AC ¶¶ 15, 17) are inaccurate because these descriptions fail to take account of the New York Fed's public purpose.  The New York Fed is organized in the form of a federally chartered corporation.  Although it performs some banking activities (it accepts deposits, makes loans, and buys and sells securities), its purpose is exclusively public, not private, in accordance with the responsibilities delegated by Congress through the Federal Reserve Act, several of which are enumerated in the Constitution.  These responsibilities include (1) issuing and circulating Federal Reserve Notes, the Nation's currency, each of which bears the mark of the issuing Federal Reserve Bank; (2) regulating the value of that currency through national monetary policy, principally through the trading desks located at the New York Fed; (3) serving as the fiscal agent of the United States in borrowing money and satisfying debt; (4) supervising financial institutions on behalf of the Board of Governors; and (5) administering an independent federal law enforcement force to protect its installations.  *Cf.* U.S. Const. Art. I, Sec. 8 (enumerating Congress's power to "borrow Money on the credit of the United States" and "coin Money [and] regulate the Value thereof").  *See also Fed. Reserve Bank of Boston v. Comm'r of Corps. & Taxation*, 499 F.2d 60, 62 (1st Cir. 1974) ([F]ederal reserve banks . . . are plainly and predominantly fiscal arms of the federal government.  Their interests seem indistinguishable from those of the sovereign . . . .").

**III.     Plaintiff Has Failed to State a Claim for Breach of Contract.**

Plaintiff now asserts that *two* contracts were breached when she was fired from the New York Fed.  *First*, she pleads that the New York Fed breached an "implied in fact employment contract" with her.  This claim fails as a matter of law because Plaintiff was an "at will" employee who was not subject to an employment contract.  The Federal Reserve Act provides that "officers and employees" of Federal Reserve Banks may be "dismiss[ed] at pleasure," 12 U.S.C. § 341 (Fifth), which is synonymous with "at will" employment.  *See Moodie v. Fed. Reserve Bank of New York*, 831 F. Supp. 333, 336-37 (S.D.N.Y. 1993) (describing Federal Reserve Banks as "employers at will"); *Scott v. Fed. Reserve Bank of New York*, 704 F. Supp. 441, 447 (S.D.N.Y. 1989) ("The words 'at pleasure' have been interpreted to mean that no officer or employee of a Federal Reserve Bank has any enforceable contract or other property right to his or her employment.").  The statutory right to dismiss employees "at pleasure" is fundamentally inconsistent with a contractual employment relationship, in which an employee has a contractual right to retain employment.  *See Mele v. Fed. Reserve Bank of New York*, 359 F.3d 251, 255 (3d Cir. 2004) ("[T]he Federal Reserve Act precludes enforcement against a Federal Reserve Bank of an employment contract that would compromise its statutory power to dismiss at pleasure, and prevents the development of a reasonable expectation of continued employment."); *Jaffe v. Fed. Reserve Bank of Chicago*, 586 F. Supp. 106, 107-08 (N.D. Ill. 1984) ("Courts uniformly hold that [the Federal Reserve Act] precludes the enforcement of any employment contract against a Federal Reserve Bank and prevents the development of any reasonable expectation of continued employment.").

Plaintiff asserts that Section 1831j impliedly altered the "at will" employment arrangement created by the Federal Reserve Act and created a "property right" to employment.

(AC ¶ 175.)  Yet nothing on the face of that statute—which amended the Federal Deposit

Insurance Act, not the Federal Reserve Act, *see supra* n.10—supports Plaintiff's view.  Section

1831j does not alter the fundamental right of an employee to "walk away" from a job, or the

general right of a Federal Reserve Bank to fire the employee with or without cause.  It merely

prohibits firing for certain causes.  To the extent that Plaintiff also asserts that any of the New

York Fed's employee policies create an implied employment contract (AC ¶ 176), the possibility

of abrogating the Federal Reserve Act by private contract was long ago considered and rejected.

