UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

CARMEN SEGARRA,

                      Plaintiff,

          -v-

FEDERAL RESERVE BANK OF NEW
YORK, MICHAEL SILVA, MICHAEL KOH,
and JOHNATHON KIM,

                    Defendants.

------------------------------------------------------------X

No. 13 Civ. 7173 (RA)

OPINION AND ORDER

**USDC-SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #: _____
DATE FILED: 4/23/2014

RONNIE ABRAMS, United States District Judge:

    Plaintiff Carmen Segarra was employed as a Senior Bank Examiner by Defendant

Federal Reserve Bank of New York ("FRBNY") until she was terminated on May 23, 2012.  She

alleges that FRBNY fired her because she concluded that the subject of her examination, The

Goldman Sachs Group, Inc. ("Goldman Sachs") did not have a firmwide conflict-of-interest

policy.  In the instant action she asserts that Defendants violated the whistleblower protection

provisions of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1831j, and raises various

state law claims.

    Before the Court is Defendants' motion to dismiss the First Amended Complaint

("FAC") under Fed. R. Civ. P. 12(b)(6) and Plaintiff's motion seeking leave to file a Second

Amended Complaint.  For the following reasons, the Court concludes that Plaintiff has failed to

state a claim under § 1831j and declines to exercise supplemental jurisdiction over her remaining

state law claims.  It also concludes that filing a Second Amended Complaint would be futile and

denies Plaintiff's motion to do so.

## BACKGROUND

Defendant FRBNY is one of twelve Reserve Banks that, together with the Board of Governors, comprise the Federal Reserve System.  (FAC ¶¶ 15, 17.)  Among other tasks, the Federal Reserve System is responsible for developing and executing the nation's monetary policy, supervising and regulating banking institutions, and assisting the federal government in its financing operations.  (Id. ¶ 16.)  In its supervisory role, it "evaluate[s] the overall safety and soundness" of banking organizations by assessing an "organization's risk-management systems, financial condition, and compliance with applicable banking laws and regulations."  (Id. ¶ 26.)

Segarra, a lawyer, was hired by FRBNY as a Senior Bank Examiner on October 31, 2011, after serving in a variety of positions for several major banking institutions.  (Id. ¶ 14.)  Defendant Johnathon Kim, who was Segarra's supervisor, met with her shortly after she arrived and explained that she would be examining Goldman Sachs's conflict-of-interest policy and the firm's role in several transactions that had attracted the attention of regulators.  (Id. ¶ 35.)  The remaining Defendants named in this action—Michael Silva and Michael Koh—were "responsible for managing the relationship between Goldman and Defendant FRBNY, not for performing examinations of Goldman," although, according to Plaintiff, they "frequently and improperly held themselves out as having supervisory authority over Carmen's work as a bank examiner."  (Id. ¶¶ 42-43.)

Plaintiff alleges that Defendant Kim instructed her to use a document known as "SR 08-08" as "the basis for her investigation of Goldman."  (Id. ¶ 35.)  As described in the following sections, the parties dispute the proper characterization of SR 08-08—a dispute that has important consequences for Plaintiff's claim.  Defendants assert that SR 08-08 is "an advisory letter published in 2008 by the Board of Governors' Division of Bank Supervision and

Regulation (hence, 'SR')," which "contains 'clarification as to the Federal Reserve's views'
regarding 'a firmwide approach to compliance risk management and oversight.'"  (Defs.' Mem.
of Law at 4 (quoting Declaration of David Gross ("Gross Decl.") Ex. A at 2).)  Plaintiff, on the
other hand, asserts that this document is a regulation "promulgated . . . under the [Federal
Reserve] Board's authority to issue banking supervision regulations."  (FAC ¶ 38.)  The parties
agree, however, that SR 08-08 states that "[o]rganizations supervised by the Federal Reserve,
regardless of size and complexity, should have effective compliance risk management
programs," and that the document provides a list of the components of an effective risk
management program.  (Id. ¶ 39; Gross Decl. Ex. A at 3.))

        Plaintiff's FAC provides a discursive account of the seven months she spent at FRBNY
and includes a number of conclusory allegations (see, e.g., FAC ¶ 139), and over fifty pages of
handwritten notes and meeting minutes (id. at App. A).  The gravamen of the FAC, however, can
be summarized as follows: Plaintiff concluded that Goldman Sachs lacked a conflict-of-interest
program that complied with SR 08-08; Defendants Kim, Koh, and Silva obstructed her
examination and ultimately asked her to change her conclusions; and Plaintiff was terminated
from FRBNY because she refused to comply.  (See, e.g., id. ¶ 133.)

        In particular, Plaintiff alleges that at a meeting on December 8, 2011, Goldman Sachs
"stated it had no firmwide conflict of interest policy."  (Id. ¶ 51.)  Later that day, at an
"impromptu meeting" among FRBNY personnel, Defendant Silva "expressed concern that
Goldman would suffer significant financial harm if consumers and clients learned the extent of
Goldman's noncompliance with rules on conflict of interest."  (Id. ¶ 57.)  Plaintiff further alleges
that after additional discussions with Goldman Sachs, she met with FRBNY's "Legal and
Compliance risk team," which "agreed Goldman's failure to comply with SR 08-08 warranted

mention in the annual report and/or examination letter to be issued by FRBNY to Goldman." (<u>Id.</u> ¶ 99.)  When Plaintiff explained this conclusion in an email to Silva, Koh, and Kim, Kim responded that Plaintiff's "email was 'premature.'"  (<u>Id.</u> ¶ 121.)  Several days later, "Defendants Silva and Koh met with Carmen and attempted to force her to change the findings of her examination of Goldman.  They said they did not believe her finding that Goldman had no conflict of interest policy was 'credible.'"  (<u>Id.</u> ¶ 126.)  Three days after Plaintiff refused to change her findings, she was terminated from FRBNY "because her bank examination found that Goldman had no conflict of interest program in compliance with SR08-08 and because Carmen refused Defendants' unlawful request to change her examination findings."  (<u>Id.</u> ¶ 133.)