*See Obradovich v. Fed. Reserve Bank of New York*, 569 F. Supp. 785, 790 (S.D.N.Y. 1983)

(Weinfeld, *J.*) ("The Court holds, therefore, that the 'dismiss at pleasure' provision of the Federal

Reserve's corporate powers statute restricts the Federal Reserve's power to contract with *all*

*employees*.  Any implied contract based upon the Federal Reserve's personnel rules would

exceed the Federal Reserve's authority, and be unenforceable."); *Bollow v. Fed. Reserve Bank of*

*San Francisco*, 650 F.2d 1093, 1098 (9th Cir. 1981) (same).

> *Second*, Plaintiff asserts that Mr. Kim created an oral contract with Plaintiff "to

personally help her with her employment."  (AC ¶ 173.)  Setting aside that this is the ordinary

function of a supervisor, not an exceptional contract, Plaintiff's claim fails as a matter of law

because she has not alleged any consideration, a necessary element in the formation of any

contract.  *See* Restatement (Second) of Contracts § 71 (requiring a bargained-for exchange).  All

that is pleaded is a bare offer to help (AC ¶ 83), which does not create an enforceable contract.

Moreover, in light of Plaintiff's new allegations regarding Mr. Kim's repeated offers to help her

(AC ¶¶ 43, 83) and efforts to "commiserate[]" with her (AC ¶¶ 44, 87), it is altogether surprising

that she has chosen to subject him to the obloquy of being named as a defendant in this lawsuit.

**IV.     Plaintiff Has Failed to State a Claim for Wrongful Termination in Violation of Public Policy.**

Plaintiff's claim for the tort of wrongful termination in violation of public policy must be dismissed because "New York does not recognize a tort of wrongful discharge for at-will employment." *Caruso v. City of New York*, No. 06 Civ. 5997, 2013 U.S. Dist. LEXIS 138643, at *77 (S.D.N.Y. Sept. 26, 2013) (Abrams, *J.*).  *See also Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 301 (1983) (declining, in the context of an "at will" employment arrangement, to recognize a tort for "abusive discharge . . . where employees have been discharged for disclosing illegal activities on the part of their employers").  As explained above, Plaintiff was unquestionably an "at will" employee, and the status of her employment arrangement is fixed by federal law, which supersedes any state law right to continued employment, *see Goodyear Atomic Corp.*, 486 U.S. at 180.  This claim must be dismissed against the Individual Defendants for the independent reason that Plaintiff could only be fired by her employer, the New York Fed, not by any of her co-employees.  The Individual Defendants did not employ Plaintiff and, *a fortiori*, did not fire her.

**V.     Plaintiff Has Failed to State a Claim for Negligence in Employment.**

Assuming *arguendo* that a state tort could limit an employment arrangement created by federal statute, Plaintiff's new claim for "negligence in employment" fails for three reasons. *First*, the New York tort of negligence in hiring, retention, and supervision "arises when an employer places an employee in a position to cause *foreseeable harm*," meaning a "propensity for the conduct which caused the injury."  *Bouchard v. New York Archdiocese*, 719 F. Supp. 2d 255, 260 (S.D.N.Y. 2010) (emphasis added).  Plaintiff, however, does not and cannot allege any such propensity or foreseeability.  *Second*, this tort provides an alternative to vicarious liability where a plaintiff could not otherwise sue an employer owing to *ultra vires* actions by a colleague

or supervisor.  *Id.*  Here, by contrast, Plaintiff has asserted several direct claims against her employer, the New York Fed, which is the only party that could have caused the injury for which plaintiff seeks redress (unlawful termination).  *Third*, the claim rests on the erroneous legal assumption that Plaintiff had some entitlement to conduct an examination of Goldman Sachs free from supervision by more senior examiners, such that any intervention by her superiors was unlawful interference.  Plaintiff, however, fails to cite any legal support for this theory—nor can she; the statutory right to conduct a supervisory examination belongs to the Board of Governors and to the New York Fed, not to Plaintiff.  *See* 12 U.S.C. §§ 248, 483.