Plaintiff filed the instant action on October 10, 2013, and filed the FAC on December 4, 2013.  (Dkt. nos. 1, 24.)  Defendants moved to dismiss, and the Court heard oral argument on the motion on April 4, 2014.

## LEGAL STANDARD

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp v. Twombly</u>, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id.</u>  Although the Court must credit each allegation in the FAC, it need not accept as true "a legal conclusion couched as a factual allegation."  <u>Id.</u>

## DISCUSSION

In the FAC, Plaintiff asserts six causes of action: (1) a violation of the FDIA whistleblower protection statute, 12 U.S.C. § 1831j; (2) a violation of New York General

Business Law § 349, which prohibits "deceptive acts and practices" directed at consumers; (3)

"wrongful termination in violation of public policy"; (4) breach of an implied-in-fact

employment contract; (5) negligence in employment against FRBNY; and (6) "conspiracy."[1]

## 1.      Plaintiff's FDIA Whistleblower Claim

In her sole federal cause of action, Plaintiff alleges that she engaged in a protected

activity in her employment as a bank examiner and was fired as a result, in violation of 12 U.S.C.

§ 1831j.  As relevant here, § 1831j provides:

> (2) Employees of banking agencies
>
> No Federal banking agency, Federal home loan bank, Federal reserve bank, or any person who is performing, directly or indirectly, any function or service on behalf of the Corporation may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to any such agency or bank or to the Attorney General regarding any possible violation of any law or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety by—
>
> (A) any depository institution or any such bank or agency;
>
> (B) any director, officer, or employee of any depository institution or any such bank;
>
> (C) any officer or employee of the agency which employs such employee; or
>
> (D) the person, or any officer or employee of the person, who employs such employee.

12 U.S.C. § 1831j(a)(2).  Whistleblower protection was first added to the FDIA in 1989 after the

savings and loan crisis, see Financial Institutions Reform, Recovery, and Enforcement Act of

---

[1]      Although a government employee may be entitled to First Amendment protection when she speaks out "as a citizen on a matter of public concern," the Supreme Court has concluded that a government employee is not entitled to such protection "based on speech made pursuant to the employee's official duties."  Garcetti v. Ceballos, 547 U.S. 410, 413, 418 (2006).  Perhaps for this reason, Plaintiff has not alleged a First Amendment retaliation claim.

1989, Pub. L. No. 101-73, § 932, 103 Stat. 183, 494, and this provision assumed its current form through amendments in the early 1990s, see Resolution Trust Corporation Completion Act, Pub. L. No. 103-204, § 21, 107 Stat. 2369, 2406 (1993); Federal Deposit Insurance Corporation Improvement Act of 1991, Pub. L. No. 102-242, § 251, 105 Stat. 2236, 2332.

A.      **Plaintiff's § 1831j Claim Against Defendants Silva, Koh, and Kim: Whether the Statute Provides for Individual Liability**

Drawing on the text of the statute and case law interpreting it, Defendants first assert that claims against individual employees are not cognizable under § 1831j.  Rather, they argue, the statute provides a cause of action only against the institution, agency, or bank that employed the aggrieved plaintiff.  (Defs.' Mem. of Law at 7-8.)  The Court agrees.

The first sentence of 1831j(a)(2) defines which actors are subject to its provisions: "No federal banking agency, Federal home loan bank, [or] Federal reserve bank" may terminate or discriminate against an employee for engaging in protected activity.  Although the statute also encompasses "any person who is performing, directly or indirectly, any function or service on behalf of the [Federal Deposit Insurance] Corporation," that phrase was not added until 1993, and the legislative history surrounding its addition makes clear that Congress added it only to "includ[e] FDIC contractors in the whistleblower protections of such section."  H.R. Rep. No. 103-103, pt. 1, at 36 (1993), reprinted in 1993 U.S.C.C.A.N. 3040, 3052.  Nowhere does Plaintiff argue that any of the individual Defendants in this case were acting "on behalf of" the FDIC, and the inclusion of this singular exception for FDIC contractors only reinforces the Court's conclusion that the statute does not apply to individuals.

A separate provision in § 1831j provides further evidence that Congress did not intend the statute to reach individual employees.  This subsection, entitled "Remedies," provides:

If the district court determines that a violation of subsection (a) of this

6

section has occurred, it may order the depository institution, Federal home loan bank, Federal Reserve bank, or Federal banking agency which committed the violation—

> **(1)** to reinstate the employee to his former position;
>
> **(2)** to pay compensatory damages; or
>
> **(3)** take other appropriate actions to remedy any past discrimination.

12 U.S.C. § 1831j(c). This provision is additional evidence that Congress contemplated that only the institution or agency employing the whistleblowing plaintiff could be held liable. Nowhere does the statute provide for remedies against individuals.