## VI.    Plaintiff Has Failed to State a Claim for Conspiracy.

Plaintiff alleges that the Defendants participated in a conspiracy to commit "unlawful and tortious acts"—a non-descript and open-ended goal that merely recites an element of the claim. (AC ¶189.)  Defendants allegedly advanced this "conspiracy" in three ways: (1) interfering with "*Carmen Segarra's* examination of Goldman," (2) firing her for not "chang[ing] *her* preliminary bank examination findings," and (3) accusing her of criminal conduct in retaliation for filing this lawsuit.  (AC ¶¶ 190-92 (emphases added).)  The first two allegations are entirely duplicative of other claims and fail for the same reasons. The third allegation is irrelevant because raising a defense against reinstatement in a legal proceeding *initiated by Plaintiff* is not tortious conduct and therefore cannot be a basis for inferring a pre-existing conspiracy.[14]

## VII.    Plaintiff is Not Entitled to Reinstatement or Front Pay.

Plaintiff is not entitled to reinstatement or front pay because of her own wrongdoing, which was discovered after the New York Fed fired her.  Although reinstatement is a remedy available under many federal employment statutes, the Supreme Court held in *McKennon v.*

---

[14] In addition, Plaintiff fails to explain how Defendant Kim, who allegedly sympathized with Plaintiff and offered to help her (AC ¶¶ 83, 87), was part of this conspiracy to harm Plaintiff.

*Nashville Banner Publishing Company*, 513 U.S. 352 (1995), that where a defendant discovers an independent reason to fire a former employee, neither reinstatement nor front pay is an appropriate remedy.  In that case, a former employee who sued her employer under a federal anti-discrimination statute admitted during the litigation that she had "copied several confidential documents bearing upon the company's financial condition" during the last year of her employment as a form of "insurance and protection" against being fired on an impermissible basis.  *Id.* at 355.  The defendant promptly informed the plaintiff that her actions violated company policies, were independent grounds for termination, and precluded any right to reinstatement.  *Id.*  The Supreme Court agreed.  Because reinstatement is a form of equitable relief, an employer's "lawful prerogative[]" to terminate an employee for misconduct "in the usual course of its business" weighs heavily against compulsory reinstatement.  *Id.* at 361 (quotation marks and citation omitted).  Indeed, "*as a general rule in cases of this type, neither reinstatement nor front pay* is an appropriate remedy.  It would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds."  *Id.* at 361-62 (emphasis added).

The instant case, which is squarely governed by *McKennon* on the facts, concerns not only a violation of internal policies, but also a violation of law.  Confidential supervisory information is the property of the Board of Governors and may not be used without permission from the Board.  (*See* Gross Decl. Ex. E.)  Without even seeking—much less actually receiving—permission from the Board of Governors, Plaintiff misappropriated and published unredacted confidential supervisory information in her Complaint, both in substantive pleadings and as attached exhibits.  And, prior to initiating this lawsuit, Plaintiff circulated her Complaint, including its confidential attachments, to the news media.  Plaintiff's actions violate federal

criminal law, *see* 18 U.S.C. §§ 641 (theft of government property) and 655 (theft of property of value by bank examiner), and federal regulations (*see* Gross Decl. Ex. E).  It would be, in the Supreme Court's words, "inequitable and pointless" to order that she be reinstated, or to compel the New York Fed to bear the cost (in the form of front pay) for Plaintiff's reckless conduct.  In this regard, it is important to note that Plaintiff could have obtained the same information lawfully through discovery with appropriate protective measures.  But she did not.  To the extent that Plaintiff might have been entitled to reinstatement and front pay under Section 1831j or any common law claim, she has forfeited that right.