A holding that § 1831j does not permit individual liability is consistent with the conclusion of the only other court in this Circuit to have addressed the issue. See Cosgrove v. Fed. Home Loan Bank of N.Y., No. 90 Civ. 6455(RPP), 1999 WL 163218, at *7 (S.D.N.Y. Mar. 23, 1999) ("Because Section 1831j has no provision imposing liability upon individuals or permitting remedies against individuals, a private cause of action under Section 1831j can only proceed against one of the federal agencies identified in Section 1831j(a)(2) or against a federally-insured depository institution."). Other district courts have also declined to hold individuals liable under § 1831j, see Rouse v. Farmers State Bank of Jewell, IA, 866 F. Supp. 1191, 1203-04 (N.D. Iowa 1994); Hicks v. Resolution Trust Corp., 767 F. Supp. 167, 171-72 (N.D. Ill. 1991), and Plaintiff has not cited any case that held otherwise. Accordingly, the Court dismisses the § 1831j claim against Defendants Koh, Silva, and Kim.

**B.    Plaintiff's § 1831j Claim Against FRBNY: Defining the Protected Activity**

In order to be a "whistleblower" entitled to protection under § 1831j, Segarra must allege that FRBNY retaliated against her because she "provided information" about "any possible violation of any law or regulation, gross mismanagement, a gross waste of funds, an abuse of

authority, or a substantial and specific danger to public health or safety."  12 U.S.C.

§ 1831j(a)(2).  Segarra therefore must plausibly allege at least two elements: that she "provided

information" about one of the five enumerated grounds of wrongdoing and that she faced adverse

action as a result.

The FAC alleges that "Defendants terminated Carmen for finding Goldman did not have

a firmwide conflicts of interest practice[ ] in compliance with SR 08-08 and for refusing to

change her examination findings."  (FAC ¶ 151.)  Plaintiff devotes much of her opposition brief

to arguing that SR 08-08 is a regulation.  (See Pl.'s Opp. at 4-9.)  Defendants, on the other hand,

argue that SR 08-08 "is an *advisory letter*, not a regulation," (Defs.' Mem. of Law at 9), thus

asserting that even if Plaintiff provided information about Goldman Sachs's noncompliance with

SR 08-08, that information did not relate to a "possible violation of any law or regulation."[2]  The

Court addresses this dispute in the following section.

Plaintiff's other allegation—that she was fired because she "refus[ed] to change her

examination findings"—does not assert a protected activity within the scope of § 1831j.  Section

1831j emphasizes the provision of information: employees may not be subjected to adverse

action "because" they "provided information" about one of the enumerated types of wrongdoing.

12 U.S.C. § 1831j(a)(2).  An individual "provides" information when she discloses it or makes it

available to others.  See, e.g., Merriam-Webster Online Dictionary, http://www.merriam-

webster.com/dictionary/provide (last visited April 23, 2014) (defining "provide," in relevant part,

as "to make (something) available : to supply").  Section 1831j's protections attach when an

---

[2]      Nowhere does Plaintiff plausibly allege that she was terminated for providing information about "gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety."  12 U.S.C. § 1831j.  The FAC does allege that "[i]n acts that constitute gross mismanagement, Defendant FRBNY and Defendant Kim failed to ensure that Carmen's bank activities continued without interference from relationship managers Silva and Koh."  (FAC ¶ 78.)  Plaintiff does not specify, however, to whom she reported this alleged "gross mismanagement" or whether such a disclosure played any role in her termination.

individual discloses protected information to a third party, not when she is asked to alter that information.

An employee's allegation that she was asked to change the results of her investigation is by no means irrelevant to her whistleblower claim.  Proof of such a request may be persuasive evidence that an employee was fired because she disclosed protected information and not for some other reason.  Moreover, federal law imposes criminal penalties on anyone who "corruptly obstructs" a federal bank examination, see 18 U.S.C. § 1517, and on anyone who makes a false statement with intent to deceive a bank examiner, see id. § 1005.[3]  Congress did create a private right of action against "the directors or officers of any member bank" who "knowingly violate" 18 U.S.C. § 1005 (and certain other criminal provisions).  See 12 U.S.C. § 503.  None of the Defendants named in this action, however, are "the directors or officers of any member bank,"[4] and in any event, Plaintiff does not purport to bring a cause of action under 12 U.S.C. § 503.

In sum, to state a claim under § 1831j, Plaintiff must plausibly allege that she "provided information" about the violation of a "law or regulation."  Plaintiff has alleged that she was terminated because she provided information about a possible violation of SR 08-08.  Therefore, the question before the Court is whether SR 08-08 is a "law or regulation."  To answer that question, the Court first examines the proper construction of the phrase "law or regulation" and then considers whether SR 08-08 falls within the meaning of that phrase.

---

[3]      Plaintiff, as a private citizen, cannot enforce these criminal laws through a civil lawsuit.  See, e.g., Hill v. Didio, 191 Fed. App'x 13, 14-15 (2d Cir. 2006) ("As a general matter, we have long recognized that crimes are prosecuted by the government, not by private parties."); Davis v. Countrywide Home Loans, No. 09 Civ. 8606(RJS)(HBP), 2010 WL 3219306 (S.D.N.Y. July 23, 2010), report and recommendation adopted, 2010 WL 3219304 (S.D.N.Y. Aug. 13, 2010) ("18 U.S.C. § 1005 does not provide a private right of action.").

[4]      The term "member bank" is defined as "any national bank, State bank, or bank or trust company which has become a member of one of the Federal reserve banks."  12 U.S.C. § 221.  Plaintiff has not cited any authority suggesting that FRBNY is a "member bank," or that—even if it were—any of the individual Defendants are "directors or officers" of FRBNY.