## VIII.   The New York Fed is Not Liable for Punitive Damages.

Finally, Plaintiff cannot recover punitive damages from the New York Fed because she has not pointed to any Congressional authorization for a civil penalty, which is required where a defendant is a federal instrumentality.  *See Missouri Pacific R.R. Co. v. Ault*, 256 U.S. 554, 563 (1921) (stating that "Congress is not to be assumed to have adopted the method of fines paid out of public funds to insure obedience to the law," and establishing the presumption that "[t]he purpose for which the government permitted itself to be sued was compensation, not punishment").  Courts in virtually every federal circuit have applied *Ault*'s presumption that federal agencies or instrumentalities are not liable for punishment without Congress's clear approval—a sensible presumption avoiding the absurd effect of inflicting punishment on the taxpayer.[15]  The New York Fed is unquestionably a federal instrumentality owing to its role as

---

[15] *See, e.g.*, *Reconstruction Fin. Corp. v. J. G. Menihan Corp.*, 111 F.2d 940, 942 (2d Cir. 1940) (stating that, under *Ault*, a "sue and be sued" provision did not "sanction the recovery of penalties" against a federal instrumentality); *Bank One, Texas, N.A. v. Taylor*, 970 F.2d 16, 33-34 (5th Cir. 1992) (no punitive damages liability for the FDIC absent unequivocal Congressional authorization); *Commerce Fed. Sav. Bank v. Fed. Deposit Ins. Corp.*, 872 F.2d 1240, 1247-48 (6th Cir. 1989) (same); *Smith v. Russellville Production Credit Ass'n*, 777 F.2d 1544, 1550 (11th Cir. 1985) ("[A] federal agency or instrumentality of the United States cannot be liable for

24

an important component of the Nation's central bank.  *See supra* n.12.  Moreover, its earnings after the deduction of expenses are paid to the United States Treasury.  *See* 12 U.S.C. § 290. Congress expressly authorized only *remedial* relief in Section 1831j(c), which never mentions punishment.  Accordingly, the New York Fed is not liable for punitive damages under that statute or any of Plaintiff's other causes of action.[16]

## CONCLUSION

For the reasons set forth herein, the Amended Complaint should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated: January 3, 2014
      New York, New York

Thomas C. Baxter, Jr.
General Counsel and
  Executive Vice President
Federal Reserve Bank of New York
33 Liberty Street
New York, NY 10045

By: /s/ David Gross

Thomas M. Noone (TN-0616)
Attorney
Ph.: 212-720-7743
Fax: 212-720-8709
thomas.noone@ny.frb.org

David Gross (DG-3372)
Counsel and Vice President
Ph.: 212-720-2356
Fax: 212-720-8709
david.gross@ny.frb.org

---

[16] punitive damages unless Congress makes a special provision permitting such damages."); *Rohweder v. Aberdeen Production Credit Ass'n.*, 765 F.2d 109, 113 (8th Cir. 1985) (same); *In re Sparkman*, 703 F.2d 1097, 1100-01 (9th Cir. 1983) (same); *Mays v. Tennessee Valley Auth.*, 699 F. Supp. 2d 991, 1030 (E.D. Tenn. 2010) (same); *Harrison v. Fed. Deposit Ins. Corp.*, No. 92-CV-0304E, 1993 U.S. Dist. LEXIS 18924, at *1 (W.D.N.Y. Apr. 16, 1993) ("FDIC, as an instrumentality of the United States, is immune from punitive damages."); *United States v. Halpin*, No. 88-0215, 1989 U.S. Dist. LEXIS 1051, at *4 (E.D.N.Y. Jan. 12, 1989) ("[F]ederal courts have long held that neither a penalty nor punitive damages may be recovered against the United States and its agencies and instrumentalities absent express Congressional approval."); *Massachusetts v. Hills*, 437 F. Supp. 351, 354 (D. Mass. 1977) (same).

[16] Plaintiff asserts that, under federal law, Defendants are liable for all forms of damages (AC ¶ 13), but cites a provision of the Federal Reserve Act that establishes liability for "directors and officers of any *member bank*," meaning a supervised commercial bank.  *See* 12 U.S.C. § 503 (emphasis added).  *See also id.* at § 221 (defining "member bank").