### i.        The Reach of 1831j

A "central distinction" in administrative law is between those agency pronouncements that amount to "substantive rules" and those that are merely "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." Chrysler Corp. v. Brown, 441 U.S. 281, 301 (1979).  The former category of agency actions creates new obligations or rights, N.Y.C. Emps.' Ret. Sys. v. S.E.C., 45 F.3d 7, 12 (2d Cir. 1995); must be subjected to the Administrative Procedure Act's notice-and-comment procedures, see 5 U.S.C. § 553(b)-(d); and carries the force of law, N.Y.C. Emps.' Ret. Sys., 45 F.3d at 12.  The latter category—of interpretative rules and general policy statements—merely clarifies existing law, see id.; need not undergo notice and comment, see 5 U.S.C. § 553(b)(3)(A); and "lack the force of law," Christensen v. Harris County, 529 U.S. 576, 587 (2000).

The first question, therefore, is whether Congress's protection for individuals who "provide information" about "any possible violation of any law or regulation" extends to individuals who provide information about noncompliance with advisory letters and other agency guidance.  In the Court's view, Congress did not intend the statute to stretch so far.

When Congress did intend to encompass the full panoply of agency action— interpretations, guidance, and policy statements—it said so.  Throughout Title 12, Congress distinguishes between "regulations" on the one hand and "policies," "interpretations," and "guidance" on the other.  See, e.g., 12 U.S.C. § 24a(f)(2) ("[T]he term 'equity capital' includes . . . any debt instrument issued by a financial subsidiary, if the instrument qualifies as capital of the subsidiary under any Federal or State *law, regulation, or interpretation* applicable to the subsidiary."); id. § 1463(c) ("The *regulations* of the Comptroller and the *policies* of the Comptroller and the Corporation governing the safe and sound operation of savings associations,

including *regulations and policies* governing asset classification and appraisals, shall be no less stringent than those established by the Comptroller for national banks."); id. § 1843(k)(4)(G)(ii) (describing an action as "financial in nature" if it is one that "the Board [of Governors] has determined, under *regulations prescribed or interpretations issued* . . . to be usual in connection with the transaction of banking"); id. § 1852(d) ("The Board *shall issue regulations* implementing this section . . . . The Board *may issue interpretations or guidance* regarding the application of this section to an individual financial company or to financial companies in general.") (emphasis added throughout).  Either Congress intended the phrase "law or regulation" to encompass nonbinding agency actions and was simply imprecise in its drafting, or it meant for the phrase to include only those pronouncements that carry with them the force of law.  The Court adopts the latter interpretation.

This conclusion is consistent with the Third Circuit's decision in Matter of Seidman, 37 F.3d 911, 930-32 (3d Cir. 1994), which also construed the phrase "law or regulation" as used in a different provision of Title 12.  In Seidman, the Court addressed 12 U.S.C. § 1818(e)(1)(A)(i)(I), which permits federal banking agencies to remove a regulated bank's officers or directors from office upon a showing that the individual has "violated any law or regulation."  The agency in Seidman concluded that the individual director had violated 12 C.F.R. § 571.7(b), which provided that each director of a savings association "has a fundamental duty to avoid placing himself or herself in a position which creates, or which leads to or could lead to, a conflict of interest or appearance of a conflict of interest."  The Third Circuit noted that although the provision was published in the Code of Federal Regulations, it had not been subjected to notice and comment, was expressly labeled a "Statement of Policy," and "impose[d] no specific substantive requirements."  Seidman, 37 F.3d at 930-32.  The Court thus concluded that the

relevant agency provision was "no more than a statement of policy that a director of a banking institution, like Seidman, should use as a guide for personal conduct, not a rule whose violation triggers the severe penalty section 1818(e) imposes." Id. at 932. Accordingly, the Court "reject[ed] the [agency's] conclusion that section 571.7(b)'s 'Statement of Policy' is a 'regulation or law' within the meaning of section 1818(e)(1)(A)(i)(I)." Id.

Similarly, in United States v. Reeves, 891 F. Supp. 2d 690 (D.N.J. 2012), the District of New Jersey addressed a provision of the Lacey Act that made it unlawful to transport in interstate commerce any wildlife taken "in violation of any law or regulation of any State." Id. at 693 (quoting 16 U.S.C. § 3372(a)(2)(A)). The government charged the defendant with violating this provision, alleging that he harvested oysters in violation of the "Terms and Conditions" incorporated as part of "the annual New Jersey licensing agreement." Id. at 696. Noting that the oyster-harvesting restrictions had not been subjected to notice-and-comment or otherwise promulgated in accordance with the procedures of the state's Administrative Procedure Act, the Court concluded that the "Terms and Conditions cannot be considered a law or regulation of the State of New Jersey during the time period charged in the Indictment." Id. at 708.

Both Reeves and Seidman construed the phrase "law or regulation" in the context of a statute that punished individuals; here, by contrast, the statute protects federal bank examiners. Policy considerations might favor a broad construction of the phrase "law or regulation," particularly given that Congress in 1993 expanded the statute to protect examiners from being fired because they disclosed information about "gross mismanagement" or an "abuse of authority." If Congress had wanted to extend protection even more broadly, however, it could easily have said so—and indeed did say so in other provisions of Title 12. Moreover, as Defendants rightly point out (see Tr. of Oral Argument, April 4, 2014 ("4/4/14 Tr.") 7:5-22),

expanding § 1831j beyond its text creates difficult line-drawing problems: could an employee claim whistleblower protection for reporting noncompliance with an agency policy or with a speech given by a member of the Federal Reserve's Board of Governors that outlines an important policy consideration?  The Court thus concludes that the phrase "regulation" encompasses only those agency pronouncements that carry with them the force of law, as the Third Circuit held in Seidman and the District Court held in Reeves.

### ii.     Whether SR 08-08 Carries the Force of Law

To determine whether an agency pronouncement is a binding, substantive rule or a nonbinding statement of general policy or other guidance, courts look to three factors.  First, courts consider whether the statement purports to create new substantive obligations, which can be determined by looking at the text of the pronouncement.  See Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533, 538 (D.C. Cir. 1986) (Scalia, J.) ("We have, for example, given decisive weight to the agency's choice between the words 'may' and 'will.'").  Second, courts look to whether the pronouncement has been subjected to notice and comment.  See 5 U.S.C. 553; N.Y.C. Emps.' Ret. Sys. v. S.E.C., 45 F.3d 7, 11-12 (2d Cir. 1995).  Third, courts consider whether the statement has been published in the Code of Federal Regulations, which, as then-Judge Scalia explained, is the "real dividing point between regulations and general statements of policy."  Brock, 796 F.2d at 539.

Here, Defendants assert—and nowhere does Plaintiff dispute—that SR 08-08 was not subjected to notice and comment and is not published in the Code of Federal Regulations.  (See Defs.' Mem. of Law at 10.)  Nor does the text of SR 08-08 purport to establish binding obligations.[5]  Although the letter at times speaks of what banks "should" do, nowhere does it say

---

[5]     Plaintiff's Amended Complaint repeatedly references SR 08-08 and quotes a substantial portion of it. (See Am. Compl. ¶ 39.)  The Court therefore may consider the letter in its entirety on this motion to dismiss.  See, e.g.,

what they "must" or "will" do.  Instead, it "encourages" banking institutions to ensure sufficient resources are dedicated to compliance programs; outlines the Federal Reserve's "expectations"; and "clarifies Federal Reserve views applicable to large banking organizations with complex compliance profiles."  (Gross Decl. Ex. A at 2.)  None of the three factors outlined above suggests that this letter carries with it the force of law.

In response, Plaintiff argues that FRBNY has treated SR 08-08 as a binding regulation, enforcing it in the course of consent decrees it has entered into with the banks it supervises. Examination of these consent decrees, however, reveals that Plaintiff is mistaken.  Although each of the consent decrees requires the supervised bank to submit a compliance plan that is consistent with SR 08-08, nowhere do the agreements suggest that SR 08-08 is an otherwise binding regulation.  Instead, each of the consent decrees expressly refers to SR 08-08 as "guidance."  See In re The Goldman Sachs Grp., Inc. et al., No. 11-112-B-HC, ¶¶ 12(d), 16(b) (Sept. 1, 2011); In re Citigroup Inc., No. 13-004-B-HC, ¶ 3(i) (Mar. 21, 2013); In re JP Morgan Chase & Co., No. 13-002-B-HC, ¶ 3(g) (Jan. 14, 2013); In re Morgan Stanley, No. 12-015-B-HC, ¶¶ 11(d), 15(b) (Apr. 2, 2012); In re Bank of America Corp., No. 11-029-B-HC, ¶ 3(b) (Apr. 13, 2011); In re JP Morgan Chase & Co. et al., No. 11-023-B-HC, 7(b) (Apr. 13, 2011); In re Wells Fargo & Co., No. 11-025-B-HC, ¶ 3(b) (Apr. 13, 2011); In re HSBC North Am. Holdings, Inc., No. 10-202-B-HC, ¶ 5(n) (Oct. 4, 2010).

Plaintiff also asserts that FRBNY "has received instructions" from the Board of Governors of the Federal Reserve ("Board of Governors") "to enforce SR 08-08 as a binding regulation," and that FRBNY should therefore be estopped from arguing that SR 08-08 "is anything other than a binding regulation."  (Pl.'s Opp. at 7.)  In support of this argument, Plaintiff relies on a report that the Board of Governors produced outlining its review of

New York Life Ins. Co. v. United States, 724 F.3d 256, 258 n.1 (2d Cir. 2013).

FRBNY's Bank Supervision Group.  (Id. (citing Declaration of Linda Stengle, Jan. 24, 2014, ("Stengle Decl.") Ex. B).)  The report Plaintiff cites, however, simply notes that FRBNY's "examination teams need to perform more work to determine compliance with *SR 08-08 Compliance Risk Management Programs*."  (Stengle Decl. Ex. B at 9.)  Nowhere does the report suggest that SR 08-08 is a binding regulation; indeed, like the consent decrees described above, the report expressly refers to SR 08-08 as "guidance."  (Id.)

The Court expresses no conclusion as to whether Goldman Sachs was or was not in compliance with SR 08-08.  Rather, it concludes only that SR 08-08 is an advisory letter that does not carry with it the force of law.  Assuming as true the allegations in Plaintiff's FAC, Plaintiff nonetheless did not reveal a violation of a "law or regulation" when she disclosed that Goldman Sachs was not in compliance with SR 08-08.  This "finding" may well have been important, but it did not fall into one of the categories that Congress determined was entitled to protection.  Under the facts alleged in the FAC, Plaintiff is thus not a "whistleblower" within the meaning of § 1831j.

**2.    Plaintiff's Assertions of Other Protected Activities and Her Motion To Amend**

At oral argument on the instant motion, in response to questions raised by the Court, Plaintiff raised an additional argument.  She asserted that she was fired because her examination revealed that Goldman Sachs violated a number of other laws and regulations—not just that it had failed to comply with SR 08-08.  (See 4/4/14 Tr. 17:17-24.)  One week after oral argument, Plaintiff's counsel submitted a letter to the Court reiterating this position and "point[ing] out allegations made in the complaint that do not depend upon SR08-08."  (Dkt. no. 40 at 2.)  Three days later, Plaintiff submitted a motion seeking leave to file a Second Amended Complaint ("SAC").  (Dkt. no. 42.)

Plaintiff's argument is unsupported by the allegations of the FAC, and review of her proposed SAC shows that her amendment would be futile.

The FAC does allege that Defendants "had notice from Carmen that Goldman's compliance problems uncovered by Carmen during her examinations also violated other federal laws, rules and regulations," and proceeds to list over fifteen different statutory and regulatory provisions that Goldman Sachs allegedly violated. (FAC ¶ 139.) Assuming—as the Court must for purposes of this motion—that Goldman Sachs did violate these laws, and assuming further that Plaintiff conveyed this information to Defendants, the FAC omits a crucial allegation: that Plaintiff was fired because she reported these violations. The FAC alleges only that "Defendants terminated Carmen for finding Goldman did not have a firmwide conflicts of interest practice[ ] in compliance with SR 08-08 and for refusing to change her examination findings." (Id. ¶ 151; see also ¶ 5 ("[Defendants] fired [Plaintiff] because they suddenly, after months of receiving relevant information, changed their position and said Carmen's finding that Goldman Sachs had no firmwide conflict of interest policy in compliance with SR 08-08 was not credible."); id. ¶ 133 ("Defendants terminated Carmen because her bank examination found that Goldman had no conflict of interest program in compliance with SR 08-08 and because Carmen refused Defendants' unlawful request to change her examination findings.").)[6]

Insofar as Plaintiff argues that Defendants' request "to change her examination findings" related to these other alleged violations, that assertion too is contradicted by the FAC, which makes clear that the alleged request to change her findings related only to her conclusion about

---

[6] Additionally, paragraph 134 of the FAC alleges that Plaintiff notified "Defendant FRBNY" that "Defendants and others" had acted in violation of the criminal laws prohibiting the obstruction of a federal bank examination, "among other rules and regulations." Plaintiff does not allege whom she told about these alleged violations, nor does she allege any facts from which the Court can infer that she was fired as a result of any such disclosure. Furthermore, any assertion that this disclosure was the basis for her termination would be inconsistent with the other allegations in the FAC. See, e.g., FAC ¶ 5 ("Specifically, [Defendants] fired [Segarra] because they suddenly, after months of receiving relevant information, changed their position and said Carmen's finding that Goldman Sachs had no firmwide conflict of interest policy in compliance with SR 08-08 was not credible.").

SR 08-08.  (See, e.g., id. ¶ 115 ("Consistent with the decision of the Legal and Compliance risk

team on March 21, 2012, Carmen was finalizing her report and preparing language that would be

used to describe Goldman's noncompliance with SR 08-08 in the annual letter to Goldman and

the annual report of the bank examiners' activities."); id. ¶ 116 ("Defendants knew Goldman had

no firmwide conflict of interest policy in compliance with SR 08-08.  Defendants also knew

Carmen planned to identify Goldman's failure to comply with SR 08-08 in the annual

report . . . ."); id. ¶ 117 ("Defendants agreed they needed to prevent Carmen from issuing an

examination finding that Goldman had no conflict of interest program that complied with SR 08-

08."); id. ¶ 126 ("On May 15, 2012, Defendants Silva and Koh met with Carmen and attempted

to force her to change the findings of her examination of Goldman.  They said they did not

believe her finding that Goldman had no conflict of interest policy was 'credible.'  Defendants

Silva and Kim told Carmen that she had to 'come off of that position.'"); id. ¶ 129 ("Carmen told

Defendants Silva and Koh she did not believe it was responsible or proper to change her findings

to say Goldman had a firmwide conflict of interest policy when so much evidence existed

showing Goldman's non-compliance.").)  The lack of a causal connection—between Plaintiff's

alleged disclosure of these violations and her termination—is fatal to the FAC.

Plaintiff's proposed SAC does nothing to address this defect.  Indeed, Plaintiff's motion

seeking leave to amend acknowledges that "the proposed changes are merely cosmetic."  (Dkt.

no. 42 at 2 ¶ 7.)  The only proposed change is the addition of a new paragraph under Count

One—Plaintiff's § 1831j claim—that simply cross references earlier paragraphs of the FAC

describing alleged violations that Plaintiff "reported."  (Id. at 33-34 ¶ 150a.)

Plaintiff's motion to amend misses the point.  The shortcoming in the FAC is not some

technical defect resulting from Plaintiff's failure to use certain magic words or to clearly

incorporate allegations made elsewhere in the FAC.  The problem is deeper: Plaintiff has failed

to allege that she was terminated *because* she "reported" violations of anything other than SR 08-

08.  This shortcoming could not be cured by the addition of a bare generic phrase claiming that

she was fired for reporting other violations.  Even less could it be cured when any such

allegations would be inconsistent with the other allegations in the FAC.  Here, the paragraph that

follows the new language in the proposed SAC remains unchanged, and states that "Defendants

terminated Carmen for finding Goldman did not have a firmwide conflicts of interest practice[ ]

in compliance with SR 08-08 and for refusing to change her examination findings."  (Id. at 34

¶ 151.)  Also unchanged are the paragraphs that make clear that Plaintiff's "examination

findings" relate to alleged violations of SR 08-08.  (See, e.g., id. at 25 ¶¶ 115-17.)

 Plaintiff has had ample time to adjust her complaint to address Defendants' arguments.

After Plaintiff filed her initial Complaint and Defendants moved to dismiss, Plaintiff elected to

file the FAC.  (Dkt. nos. 18-19, 22-23.)  Defendants then filed the instant motion to dismiss,

making essentially identical arguments to their earlier motion.  (Compare dkt. no. 19 with dkt.

no. 34.)  Plaintiff's opposition to the motion focused on whether SR 08-08 was a regulation (Pl.'s

Opp. at 4-9), and nowhere did it mention any other "law or regulation" that could have formed

the basis for Plaintiff's § 1831j claim.  Now, after full briefing and oral argument on the motion,

and in violation of Rule 5C of this Court's Individual Rules & Practices in Civil Cases—which

requires plaintiffs to state whether they wish to rely on the attacked pleading or submit an

amended pleading within fourteen days after the filing of a motion to dismiss—Plaintiff has

asked for a second opportunity to amend her complaint.

 Recognizing that Rule 15(a)(2) provides that courts should "freely give leave" to amend

"when justice so requires," Fed. R. Civ. P. 15(a)(2), this Court has reviewed the SAC to

determine if it, unlike the FAC, "has alleged sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. at 678. In spite of the sufficient notice Plaintiff has been provided of the deficiencies in the FAC, and ample opportunity to seek to cure them—including in the proposed SAC[7]—Plaintiff has failed to do so. Because the proposed SAC would not withstand a renewed motion to dismiss, the Court concludes that granting leave to amend would be futile and denies Plaintiff's motion. See, e.g., Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002).[8]

**3.      Plaintiff's State Law Claims**

Plaintiff invoked the Court's jurisdiction by asserting that the FAC raised a federal question. (FAC ¶ 10.) Because the Court concludes that Plaintiff has failed to state a claim under 18 U.S.C. § 1831j—her only federal cause of action[9]—it concludes that this is the "the usual case in which all federal-law claims are eliminated before trial" such that it should "declin[e] to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); see also Kolari v. New York-Prebyterian Hosp., 455 F.3d 118, 119 (2d Cir. 2006). It therefore dismisses her state law claims without prejudice.

---

[7]      At oral argument Defendants again notified Plaintiff of the shortcoming in her argument, addressing the issue as follows: "Your Honor took the time to go through the words of section 1831j, and there's a very key word there, which is 'because.' The plaintiff has got to allege that she was fired because of a particular report, and the only allegation about that is contained in Paragraph 151, and that report has to do with . . . SR08-08." (4/4/14 Tr. 17:2-7). Plaintiff's proposed Second Amended Complaint—submitted over one week after oral argument—still does not address this shortcoming.

[8]      Defendants offer an alternative basis for granting their motion to dismiss the § 1831j claim. As relevant here, § 1831j only protects individuals who provide information about wrongdoing at a "depository institution" or federal agency. See 12 U.S.C. § 1831j(a)(2). Defendants assert that Goldman Sachs is not a "depository institution," but rather a "depository institution holding company"—a separately-defined term. See id. § 1813(c)(1) (defining "depository institution"); id. § 1813(w)(1) (defining "depository institution holding company"). The Court declines to reach this argument in light of its conclusion that Plaintiff has failed plausibly to allege that she was terminated because she provided information concerning the violation of a "law or regulation."

[9]      The basis for Count Six of the FAC—"conspiracy"—is less than clear. Presumably, Plaintiff seeks to allege a civil conspiracy, but to do so she would need to "plead specific wrongful acts which constitute an independent tort." John's Insulation, Inc. v. Siska Constr. Co., 774 F. Supp. 156, 161 (S.D.N.Y. 1991). The only claim based in federal law is the § 1831j whistleblower claim, which, for the reasons described above, fails to state a plausible claim.

Plaintiff may re-file these claims in state court.

**4.      Plaintiff's Request for "a More Complete Disclosure"**

One final matter bears mention.  The day before oral argument on Defendants' motion to dismiss, the Court held a telephone conference with the parties, at which a court reporter was present.  During the conference, the Court explained that it had just come to her attention that her husband, who is a partner in a large law firm, was representing Goldman Sachs in an advisory capacity.  (Transcript of April 3, 2014 Conference ("4/3/14 Tr.") 2:6-9.)  The Court then stated:

> "I wanted to let you know this.  And if either side—I don't need to know who—but has any desire to have me recuse myself, I am happy to entertain that request.  Again, I don't need to know who is making the request, but before the argument tomorrow, I wanted to let you know that. I'm perfectly willing to put off the argument for a few days to give you the time to think about it.  Or, Miss Stengel, if you want to talk to your client about it.  But I also didn't want to inconvenience you.  And so as soon as I found this out, I tried to . . . get you on the phone to advise you of this."

(Id. at 2:11-21.)  Plaintiff's counsel responded as follows: "We're not going to ask that you recuse yourself, Judge."  (Id. at 2:22-23.)  Defendants' counsel similarly indicated that they would not seek recusal.  (Id. at 2:24-25.)

The Court then asked if counsel wanted "to go forward with the argument, or are you sure[ ] you don't want any time to think about this."  (Id. at 3:1-3.)  Plaintiff's counsel responded: "I'm fine going forward tomorrow."  (Id. at 3:1-4.)   After addressing a question as to whether the conversation was on the record—which it was—the Court reiterated:

> Again, if this is an issue, at all, for you, this is your opportunity to raise it. And again, if you need time to think about it, I'm more than happy to put the argument off for a few days, a week.  You can think about it.  I don't need to know who made the request, I just need to know that someone made it.  But I'm really just leaving that to you.

(Id. at 3:15-16.)  At that point, Plaintiff's counsel again replied "[y]eah we're not going—I can tell you that we're not going to ask you to recuse yourself."  (Id. 3:21-22).  The following day,

the Court held oral argument on Defendants' motion to dismiss, at which it posed repeated questions to Plaintiff regarding the sufficiency of her allegations.  At no time prior to or during the argument on April 4, 2014, did Plaintiff's counsel withdraw her previous statements that she was not seeking recusal or additional time to consider whether to file such a motion.  Nor did she seek any additional information or "disclosures" from the Court.

One week after oral argument—on the same date Plaintiff submitted a letter seeking to "provide a more complete response to the questions asked" at oral argument and to "address[ ] [the Court's] concerns and requests" (dkt. no. 40 at 1, 3), Plaintiff submitted an application for "a more complete disclosure of both Judge Abrams's husband's relationship with Goldman Sachs and Judge Abrams's prior working relationship with defense attorney Thomas Noone,"[10] (dkt. no. 41 at 1.)  In particular, Plaintiff now seeks information regarding the "commencement date of Husband's present work for Goldman Sachs" and "historical relationship, if any between Husband and Goldman Sachs."  (Id. at 2.)[11]

Although Plaintiff has not filed a recusal motion, the letter before the Court implicates one of the well-established prerequisites of such a motion: that it be made "at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." Gil Enterprises, Inc. v. Delvy, 79 F.3d 241, 247 (2d Cir. 1996).  Requiring a prompt application "avoids the risk that a party is holding back a recusal application as a fall-back position in the event of adverse rulings on pending matters."  In re Int'l Bus. Machines Corp., 45 F.3d 641, 643 (2d Cir. 1995).  Because of the potential for "judge-shopping," the Second Circuit has explained,

---

[10]     As the Court explained at the April 3, 2014 telephone conference (and had previously disclosed at an earlier conference): "I used to work with Tom Noone when I was at the law firm of Davis Polk, we didn't work together closely, but I know him from there."  (Tr. 3:12-14.)

[11]     Plaintiff cites no authority for the proposition that discovery is permissible in the context of a recusal motion.  See Order, Morisseau v. DLA Piper, No. 06 Civ. 13255(LAK) (S.D.N.Y. Dec. 21, 2007), ECF No. 152 ("No basis has been shown for conducting discovery in support of the threatened [recusal] motion, assuming without deciding that discovery ever is permissible in connection with such a motion.").

parties' attempts to seek recusal must be "scrutinized with care." In re Aguinda, 241 F.3d 194, 201 (2d Cir. 2001). "Litigants are entitled to an unbiased judge; not to a judge of their own choosing." In re Drexel Burnham Lambert Inc., 861 F.2d 1307, 1312 (2d Cir. 1988).

Here, the timing of Plaintiff's requests suggests that she is engaging in precisely the type of "judge-shopping" the Second Circuit has cautioned against. Although the Court indicated that it would entertain any recusal request and offered to postpone oral argument, Plaintiff's counsel twice stated that she would not be asking the Court to recuse itself (id. 2:22, 3:21-22), and that she was "fine with going forward tomorrow" with the oral argument (id. 3:4). There was no qualification or hesitation.

"Permitting a party to obtain a do-over through recusal is unfair to the other parties and undermines public confidence in the judicial system." Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., No. 97 Civ. 5499(LAP), 2003 WL 282187, at *7 (S.D.N.Y. Feb. 7, 2003), aff'd without opinion, 124 Fed. App'x 73 (2d Cir. 2005). Although at the time of Plaintiff's request the Court had not yet issued a decision, Plaintiff's change of position emerged only after she "sample[d] the temper of the court" at oral argument and appears to have anticipated its ruling. In re Martin-Trigona, 573 F. Supp. 1237, 1245 (D. Conn. 1983). Such an attempt to engage in judicial game-playing strikes at the core of our legal system. The Court denies this request.

**CONCLUSION**

The Federal Reserve plays a central role in supervising the safety and soundness of our nation's banking institutions. Any claim that a Federal Reserve employee has been wrongfully terminated for concluding that a prominent financial institution had failed to adhere to appropriate standards deserves the closest scrutiny. In this case, however, even assuming

Plaintiff's factual allegations are true—as the Court must on a motion to dismiss—Plaintiff has failed to state a cause of action.  By enacting 12 U.S.C. § 1831j, Congress sought to protect employees of banking agencies from retaliation for providing certain types of information.  But the scope of this protection is not unlimited.  The law only protects those who adequately allege that they have suffered retaliation for providing information regarding a possible violation of a "law or regulation," as distinct from what the law treats as advisory guidance.  Plaintiff has not done so here.  Nor, according to the Supreme Court, does the First Amendment provide protection.  Although a government employee may be entitled to First Amendment protection when she speaks out "as a citizen on a matter of public concern," the Supreme Court has concluded that a government employee is not entitled to such protection "based on speech made pursuant to the employee's official duties." Garcetti v. Ceballos, 547 U.S. 410, 413, 418 (2006).

Accordingly, the Court grants Defendants' motion to dismiss the First Amended Complaint.  Count One fails to state a claim under 12 U.S.C. § 1831j, and the Court declines to exercise jurisdiction over the remaining state-law claims.  Plaintiff's motion seeking leave to file a Second Amended Complaint is denied, as are the other requests made in her April 11, 2014 letters.

The Clerk of Court is respectfully requested to terminate the motions pending at docket numbers 33 and 42 and to close the case.

SO ORDERED.

Dated:      April 23, 2014
            New York, New York

_____
Ronnie Abrams
United States District Judge

23